Exhibit 1

1.1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| TRUE RELIGION APPAREL, INC. and GURU DENIM, INC., | ) ) ) | Case No. 12-cv-9894 |
| Plaintiffs, | ) ) | **Judge Sharon Johnson Coleman** |
| v. | ) ) | **Magistrate Judge Sidney I. Schenkier** |
| DOES 1-100 d/b/a the aliases identified on Schedule "A", | ) ) ) | |
| Defendants. | ) ) ) | |

---

## FINAL JUDGMENT ORDER

This action having been commenced by Plaintiffs True Religion Apparel, Inc. and Guru Denim, Inc. (together, "True Religion") against the Defendants identified in Schedule A to the Complaint and using the Defendant Domain Names;

This Court having entered upon a showing by True Religion, a temporary restraining order and preliminary injunction against Defendants which included a domain name transfer order and asset restraining order;

True Religion having properly completed service of process on Defendants; the combination of providing notice via electronic publication and email, along with any notice that Defendants received from domain name registrars and payment processors, being notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and affording them the opportunity to present their objections; and

None of the Defendants having answered the Complaint or appeared in any way, and the time

for answering the Complaint having expired;

THIS COURT HEREBY FINDS that Defendants are liable for federal trademark infringement and counterfeiting (15 U.S.C. § 1114), false designation of origin (15 U.S.C. § 1125(a)), cyberpiracy (15 U.S.C. § 1125(d)) and violation of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS § 510, et seq.).

IT IS HEREBY ORDERED that Plaintiffs' Motion for Entry of Default and Default Judgment is GRANTED in its entirety, that Defendants are deemed in default and that this Final Judgment is entered against Defendants.

IT IS FURTHER ORDERED that:

1. Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be permanently enjoined and restrained from:

   a. using True Religion's TRUE RELIGION Trademarks or any reproduction, counterfeit copy or colorable imitation thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine True Religion product or not authorized by True Religion to be sold in connection with True Religion's TRUE RELIGION Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any product as a genuine TRUE RELIGION product or any other product produced by True Religion, that is not True Religion's or not produced under the authorization, control or supervision of True Religion and approved by True Religion for sale under True Religion's TRUE RELIGION Trademarks;

    c.   committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of True Religion, or are sponsored or approved by, or connected with True Religion;

    d.   further infringing True Religion's TRUE RELIGION Trademarks and damaging True Religion's goodwill;

    e.   otherwise competing unfairly with True Religion in any manner;

    f.   shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for True Religion, nor authorized by True Religion to be sold or offered for sale, and which bear True Religion's TRUE RELIGION Trademarks or any reproduction, counterfeit copy or colorable imitation thereof;

    g.   using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit TRUE RELIGION products; and

    h.   operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product that is not a genuine TRUE RELIGION product or not authorized by True Religion to be sold in connection with True Religion's TRUE RELIGION Trademarks.

2.    The Defendant Domain Names are permanently transferred to True Religion's control.  The domain name registries for the Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within five (5) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of

True Religion's selection, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to True Religion's account at a registrar of True Religion's selection.

3.      Those in privity with Defendants and with notice of the injunction, including any Internet search engines, web hosts, domain-name registrars and domain name registries that are provided with notice of the injunction, shall cease facilitating access to any and all websites through which Defendants engage in the sale of counterfeit and infringing goods using the TRUE RELIGION Trademarks.

4.      Pursuant to 15 U.S.C. § 1117(c)(2), True Religion is awarded statutory damages from each of the Defendants in the amount of two million dollars ($2,000,000) for willful use of a counterfeit TRUE RELIGION Trademark on products sold through at least the Defendant Domain Names for a total award in the amount of two hundred million dollars ($200,000,000);

5.      Any banks, savings and loan associations, payment processors, PayPal or other financial institutions, for any Defendant or any of Defendants' websites shall within two (2) business days of receipt of this Order:

     a.  Locate all accounts connected to Defendants, Defendants' Marketplace Accounts or Defendants' websites, including, but not limited to, any PayPal accounts connected to the email addresses listed in Schedule C hereto;

     b.  Restrain and enjoin such accounts from transferring or disposing of any money or other of Defendants' assets; and

6.      All monies currently restrained in Defendants' financial accounts, including monies held by PayPal, Inc. ("PayPal"), are hereby released to True Religion as partial payment of the above-identified damages, and PayPal is ordered to release to True Religion the amounts from Defendants' PayPal accounts within ten (10) business days of receipt of this Order.

7.     Until True Religion has recovered full payment of monies owed to it by any Defendant, True Religion shall have the ongoing authority to serve this Order on any banks, savings and loan associations, or other financial institutions including, without limitation, PayPal, (collectively, the "Financial Service Providers") in the event that any new financial accounts controlled or operated by Defendants are identified.  Upon receipt of this Order, the Financial Service Providers shall immediately:

     a.  Locate all accounts connected to Defendants, Defendants' Marketplace Accounts or Defendants' websites, including, but not limited to, any PayPal accounts; and

     b.  Restrain and enjoin such accounts from transferring or disposing of any money or other of Defendants' assets, and any funds in such accounts shall be transferred to True Religion within ten (10) business days of receipt of this Order.

8.     In the event that True Religion identifies any additional domain names or financial accounts owned by Defendants, True Religion may send notice of any supplemental proceeding to Defendants by email at the email addresses identified in Schedule A to the Complaint.

9.     The ten thousand dollar ($10,000) bond including any interest minus the registry fee is hereby released to True Religion.

This is a Final Judgment.

DATED: February 6, 2013

Sharon Johnson Coleman

U.S. District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| OAKLEY, INC. | ) | |
| | ) | Case No. 12-cv-9864 |
| Plaintiff, | ) | |
| | ) | **Judge Robert M. Dow, Jr.** |
| v. | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| DOES 1-100 d/b/a the aliases identified on | ) | |
| Schedule "A", | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FINAL JUDGMENT ORDER

This action having been commenced by Plaintiff Oakley, Inc. ("Oakley") against the Defendants identified in Schedule A to the Complaint and using the Defendant Domain Names and Online Marketplace Accounts;

This Court having entered upon a showing by Oakley, a temporary restraining order and preliminary injunction against Defendants which included a domain name transfer order and asset restraining order;

Oakley having properly completed service of process on Defendants; the combination of providing notice via electronic publication and email, along with any notice that Defendants received from domain name registrars and payment processors, being notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and affording them the opportunity to present their objections; and

None of the Defendants having answered the Complaint or appeared in any way, and the time for answering the Complaint having expired;

1

THIS COURT HEREBY FINDS that Defendants are liable for federal trademark infringement and counterfeiting (15 U.S.C. § 1114), false designation of origin (15 U.S.C. § 1125(a)), cyberpiracy (15 U.S.C. § 1125(d)) and violation of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS § 510, et seq.).

IT IS HEREBY ORDERED that Plaintiff's Motion for Entry of Default and Default Judgment is GRANTED in its entirety, that Defendants are deemed in default and that this Final Judgment is entered against Defendants.

IT IS FURTHER ORDERED that:

1. Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be permanently enjoined and restrained from:

   a. using Oakley's OAKLEY Trademarks or any reproduction, counterfeit copy or colorable imitation thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Oakley product or not authorized by Oakley to be sold in connection with Oakley's OAKLEY Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any product as a genuine OAKLEY product or any other product produced by Oakley, that is not Oakley's or not produced under the authorization, control or supervision of Oakley and approved by Oakley for sale under Oakley's OAKLEY Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Oakley, or are sponsored or approved by, or connected with Oakley;

d.  further infringing Oakley's OAKLEY Trademarks and damaging Oakley's goodwill;

e.  otherwise competing unfairly with Oakley in any manner;

f.  shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Oakley, nor authorized by Oakley to be sold or offered for sale, and which bear Oakley's OAKLEY Trademarks or any reproduction, counterfeit copy or colorable imitation thereof;

g.  using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit OAKLEY products; and

h.  operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product that is not a genuine OAKLEY product or not authorized by Oakley to be sold in connection with Oakley's OAKLEY Trademarks.

2.  The Defendant Domain Names are permanently transferred to Oakley's control. The domain name registries for the Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within five (5) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Oakley's selection, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to Oakley's account at a registrar of Oakley's selection.

3.  Those in privity with Defendants and with notice of the injunction, including any Internet search engines, web hosts, domain-name registrars and domain name registries that are provided with notice of the injunction, shall cease facilitating access to any and all websites through which Defendants engage in the sale of counterfeit and infringing goods using the OAKLEY Trademarks.

4.  Pursuant to 15 U.S.C. § 1117(c)(2), Oakley is awarded statutory damages from each of the Defendants in the amount of two million dollars ($2,000,000) for willful use of a counterfeit OAKLEY Trademark on products sold through at least the Defendant Domain Names for a total award in the amount of two hundred million dollars ($200,000,000);

5.  Any banks, savings and loan associations, payment processors, PayPal or other financial institutions, for any Defendant or any of Defendants' websites shall within two (2) business days of receipt of this Order:

    a.  Locate all accounts connected to Defendants, Defendants' Marketplace Accounts or Defendants' websites, including, but not limited to, any PayPal accounts connected to the email addresses listed in Schedule B hereto;

    b.  Restrain and enjoin such accounts from transferring or disposing of any money or other of Defendants' assets; and

6.  All monies currently restrained in Defendants' financial accounts, including monies held by PayPal, Inc. ("PayPal"), are hereby released to Oakley as partial payment of the above-identified damages, and PayPal is ordered to release to Oakley the amounts from Defendants' PayPal accounts within ten (10) business days of receipt of this Order.

7.  Until Oakley has recovered full payment of monies owed to it by any Defendant, Oakley shall have the ongoing authority to serve this Order on any banks, savings and loan

associations, or other financial institutions including, without limitation, PayPal, (collectively, the "Financial Service Providers") in the event that any new financial accounts controlled or operated by Defendants are identified. Upon receipt of this Order, the Financial Service Providers shall immediately:

a. Locate all accounts connected to Defendants, Defendants' Marketplace Accounts or Defendants' websites, including, but not limited to, any PayPal accounts connected to the email addresses listed in Schedule B hereto; and

b. Restrain and enjoin such accounts from transferring or disposing of any money or other of Defendants' assets, and any funds in such accounts shall be transferred to Oakley within ten (10) business days of receipt of this Order.

8. In the event that Oakley identifies any additional domain names or financial accounts owned by Defendants, Oakley may send notice of any supplemental proceeding to Defendants by email at the email addresses identified in Schedule A to the Complaint.

9. The ten thousand dollar ($10,000) bond including any interest minus the registry fee is hereby released to Oakley.

This is a Final Judgment.

DATED: January 30, 2013

_____
U.S. District Court Judge Robert M. Dow

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| TORY BURCH LLC; <br> RIVER LIGHT V, L.P., <br><br>          Plaintiffs, <br><br> v. <br><br> DOES 1-100 d/b/a the aliases identified on <br> Schedule "A", <br><br>          Defendants. | Case No. 1:12-cv-07163 <br><br> **Judge John Z. Lee** <br><br> **Magistrate Judge Michael T. Mason** |

## ORDER

This action having been commenced by Plaintiffs Tory Burch LLC and River Light V, L.P., (together, "Plaintiffs" or "Tory Burch") against the Defendants identified in the Complaint on Schedule "A" attached hereto, and using the Defendant Domain Names and Online Marketplace Accounts (collectively, the "Defendant Internet Stores");

This Court having entered upon a showing by Plaintiffs, a temporary restraining order and preliminary injunction against Defendants which included a domain name transfer order and asset restraining order; and

Plaintiffs having properly completed service of process on Defendants; the combination of providing notice via publication and email, along with any notice that Defendants received from domain name registrars and payment processors, being notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and affording them the opportunity to present their objections; none of the Defendants having answered the Complaint or appeared in any way, and the time for answering the Complaint having expired;

1

THIS COURT HEREBY FINDS that Defendants are liable for federal trademark infringement and counterfeiting (15 U.S.C. § 1114), false designation of origin (15 U.S.C. § 1125(a)), cyberpiracy (15 U.S.C. § 1125(d)) and violation of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS § 510, et seq.).

IT IS HEREBY ORDERED that Plaintiffs' Motion for Entry of Default and Default Judgment is GRANTED in its entirety, that Defendants are deemed in default and that this Final Judgment is entered against Defendants.

IT IS FURTHER ORDERED that:

1.  Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be permanently enjoined and restrained from:

    a.  using the TORY BURCH Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Tory Burch branded product or not authorized by Tory Burch to be sold in connection with the TORY BURCH Trademarks;

    b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine TORY BURCH branded product or any other product produced by Tory Burch, that are not Tory Burch's or not produced under the authorization, control or supervision of Tory Burch and approved by Tory Burch for sale under the TORY BURCH Trademarks;

    c. committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Tory Burch, or sponsored or approved by, or otherwise connected with Tory Burch;

    d. further infringing the TORY BURCH Trademarks and damaging Tory Burch's goodwill;

    e. otherwise competing unfairly with Tory Burch in any manner;

    f. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Tory Burch, nor authorized by Tory Burch to be sold or offered for sale, and which bear any of the TORY BURCH Trademarks or any reproductions, counterfeit copies or colorable imitations thereof;

    g. using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit Tory Burch products; and

    h. operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product bearing the TORY BURCH Trademarks or any reproductions, counterfeit copies or colorable imitations thereof that is not a genuine Tory Burch branded product or not authorized by Tory Burch to be sold in connection with the TORY BURCH Trademarks.

2. The Defendant Domain Names are permanently transferred to the ownership and control of Plaintiffs; the domain name registries for the Defendant Domain Names, namely, VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within five

(5) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Tory Burch's selection until further ordered by this Court, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to a registrar of Tory Burch's selection.

3.  Those in privity with Defendants and those with notice of the injunction, including any online marketplace such as iOffer, Internet search engines, web hosts, domain name registrars and domain name registries that are provided with notice of the injunction, shall immediately cease facilitating access to any and all websites and accounts through which Defendants engage in the sale of counterfeit and infringing goods using the TORY BURCH Trademarks.

4.  Pursuant to 15 U.S.C. § 1117(c)(2), Plaintiffs are awarded statutory damages from each of the Defendants in the amount of two million dollars ($2,000,000) for willful use of at least one counterfeit TORY BURCH Trademark on products sold through at least the Defendant Internet Stores for a total award in the amount of two hundred million dollars ($200,000,000);

5.  All monies currently restrained in Defendants' financial accounts, including monies held by PayPal, Inc. ("PayPal"), are hereby released to Plaintiffs as partial payment of the above-identified damages, and PayPal is ordered to release to Plaintiffs the amounts from Defendants' PayPal accounts within ten (10) business days of receipt of this Order.

6.  Until Plaintiffs have recovered full payment of monies owed to them by any Defendant, Plaintiffs shall have the ongoing authority to serve this Order on any banks, savings and loan associations, or other financial institutions including, without limitation, PayPal, (collectively, the "Financial Service Providers") in the event that any new financial

accounts controlled or operated by Defendants are identified. Upon receipt of this Order, the Financial Service Providers shall immediately locate and restrain any newly discovered accounts connected to Defendants or Defendants' websites, and any funds in such accounts shall be transferred to Plaintiffs within ten (10) business days of receipt of this Order.

7.      In the event that Plaintiffs identify any additional domain names owned by Defendants and linking to websites selling counterfeit TORY BURCH products, Plaintiffs may send notice of any contempt proceeding to Defendants by email at the email addresses identified in Schedule A to the Complaint.

8.      The ten thousand dollar ($10,000) bond including any interest minus the registry fee is hereby released to Plaintiffs.

This is a Final Judgment.

DATED: November 2, 2012

_____
U.S. District Court Judge John Z. Lee

*gmb*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| COACH, INC. and COACH SERVICES, INC., : | |
| : | |
| Plaintiffs, : | **Case No. 1:12-cv-1514** |
| : | |
| v. : | **Judge Robert M. Dow, Jr.** |
| : | |
| DOES 1 through 573 d/b/a the aliases identified : | **Magistrate Jeffrey T. Gilbert** |
| on Schedule "A", : | |
| : | |
| Defendants. : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## ORDER AND JUDGMENT

This action having been commenced by Plaintiffs Coach, Inc. and Coach Services, Inc. (collectively, "Coach") against Defendants identified in the Complaint and Schedule "A" attached herewith, and using at least the domain names identified in Schedule A attached herewith (the "Defendant Domain Names");

Coach having properly completed service of process on Defendants and none of the Defendants having answer the Complaint or appeared in any way, and the time for answering or otherwise responding to the Complaint having expired, it is hereby **ORDERED AND ADJUDGED:**

Defendants are liable for federal trademark infringement and counterfeiting (15 U.S.C. § 1114), false designations of origin (15 U.S.C. § 1125(a)), cybersquatting (15 U.S.C. § 1125(d)), and violation of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510).

**IT IS FURTHER ORDERED AND ADJUDGED** that:

1.     Coach's Motion for Entry of Default and Entry of Default Judgment is GRANTED in its entirety and that Defendants are deemed in default and this Final Judgment is entered against Defendants.

2.     A Permanent Injunction is entered against Defendants pursuant to Fed. R. Civ. P. 65, forever enjoining these Defendants, their agents, servants, and employees, and upon those persons in active concert or participation with them:

    a.     From manufacturing, procuring, distributing, shipping, retailing, selling, advertising, or trafficking in any merchandise, including apparel, sunglasses, bags, jewelry and/or related merchandise, not authorized by Coach, bearing unauthorized simulations, reproductions, counterfeits, copies or colorable imitations of Coach's Trademarks, or bearing a design or image which is of a substantially similar appearance to Coach's Trademarks. Specifically, those Trademarks as listed below:

| Registration No. | Mark | Classes | Date of Registration | Image |
|---|---|---|---|---|
| 2,088,706 | COACH | 6, 9, 16, 18, 20 and 25 for *inter alia* key fobs, eyeglass cases, satchels, tags for luggage, luggage, backpacks, picture frames, hats, gloves and caps. | September 19, 1997 | COACH |
| 3,157,972 | COACH | 35 for retail store services. | October 17, 2006 | COACH |
| 0,751,493 | COACH | 16, 18 for *inter alia* leather goods, wallets and billfolds. | June 23, 1963 | COACH |
| 2,451,168 | COACH | 9 for *inter alia* eyeglasses and sunglass Cases | May 15, 2001 | COACH |

| Registration No. | Mark | Classes | Date of Registration | Image |
|---|---|---|---|---|
| 2,537,004 | COACH | 24 for *inter alia* home furnishings. | February 5, 2002 | COACH |
| 1,846,801 | COACH | 25 for *inter alia* men's and women's coats and jackets. | July 26, 1994 | COACH |
| 3,439,871 | COACH | 18 for *inter alia* umbrellas. | June 3, 2008 | COACH |
| 2,061,826 | COACH | 12 for *inter alia* seat covers. | May 13, 1997 | COACH |
| 2,231,001 | COACH | 25 for *inter alia* men and women's clothing. | March 9, 1999 | COACH |
| 2,836,172 | COACH | 14 for *inter alia* sporting goods and stuffed toys. | April 27, 2004 | COACH |
| 2,939,127 | COACH | 9 for *inter alia* camera cases. | April 12, 2005 | COACH |
| 3,354,448 | COACH | 14 for *inter alia* jewelry. | December 11, 2007 | COACH |
| 2,579,358 | COACH | 20 for *inter alia* pillows, mirrors and glassware. | June 6, 2002 | COACH |
| 2,074,972 | COACH | 3, 21 for *inter alia* leather cleaning products and shoe brushes. | July 1, 1997 | COACH |
| 2,446,607 | COACH | 16 for *inter alia* writing instruments. | April 24, 2001 | COACH |
| 2,291,341 | COACH | 14 for *inter alia* clocks and watches. | November 9, 1999 | COACH |
| 1,071,000 | COACH | 18, 25 for *inter alia* women's handbags. | August 9, 1977 | COACH |
| 3,633,302 | COACH | 3 for *inter alia* perfumes, lotions and body sprays. | June 2, 2009 | COACH |
| 2,534,429 | COACH & LOZENGE DESIGN | 9 for *inter alia* eyeglasses, eyeglass frames and sunglasses. | January 29, 2002 | COACH |

| Registration No. | Mark | Classes | Date of Registration | Image |
|---|---|---|---|---|
| 3,363,873 | COACH & LOZENGE DESIGN | 3 for *inter alia* fragrances. | January 1, 2008 | COACH |
| 2,252,847 | COACH & LOZENGE DESIGN | 35 retail services. | June 15, 1999 | COACH |
| 2,291,368 | COACH & LOZENGE DESIGN | 14 for *inter alia* jewelry. | November 9, 1999 | COACH |
| 2,666,744 | COACH & LOZENGE DESIGN | 24 for *inter alia* bed linens. | December 24, 2002 | COACH |
| 2,534,429 | COACH & LOZENGE DESIGN | 9 for *inter alia* eyeglasses, eyeglass frames and sunglasses. | January 29, 2002 | COACH |
| 2,169,808 | COACH & LOZENGE DESIGN | 25 for *inter alia* clothing for men and women. | June 30, 1998 | COACH |
| 2,045,676 | COACH & LOZENGE DESIGN | 6, 9, 16, 18, 20, 25 for *inter alia* key fobs, money clips, phone cases, attaché cases, duffel bags, picture frames, hats, caps and gloves. | March 18, 1997 | COACH |
| 1,070,999 | COACH & LOZENGE DESIGN | 18, 25 for *inter alia* women's handbags. | August 9, 1977 | COACH |
| 1,309,779 | COACH & LOZENGE DESIGN | 9, 16, 18 for *inter alia* eyeglass cases and leather goods such as wallets, handbags and shoulder bags. | December 19, 1984 | COACH |
| 2,035,056 | COACH & LOZENGE DESIGN | 3, 21 for *inter alia* leather cleaning products and shoe brushes. | February 4, 1997 | COACH |

4

| Registration No. | Mark | Classes | Date of Registration | Image |
|---|---|---|---|---|
| 2,983,654 | COACH & LOZENGE DESIGN | 18, 24, 25 for *inter alia* handbags, leather goods, fabrics, swimwear, hats and shoes. | August 9, 2005 | |
| 2,626,565 | CC & DESIGN (Signature C) | 18 for *inter alia* handbags, purses, clutches, shoulder bags, tote bags, and wallets. | September 24, 2002 | |
| 2,822,318 | CC & DESIGN (Signature C) | 24 for *inter alia* fabric for use in the manufacture of clothing, shoes, handbags, and luggage. | March 16, 2004 | |
| 2,832,589 | CC & DESIGN (Signature C) | 14, 16, 18, 20, 24, 25, 4, 6, 9 for *inter alia* sunglasses and eye glass cases, leather goods, | April 13, 2004 | |
| 2,832,740 | CC & DESIGN (Signature C) | 28 for *inter alia* stuffed animals. | April 13, 2004 | |
| 2,592,963 | CC & DESIGN (Signature C) | 25 for *inter alia* clothing. | July 9, 2002 | |
| 2,822,629 | CC & DESIGN (Signature C) | 35 for retail services for *inter alia* handbags, small leather goods, jewelry and watches. | March 16, 2004 | |
| 3,012,585 | AMENDED CC & DESIGN (Signature C) | 18, 24, 25 for *inter alia* handbags, purses, fabrics and clothing. | November 8, 2005 | |
| 3,396,554 | AMENDED CC & DESIGN (Signature C) | 3 for *inter alia* fragrances. | March 11, 2008 | |

5

| Registration No. | Mark | Classes | Date of Registration | Image |
|---|---|---|---|---|
| 3,696,470 | COACH OP ART & Design | 18, 24 and 25 for *inter alia* bags, umbrellas, shoes and the manufacture of these goods. | October 13, 2009 | |
| 3,251,315 | COACH EST. 1941 | 18, 25 for *inter alia* handbags, small leather goods, jackets and coats. | June 12, 2007 | |
| 3,413,536 | COACH EST. 1941 STYLIZED | 14, 18, 25 for *inter alia* handbags, purses, shoulder bags, tote bags, and wallets. | April 15, 2008 | |
| 3,441,671 | COACH LEATHERWARE EST. 1941 [Heritage Logo] | 9, 14, 18, 25 for *inter alia* handbags, leather cases, purses, and wallets. | June 3, 2008 | |
| 3,072,459 | CL STYLIZED | 18 for *inter alia* leather goods. | March 28, 2006 | |
| 3,187,894 | CL STYLIZED | 18, 25 for *inter alia* leather goods and clothing. | December 12, 2006 | |
| 1,664,527 | THE COACH FACTORY STORE & LOZENGE DESIGN | 42 for *inter alia* retail services for leather ware. | November 12, 1991 | |
| 3,338,048 | COACH STYLIZED | 18 for *inter alia* luggage, backpacks and shoulder bags | November 11, 2007 | |
| 3,149,330 | C & LOZENGE LOGO | 9, 14, 16, 25 for *inter alia* desk accessories, clothing and eye glasses. | September 26, 2006 | |
| 2,162,303 | COACH & TAG DESIGN | 25 for *inter alia* clothing. | June 2, 1998 | |

| Registration No. | Mark | Classes | Date of Registration | Image |
|---|---|---|---|---|
| 2,088,707 | COACH & TAG DESIGN | 18 for *inter alia* accessory cases, backpacks and satchels. | August 19, 1997 | |

b.    From passing off, inducing or enabling others to sell or pass off, as authentic products produced by Coach or otherwise authorized by Coach, any product not manufactured by Coach or produced under the control or supervision of Coach and approved by Coach, which utilize any of Coach's Trademarks listed in the above chart;

c.    From committing any act calculated to cause purchasers to believe that products sold by Defendants, their agents, servants, and employees, and upon those persons in active concert or participation with them are sold under the control and supervision of Coach, or are sponsored, approved or guaranteed by Coach, or are connected with and produced under the control or supervision of Coach;

d.    From further diluting and infringing Coach's Trademarks and damaging its goodwill;

e.    From engaging in any other activity constituting unfair competition with Coach or that will cause the distinctiveness of Coach's Trademarks to be diluted; and

f.    From using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit Coach products;

g.    From operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution,

advertising, offering for sale, or sale of any product that is not a genuine Coach product or not authorized by Coach to be sold in connection with Coach's Trademarks; and

      f.      From causing, aiding, and/or abetting any other person from doing any act proscribed under a through g above;

3.      The domain name registries for the Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc., and the Public Interest Registry, within ten (10) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Coach's selection, and that the domain name registrars take any and all steps necessary to transfer the Defendant Domain Names to a registrar of Coach's selection;

4.      Those in privity with Defendants and with notice of the injunction, including any Internet search engines, web hosts, domain name registrars and domain name registries that are provided with notice of the injunction, cease facilitating access to any and all websites through which Defendants engage in the sale of counterfeit and infringing goods using Coach's Trademarks;

5.      Pursuant to 15 U.S.C.§ 1117(c)(2), Coach is awarded statutory damages from each of the Defendants in the amount of two million dollars ($2,000,000) for use a counterfeit Coach Trademark on products sold through at least the Defendant Domain Names for a total amount of two hundred million dollars ($200,000,000);

6.      Pursuant to 15 U.S.C. § 1117(d), Coach is awarded statutory damages for each of the 573 Defendant Domain Names that incorporate Coach's Trademarks in the amount of one hundred thousand dollars ($100,000) for a total amount of fifty-seven million three hundred thousand dollars ($57,300,000);

7.      All monies currently held in Defendants' financial accounts, including monies held by PayPal, Inc. ("PayPal") and The Western Union Company ("Western Union"), shall be released

to Coach as partial payment of the above-identified damages and PayPal and Western Union are ordered to release to Coach the amounts from Defendants' accounts within ten (10) business days of receipt of this Order; and,

8. In the event that Coach identifies any additional domain names owned by Defendants and linking to websites selling counterfeit Coach products, Coach may send notice of any contempt proceeding to Defendants by email at the email addresses identified in Schedule A.

It is further **ORDERED AND ADJUDGED:**

That the Court finds that there is no just reason for delay, and therefore, pursuant to Fed. R. Civ. P. 54(b), the Court expressly directs the entry of judgment on all rulings made by the Court shall operate as a final judgment as to Defendants.

IT IS SO ORDERED

Chicago, Illinois, this _15 th_ day of _October_ , 2012.

_____

U. S. District Judge Robert M. Dow Jr.

SIGNED on this _____ day of _____, 2012.

_____

U.S. CLERK OF COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| DECKERS OUTDOOR CORPORATION, | ) | |
| | ) | |
| | ) | Case No. 12-cv-1973 |
| Plaintiff, | ) | |
| | ) | **Honorable Sharon Johnson Coleman** |
| v. | ) | |
| | ) | |
| DOES 1-1,281 d/b/a the aliases identified on | ) | |
| Schedule "A", | | |
| | | |
| Defendants. | | |

## ORDER

This action having been commenced by Plaintiff Deckers Outdoor Corporation ("Deckers") against Defendants identified in the Complaint and Schedule A attached hereto and using at least the domain names identified in Schedule A and Scheudle A1 attached hereto (the "Defendant Domain Names");

This Court having entered upon a showing by Deckers, a temporary restraining order and preliminary injunction against Defendants which included a domain name transfer order and asset restraining order, and

Deckers having properly completed service of process on Defendants and none of the Defendants having answered the Complaint or appeared in any way, and the time for answering the Complaint having expired;

HEREBY FINDS that Defendants are liable for federal trademark infringement and counterfeiting (15 U.S.C. § 1114), false designation of origin (15 U.S.C. 1125(d)), cyberpiracy (15 U.S.C. 1125(d)) and violation of the Illinois Uniform Trade Practices Act (815 ILCS § 510).

1

IT IS HEREBY ORDERED that Plaintiff's Motion for Entry of Default and Motion for Entry of a Default Judgment is GRANTED in its entirety and that Defendants are deemed in default and this Final Judgment is entered against Defendants.

IT IS FURTHER ORDERED that:

1.  Defendants, their officers, agents, servants, employees, attorneys, confederates, and all person acting for, with, by, through, under or in active concert with them be permanently enjoined and restrained from:

    a.  using Deckers' UGG Trademark or any reproductions, counterfeit copy or colorable imitation thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Deckers' UGG branded product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademark;

    b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine UGG branded product or any other product produced by Deckers, that are not Deckers' or not produced under the authorization, control or supervision of Deckers and approved by Deckers for sale under Deckers' UGG Trademark;

    c.  committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Deckers, or sponsored or approved by, or connected with Deckers;

    d.  further infringing Deckers' UGG Trademark and damaging Deckers' goodwill;

    e.  otherwise competing unfairly with Deckers in any manner;

    f.   shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Deckers, nor authorized by Deckers to be sold or offered for sale, and which bear any Deckers' UGG Trademark or any reproductions, counterfeit copy or colorable imitation thereof;

    g.   using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit UGG products; and

    h.   operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Deckers' UGG branded product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademark.

2.    The domain name registries for the New Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within five (5) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Deckers' selection, and that the domain name registrars take any steps necessary to transfer the Defendant Domain Names to a registrar of Deckers' selection.

3.    Those in privity with Defendants and with notice of the injunction, including any Internet search engines, web hosts, domain-name registrars and domain name registries that are provided with notice of the injunction, cease facilitating access to any and all websites

through which Defendants engage in the sale of counterfeit and infringing goods using the UGG Trademark.

4.     Pursuant to 15 U.S.C. § 1117(c)(2), Deckers is awarded statutory damages from each of the Defendants in the amount of two million dollars ($2,000,000) for use of a counterfeit UGG trademark on products sold through at least the Defendant Domain Names for a total award in the amount of two hundred million dollars ($200,000,000);

5.     Pursuant to 15 U.S.C. § 1117(d), Deckers is awarded statutory damages for each the 1,320 Defendant Domain Names that incorporate the UGG Trademark in the amount of one hundred thousand dollars ($100,000) for a total award of in the amount of one hundred thirty-one million and four hundred thousand dollars ($131,400,000);

6.     All monies currently restrained in Defendants' financial accounts, including monies held by PayPal, Inc. ("PayPal"), is hereby released to Deckers as partial payment of the above-identified damages and PayPal is ordered to release to Deckers the amounts from Defendants' PayPal accounts within ten (10) business days of receipt of this Order.

7.     Until Deckers has recovered full payment of monies owed to them by any Defendant, Deckers shall have the ongoing authority to serve this Order on any banks, savings and loan associations, or other financial institutions, including without limitation PayPal, (collectively the "Financial Service Provider") in the event that any new financial accounts controlled or operated by Defendants are identified. Upon receipt of this Order, the Financial Service Provider shall immediately locate and restrain any newly discovered accounts connected to Defendants or Defendants' websites, and any funds in

such accounts shall be transferred to Deckers within ten (10) business days of receipt of this Order.

8.  In the event that Deckers identifies any additional domain names owned by Defendants and linking to websites selling counterfeit UGG products, Deckers may send notice of any contempt proceeding to Defendants by email at the email addresses identified in Schedule A.

9.  The ten thousand dollar ($10,000) bond including any interest minus the registry fee is hereby released to Deckers.

This is a Final Judgment.

June 29, 2012

Sharon Johnson Coleman
District Judge



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| DECKERS OUTDOOR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 11-cv-7970 |
| | ) | |
| v. | ) | **Honorable Ronald A. Guzman** |
| | ) | |
| LIYANGHUA et al., | ) | **Magistrate Martin C. Ashman** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## ORDER

This action having been commenced by Plaintiff Deckers Outdoor Corporation ("Deckers") against Defendants identified in the First Amended Complaint and Schedule "A" attached hereto and using at least the domain names identified in Schedule A attached hereto (the "Defendant Domain Names");

This Court having entered upon a showing by Deckers, a temporary restraining order and preliminary injunction against Defendants which included a domain name transfer order and asset restraining order, and

Deckers having properly completed service of process on Defendants and none of the Defendants having answered the Amended Complaint or appeared in any way, and the time for answering the Amended Complaint having expired;

HEREBY FINDS that Defendants are liable for federal trademark infringement and counterfeiting (15 U.S.C. § 1114), false designation of origin (15 U.S.C. 1125(d)), cyberpiracy (15 U.S.C. 1125(d)) and violation of the Illinois Uniform Trade Practices Act (815 ILCS § 510).

1

IT IS HEREBY ORDERED that Plaintiff's Motion for Entry of Default and Motion for Entry of a Default Judgment is GRANTED in its entirety and that Defendants are deemed in default and this Final Judgment is entered against Defendants.

IT IS FURTHER ORDERED that:

1. Defendants, their officers, agents, servants, employees, attorneys, confederates, and all person acting for, with, by, through, under or in active concert with them be permanently enjoined and restrained from:

    a. using Deckers' UGG Trademark or any reproductions, counterfeit copy or colorable imitation thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Deckers' UGG branded product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademark;

    b. passing off, inducing, or enabling others to sell or pass off any product as a genuine UGG branded product or any other product produced by Deckers, that are not Deckers' or not produced under the authorization, control or supervision of Deckers and approved by Deckers for sale under Deckers' UGG Trademark;

    c. committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Deckers, or sponsored or approved by, or connected with Deckers;

    d. further infringing Deckers' UGG Trademark and damaging Deckers' goodwill;

    e. otherwise competing unfairly with Deckers in any manner;

    f. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or

2

inventory not manufactured by or for Deckers, nor authorized by Deckers to be sold or offered for sale, and which bear any Deckers' UGG Trademark or any reproductions, counterfeit copy or colorable imitation thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit UGG products; and

h. operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Deckers' UGG branded product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademark.

2. The domain name registries for the Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within ten (10) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to MarkMonitor or a registrar of Deckers' selection, and that the domain name registrars take any steps necessary to transfer the Defendant Domain Names to MarkMonitor or a registrar of Deckers' selection.

3. Those in privity with Defendants and with notice of the injunction, including any Internet search engines, web hosts, domain-name registrars and domain name registries that are provided with notice of the injunction, cease facilitating access to any and all websites through which Defendants engage in the sale of counterfeit and infringing goods using the UGG Trademark.

4.      Pursuant to 15 U.S.C. § 1117(c)(2), Deckers is awarded statutory damages from each of the Defendants in the amount of two million dollars ($2,000,000) for use of a counterfeit UGG trademark on products sold through at least the Defendant Domain Names for a total award in the amount of two hundred and two million dollars ($202,000,000);

5.      Pursuant to 15 U.S.C. § 1117(d), Deckers is awarded statutory damages for each the 1,612 Defendant Domain Names that incorporate the UGG Trademark in the amount of one hundred thousand dollars ($100,000) for a total award of in the amount of one hundred sixty-one million and two hundred thousand dollars ($161,200,000);

6.      All monies currently restrained in Defendants' financial accounts, including monies held by PayPal, Inc. ("PayPal"), is hereby released to Deckers as partial payment of the above-identified damages and PayPal is ordered to release to Deckers the amounts from Defendants' PayPal accounts within ten (10) business days of receipt of this Order.

7.      In the event that Deckers identifies any additional domain names owned by Defendants and linking to websites selling counterfeit UGG products, Deckers may send notice of any contempt proceeding to Defendants by email at the email addresses identified in Schedule A.

8.      The one hundred and fifty thousand dollar ($150,000) bond including any interest minus the registry fee is hereby released to Deckers.

This is a Final Judgment.

DATED: ~~March~~ *APRIL* 11, 2012

U.S. District Court Judge Ronald A. Guzman

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DECKERS OUTDOOR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11 C 10 |
| | ) | |
| DOES 1-55 d/b/a the aliases identified on Schedule A and DOES 56-500, | ) | Judge John W. Darrah |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Deckers Outdoor Corporation's ("Deckers") Motion for Entry

of Default and Entry of Default Judgment pursuant to Fed. R. Civ. P. 55(b)(2) against

Defendants, Does 1-55 d/b/a the aliases identified on Schedule A to Deckers' Amended

Complaint (collectively, "the Defendants") based on Deckers' action for trademark

infringement and counterfeiting.

Deckers is known as a source of high quality footwear products, including the

UGG® (the "UGG Trademark") brand of premium sheepskin footwear.

Deckers filed this action on January 3, 2011, alleging federal trademark

infringement and counterfeiting (Count I), false designation of origin (Count II),

cyberpiracy (Count III) and violation of the Illinois Uniform Trade Practices Act

(Count IV), and seeks statutory damages and injunctive relief. (Dkt. No. 5.) On the same

day, Deckers filed an *ex parte* application for entry of a temporary restraining order and

preliminary injunction. (Dkt. No. 49.) The Court granted Deckers' motion for a

temporary restraining order on February 3, 2011 (*see* Dkt. No. 26), and converted the

temporary restraining order to a preliminary injunction on March 8, 2011 (*see* Dkt. No. 37).

On May 24, 2011, the Court denied Deckers' Motion for Entry of Default Judgment on the basis that Deckers had not established that the Court has personal jurisdiction over Does 1-55, consistent with the requirements recently set forth by the Seventh Circuit in *be2 LLC v. Ivanov*, 642 F.3d 555 (7th Cir. 2011). (*See* Dkt. No. 50.)

Deckers filed an Amended Complaint on August 17, 2011. (Dkt. No. 56.) Deckers included newly discovered domain names linked to websites operated by Defendants and added new allegations relating to Defendants' illegal activities that were directed toward Illinois. (*See id.*) The Amended Complaint was served electronically on all Defendants on August 17, 2011. (*Id.*) None of the Defendants has entered an appearance or otherwise defended this action since being notified of this Action in February 2011. The time for responding to the Amended Complaint expired on August 31, 2011, pursuant to Fed. R. Civ. P. 15(a)(3).

In its Motion for Default Judgment pursuant to Rule 55(b)(2), Deckers seeks the entry of an Order, finding that each of the Defendants are liable on all counts of Deckers' Amended Complaint. Deckers further seeks an award of statutory damages pursuant to 15 U.S.C. § 1117(c)(2) for willful trademark counterfeiting against each of the 49 Defendants[1] in the amount of up to $2,000,000 per Defendant for use of a counterfeit UGG Trademark on products sold through each of the 271 Defendant Domain Names. Deckers also seeks an award of statutory damages pursuant to 15 U.S.C. §1117(d) of up

---

[1] Each unique registrant e-mail address is counted as a separate Defendant. The Defendant Domain Names identified are registered using 49 unique email addresses.

to $100,000 for each of the 140 Defendant Domain Names that incorporate Deckers'

UGG Trademark. Deckers further seeks entry of a permanent injunction, prohibiting

Defendants from selling products containing counterfeit UGG Trademarks, an order that

domain names used by Defendants to sell products containing counterfeit UGG

trademarks be permanently transferred to Deckers, and that all assets in Defendants'

financial accounts operated by PayPal, Inc. ("PayPal") be transferred to Deckers,

including the approximately $130,617 identified by Deckers.

## ANALYSIS

### *Entry of Default and Default Judgment*

Deckers has met its burden of making a *prima facie* case for personal jurisdiction

over Defendants. *See uBID, Inc. v. GoDaddy Group Inc.*, 623 F.3d 421, 423 (7th Cir.

2010); *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 599 (7th Cir. 2007).

Because Defendants have chosen not to appear or produce any evidence regarding their

illegal activities in Illinois, the allegations in the Amended Complaint, which must be

accepted as true, establish a *prima facie* case for personal jurisdiction against each

Defendant. (*See* Am. Compl. ¶¶ 2, 4, 8, 9 and 11-17.) *See Purdue Research Found. v.*

*Sanofi-Sythelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) ("When determining whether a

plaintiff has met his burden, jurisdictional allegations pleaded in the complaint are

accepted as true unless proved otherwise by defendants' affidavits or exhibits.").

Deckers has pled that each of the Defendants has targeted and solicited sales from

Illinois residents by operating English language websites that offer shipping to Illinois,

has accepted payment in U.S. dollars, and has sold counterfeit UGG products to residents

of Illinois. *See The Gen. Council of the Assemblies of God v. The Ranger Supply Store,*

*Inc. et al.*, No. 10 C 07050 (N.D. Ill. June 29, 2011) (entering default judgment against

defendants who sold counterfeit products to Illinois residents through an Internet website)

(*General Council*).

Pursuant to Rule 55(a) of the Federal Rules of Civil Procedure, "when a party

against whom a judgment for affirmative relief is sought has failed to plead or otherwise

defend, and that failure is shown by affidavit or otherwise, the clerk must enter the

party's default." Fed. R. Civ. P 55(a). "Although Rule 55(a) . . . refers to entry of default

by the clerk, it is well-established that a default also may be entered by the court."

*Breuer Elec. Mfg. Co. v. Toronado Sys. of Am., Inc.*, 687 F.2d 182, 185 (7th Cir. 1982).

When motion is made to the court for entry of a default, the decision to enter default lies

within the district court's discretion. *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d

1394, 1398 (7th Cir. 1993).

The Defendants were properly served on August 17, 2011. (*See* Dkt. No. 60,

Gaudio Decl. at ¶ 15, Ex. 14). Despite having been served with process, the Defendants

have ignored these proceedings and failed to plead or otherwise defend this action.

(*Id.* at ¶ 16). Therefore, Deckers has met the requirements for entry of default against the

Defendants pursuant to Rule 55(a).

Rule 55(b)(2) of the Federal Rules of Civil Procedure provides for a court-ordered

default judgment. A default judgment establishes, as a matter of law, that Defendants are

liable to Plaintiff on each cause of action alleged in the complaint.

*United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989). When the Court

determines that a defendant is in default, the factual allegations of the Complaint – except

those relating to damages – are taken as true and may not be challenged and the

4

defendants are liable as a matter of law as to each cause of action alleged in the complaint. Fed. R. Civ. P. 8(b)(6); *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994).

Deckers has therefore shown the following:

1.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391. Deckers' investigation has shown that Defendants have set up fully interactive commercial Internet websites, operating under the 271 domain names, which are identified in Schedule A attached to Deckers' Amended Complaint and Schedule B attached to Deckers' Memorandum in Support of its Motion for Default Judgment, Docket Number 64 (collectively, the "Defendant Domain Names"). (Am. Compl. ¶ 2.) Through these Domain Names, Defendants have targeted and solicited sales from Illinois residents by operating English language websites that offer shipping to Illinois, have accepted payment in U.S. dollars and, on Deckers' information and belief, have sold counterfeit UGG products to residents of Illinois. (*Id.*) Each of the Defendants is committing tortuous acts in Illinois, is engaging in interstate commerce and has wrongfully caused Deckers substantial injury in the State of Illinois. (*Id.*)

3.    Deckers is famous throughout the United States and elsewhere as a source of high quality footwear products, including the UGG® brand of premium sheepskin footwear. (*Id.* ¶ 4.) Deckers' UGG products are distributed and sold to consumers through retailers throughout the United States, including through over 100 authorized retailers in Illinois, the uggaustralia.com website, and UGG

Concept Stores, including a Concept Store located at 909 North Rush Street in Chicago, Illinois. (*Id.*)

4. Since acquiring the UGG Trademark and the goodwill of the business in 1995, Deckers has continuously sold footwear and clothing under the UGG Trademark. (*Id.* ¶ 5.) Deckers has built substantial goodwill in the UGG Trademark and the UGG Trademark, is famous and a valuable asset of Deckers. (*Id.*)

5. Deckers holds registrations for the UGG Trademark (and stylized variations) in more than 100 countries around the world, including U.S. Trademark Registration No. 3,050,925. (*Id.* ¶ 6.) The UGG Trademark has been used continuously since as early as 1979 by Deckers and its predecessors in interest. (*Id.*) The registration is valid and subsisting. (*Id.*)

6. The UGG Trademark is distinctive when applied to high quality apparel, footwear and related merchandise, signifying to the purchaser that the products come from Deckers and are manufactured to the highest quality standards. (*Id.* ¶ 7.) Whether Deckers manufactures the products itself or licenses others to do it, Deckers has insured that products bearing its trademarks are manufactured to the highest quality standards. (*Id.*) Deckers' products branded under the UGG Trademark have been widely accepted by the public and are enormously popular, as demonstrated by hundreds of millions of dollars in sales each year. (*Id.*) The UGG Trademark is a famous mark. (*Id.*)

7. Defendants are unknown individuals and business entities who, upon the information and belief of Deckers, reside in the People's Republic of China or other foreign jurisdictions with lax trademark enforcement legal systems.

(*Id.* ¶ 8.) Defendants conduct business throughout the United States, including within the State of Illinois and this Judicial District, through the operation of the fully interactive commercial websites operating under the Defendant Domain Names. (*Id.*)

8.  Defendants are directly and personally contributing to, inducing, and engaging in the sale of counterfeit products bearing UGG Trademarks. (*Id.* ¶ 9.) The counterfeit products for sale on the Defendant Domain Names bear similar irregularities and indicia of being counterfeit to one another, indicating that the counterfeit products were manufactured by and come from a common source and that Defendants are interrelated. (*Id.*) In addition, the websites linked to Defendant Domain Names include multiple similarities, such as the same page layout, text, and copyright protected images copied from Deckers' uggaustralia.com website. (*Id.*)

9.  Defendants are liable on all counts of Deckers' Amended Complaint, specifically for trademark infringement (*see* Dkt. No. 56 at ¶¶ 18-24); false designation of origin (*id.* at ¶¶ 25-29); cybersquatting (*id.* at ¶¶ 30-35); and violation of the Illinois Deceptive Trades Practices Act (*id.* ¶¶ 36-29).

### Statutory Damages

As set forth above, Defendants are liable for violations of the Lanham Act. Consequently, Deckers first moves for statutory damages pursuant 15 U.S.C. § 1117(c)(2), for willful trademark counterfeiting against each of the 49 Defendants in the amount of up to $2,000,000 per Defendant for use of a counterfeit UGG Trademark, pursuant to 15 U.S.C. § 1117(d).

7

The Lanham Act allows a plaintiff to elect, at any time before final judgment is rendered, one of two alternative recovery options for trademark infringement: (1) the actual damages caused by the infringement, 15 U.S.C. § 1117(a); or (2) statutory damages, 15 U.S.C. § 1117(c). Courts commonly find statutory damages appropriate in default judgment cases because the information needed to prove actual damages is within the infringers' control and is not disclosed. *See Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874 (S.D. Ohio 2007); *Chanel, Inc. v. French*, No. 05-61838, 2006 WL 3826780, *2 (S.D. Fla. Dec. 27, 2006); *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1220 (S.D. Fla. 2004); *Tiffany Inc. v. Luban*, 282 F. Supp. 2d 123, 123 (S.D.N.Y. 2003); *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494 (C.D. Cal. 2003); *Sara Lee Corp. v. Bags of New York*, 36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999).

Section 1117(c)(1) allows statutory damages of "not less than $1,000 and no more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(1). "If the court finds that the use of the counterfeit mark was willful," Section 1117(c)(2) allows a statutory damages award of up to $2,000,000 per counterfeit mark. 15 U.S.C. § 1117(c)(2).

"Willful infringement may be attributed to the defendant's actions where he had knowledge that his conduct constituted infringement or where he showed a reckless disregard for the owner's rights." *Lorillard Tobacco Co. v. S&M Cent. Service Corp.*, No. 03 C 4986, 2004 WL 2534378, *7 (N.D. Ill. Nov. 8, 2004) (*Lorillard Tobacco Co.*). As such, knowledge need not be proven directly but can be inferred from a defendant's conduct. *Id.* Willful infringement may be shown by the fact that the "defendant ignored

8

the plaintiff's notices[,] did not seek advice of an attorney, and passed the matter off as a nuisance." *Id.*

Deckers has sufficiently demonstrated that Defendants' use of the UGG Trademark was willful. (*See* Am. Compl. ¶¶ 9, 12.) Under circumstance similar to those presented here, in *General Council*, the district court deemed defendants' use of plaintiff's trademark willful where the defendants were in default. (*See* 6/29/11 Order, Dkt. No. 47, *General Council*, No. 10-cv-7050.) *See also Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003).

While § 1117(c) sets out a dollar range for possible statutory damage awards, the statute does not provide guidance on how to select a damage figure within that range. Courts assessing statutory damages under § 1117(c) have looked to case law applying the statutory damage provision of the Copyright Act, 17 U.S.C. § 504(c), for guidance. *See Lorillard Tobacco Co.*, 2004 WL 2534378 at *4. Addressing 17 U.S.C. § 504(c) in *Chi Boy Music v. Charlie Club.*, 930 F.2d 1229 (7th Cir. 1991) (*Chi-Boy Music*), the Seventh Circuit held that a court awarding statutory damages is "not required to follow any rigid formula but instead enjoys wide discretion."

An award of statutory damages serves dual interests in that it is remedial in nature but also intended to protect an important public interest. *Sands, Taylor & Wood v. The Quaker Oats Co.*, 34 F.3d 1340, 1348 (7th Cir. 1994). As such, the remedy imposed under statute must provide sufficient deterrent effect to ensure that the guilty party will not engage in further infringing conduct. *Id.* Statutory damages are appropriate to "penalize the infringer and deter future violations" when the infringement is willful. *Lorillard Tobacco Co.*, 2004 WL 2534378 at *4 (quoting *Chi Boy Music*, 930 at 1230).

9

Deckers requests an award up to the maximum statutory damages award authorized by 15 U.S.C. § 1117(c)(2) for willful trademark counterfeiting against each of the 49 Defendants in the amount of $2,000,000 per Defendant, which totals $98,000,000. Elsewhere in its Motion, Deckers notes that this case is "virtually identical to the facts" in *General Council* (Mem. at 11), which involved a non-Illinois trademark owner suing non-Illinois based Defendants for selling counterfeit products to Illinois residents over an Internet website.

In *General Council*, the district court entered an order for default judgment on the plaintiff's claims, among them trademark infringement and copyright infringement. In its motion for default judgment, plaintiff requested $2,000,000 per counterfeit mark. Holding that defendants' use of the trademark was willful, the court awarded $750,000 per infringing use of counterfeit marks. Based on the similarities between the cases, such a statutory award is reasonable and will be applied here. Plaintiff is awarded $750,000 against each of the 49 Defendants for use of a counterfeit UGG Trademark, for a total of $36,750,000.

Second, Deckers moves for statutory damages pursuant to 15 U.S.C. § 1117(d) on the grounds that Defendants violated Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d). 15 U.S.C. § 1117(d) provides that:

> In a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.

Deckers requests statutory damages of up to $100,000 for each of the 140 Defendant Domain Names that incorporate Deckers' UGG Trademark.

10

An award of $50,000 per domain name, for each of the 140 Defendant Domain Names that incorporate Deckers' UGG Trademark, for a total of $7,000,000, is reasonable and consistent with *General Council*, which, as discussed above, involved similar circumstances. (*See* 6/29/11 Order, Dkt. No. 47, *General Council*, No. 10-cv-7050 (awarding $50,000 per domain name under 15 U.S.C. § 1117(d) where plaintiff requested $100,000 per domain name).)

## CONCLUSION

It is hereby ordered that Deckers' Motion for Entry of Default and Motion for Entry of a Default Judgment is granted in its entirety and that Defendants, d/b/a the aliases identified on Schedule A to Deckers' Amended Complaint are deemed in default; and this Final Judgment is entered against Defendants.

It is further ordered:

1.      Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily and permanently enjoined and restrained from:

   a.      using Deckers' UGG Trademark or any reproductions, counterfeit copy or colorable imitation thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Deckers' UGG branded product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademark;

11

b.      passing off, inducing, or enabling others to sell or pass off any product as a genuine UGG branded product or any other product produced by Deckers, that are not Deckers' or not produced under the authorization, control or supervision of Deckers and approved by Deckers for sale under Deckers' UGG Trademark;

c.      committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Deckers, or sponsored or approved by, or connected with Deckers;

d.      further infringing Deckers' UGG Trademark and damaging Deckers' goodwill;

e.      otherwise competing unfairly with Deckers in any manner;

f.      shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Deckers, nor authorized by Deckers to be sold or offered for sale, and which bear any Deckers' UGG Trademark or any reproductions, counterfeit copy or colorable imitation thereof;

g.      using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit UGG products; and

12

h.    operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Deckers' UGG branded product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademark.

2.    The registrars and registries for the Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc. and the Public Interest Registry are required to:

a.    prevent the Defendant Domain Names from linking to corresponding counterfeit websites; and

b.    at Deckers' election, transfer to Deckers' control or cancel the Defendant Domain Names and any other domain names owned by Defendants, including any domain names registered using the registrant email addresses listed below, that have been identified as being used to engage in their counterfeiting of the UGG Trademark.

3.    Those in privity with Defendants and those with notice of the injunction, including any Internet search engines, web hosts, domain-name registrars and domain name registries that are provided with notice of the injunction, cease facilitating access to any and all websites through which Defendants engage in the sale of counterfeit and infringing goods using the UGG Trademark;

13

4.  That pursuant to 15 U.S.C. § 1117(c)(2), Deckers is awarded statutory damages from each of the 49 Defendants in the amount of seven-hundred-fifty-thousand dollars ($750,000) for use of a counterfeit UGG Trademark on products sold through at least the Defendant Domain Names, for a total award in the amount of thirty-six million seven-hundred-fifty thousand dollars ( $36,750,000).

5.  That pursuant to 15 U.S.C. § 1117(d), Deckers is awarded statutory damages for each the 140 Defendant Domain Names that incorporate the UGG Trademark in the amount of fifty thousand dollars ($50,000), for a total award in the amount of seven million dollars ($7,000,000).

6.  That pursuant to 15 U.S.C. § 1117(a), Deckers is awarded reasonable attorney's fees.

7.  That all monies currently restrained in Defendants' financial accounts, including monies held by PayPal, are hereby released to Deckers as partial payment of the above-identified damages; and PayPal is ordered to release to Deckers said amounts from Defendants' PayPal accounts within ten (10) business days of receipt of this Order.

Date: __10·14-11__

_____
JOHN W. DARRAH
United States District Court Judge



Neutral

As of: July 10, 2013 6:58 PM EDT

# All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc.

United States District Court for the Central District of Illinois, Urbana Division

April 18, **2013**, Decided; April 18, **2013**, Filed

Case No. 11-CV-2160

**Reporter:** 2013 U.S. Dist. LEXIS 55218; 2013 WL 1701871

ALL STAR CHAMPIONSHIP RACING, INC., Plaintiff, v. O'REILLY AUTOMOTIVE STORES, INC., d/b/a O'RELLY AUTO PARTS, Defendant.

**Prior History:** *All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc., 2012 U.S. Dist. LEXIS* 34951 (C.D. Ill., Mar. 15, 2012)

---
**Core Terms**
---

trademark, counterfeit, star, sponsorship, license, terminate, summary judgment, advertize, franchise, website, manufacture, trademark infringement, defamatory, consumer, auto parts, counterclaims, licensee, franchisee, sponsor, impute, season, implied license, endorsement, infringer, contest, potato, champion, artifact, holdover, licensor

**Counsel:** **[*1]** For All Star Championship Racing Inc, Plaintiff, Counter Defendant: John Bramfeld, JOHN F BRAMFELD LAW OFFICE, Champaign, IL.

For O'Reilly Automotive Stores Inc, doing business as O'Reilly Auto Parts, Defendant: Stephen R Kaufmann, LEAD ATTORNEY, HEPLER BROOM LLC, Springfield, IL; Troy A Bozarth, LEAD ATTORNEY, Michael Patrick Murphy, HEPLER BROOM LLC, Edwardsville, IL.

For O'Reilly Automotive Stores Inc, Counter Claimant: Stephen R Kaufmann, LEAD ATTORNEY, HEPLER BROOM LLC, Springfield, IL; Troy A Bozarth, LEAD ATTORNEY, Michael Patrick Murphy, HEPLER BROOM LLC, Edwardsville, IL.

**Judges:** MICHAEL P. McCUSKEY, U. S. DISTRICT JUDGE.

**Opinion by:** MICHAEL P. McCUSKEY

---
**Opinion**
---

This case is before the court on Defendant O'Reilly Automotive Stores's ("Defendant") Motion for Summary

Judgment (#57) on its Amended Counterclaims (#26). The underlying case is a contract dispute. While Plaintiff All Star Championship Racing's ("Plaintiff") claims are still being litigated and are proceeding independently, Defendant has filed five counterclaims. The present opinion adjudicates the Motion for Summary Judgment on those counterclaims. The court has reviewed the briefs, exhibits, and prior filings in the docket. Following this careful **[*2]** review, Defendant's Motion for Summary Judgment (#57) is GRANTED IN PART and DENIED IN PART as to Counts 1, 2, 3, and 4; and DENIED as to Count 5.

**Jurisdiction**

With respect to Counts 1 and 2 of Defendant's Counterclaims, this court has jurisdiction pursuant to *15 U.S.C. § 1121* and *28 U.S.C. § 1338* as those claims arise under the Lanham Act, *15 U.S.C. § 1051-1141n*. Regarding Counts 3, 4, and 5 of the Counterclaims, this court has supplemental jurisdiction pursuant to *28 U.S.C. § 1367* as those claims form part of the same case or controversy as the Lanham Act claims. In addition, because Plaintiff is a corporation incorporated under the laws of Illinois, with a principal place of business in Illinois, and Defendant is a corporation incorporated under the laws of Missouri, with a principal place of business in Missouri, and Defendant has alleged an excess of $75,000 in controversy in its notice of removal (but Plaintiff's original claim was $66,000), this Court has diversity jurisdiction.

**Background**

**Factual background**

Magistrate Judge David G. Bernthal previously described the underlying factual background in his Report and Recommendation (#58). Those facts will not be repeated here in detail, **[*3]** but instead only those relevant to the counterclaims. Plaintiff organizes automobile races and sells advertisement rights associated with those races. There are three series relevant here: the All Star Circuit of Champions; the Midwest All Star Series; and the All Star Late Model series. Defendant is a publicly-traded corporation that sells automobile parts with nearly 4,000 retail stores and over six billion dol-

2013 U.S. Dist. LEXIS 55218, *3

lars in sales in 2012. [1] Defendant registered four trademarks (the ″Marks″). These are (a) U.S. Trademark Registration Number 3,526,775, for a trademark consisting of the word ″O'Reilly″ in stylized font with a shamrock positioned inside the ″O″ (″O'Reilly Mark″); (b) U.S. Trademark Registration Number 1,896,667, for a service mark consisting of the words ″O'Reilly Auto Parts″ with the word ″O'Reilly″ in stylized font with a shamrock positioned inside the ″O″ (″O'Reilly Auto Parts Mark″); (c) U.S. Trademark Registration Number 3,629,620, for a service mark consisting of the words ″O'Reilly Racing″ for ″promoting the ticket sales relating to the motor sports racing events of others″ (″O'Reilly Racing Mark″); and (d) U.S. Trademark Registration Number 3,422,750, for a service [*4] mark consisting of the words ″O'Reilly Auto Parts Professional Parts People″ for ″retail and on-line retail stores featuring automobile parts and accessories″ (″O'Reilly Auto Parts Professional Parts People Mark.″).

The parties do not contest that in 2006, Defendant purchased advertising rights from Plaintiff's predecessor-in-interest for the 2007, 2008, and 2009 racing seasons for the All Star Circuit of Champions (the ″2007, 2008, and 2009 Agreement″), acquiring, among other things, the right to display Defendant's Marks on its marketing, advertising, and other affiliated materials. (Amended Counterclaim, #26 ¶ 15; Answer to Amended Counterclaim, #66 ¶ 15; Motion for Summary Judgment, #57 exh. E). The parties also do not contest that in 2007, they entered into a similar agreement for the 2008, 2009, and 2010 racing seasons for the Midwest All Star series. (#26 ¶ 16; #66 ¶ 16; #57 exh. F). At some point in 2010, a dispute arose between the parties regarding the formation and validity of a contract that would have renewed the advertising rights for the 2010, 2011, and 2012 [*5] seasons for the All Star Circuit of Champions (the ″2010, 2011, and 2012 Agreement″).

Both parties have a different presentment and interpretation of events and correspondence occurring from late 2009 through the middle of 2011. In late 2009, Defendant sent Plaintiff a copy of what it alleges was a draft of the 2010, 2011, and 2012 Agreement. (#57, exh. G). The copy had several minor redlined corrections on it. Plaintiff signed it, dated it 1-4-010 [sic] (it appears that 1-4-09 was written, then corrected to be 1-4-10), and returned it to Defendant. Defendant avers that it never countersigned that contract, and indeed, the copies provided by both parties are not countersigned. There are other contested issues.

For example, Defendant alleges, but Plaintiff denies, the existence of an oral extension of the license to use the Marks to last through the 2010 season. (#26 ¶ 31; #66 ¶ 31). Plaintiff does admit the following facts: First, on or about November 2, 2010, Defendant's representative

contacted Plaintiff and stated that Defendant had made a business decision to discontinue its relationship with Plaintiff and had decided to pursue relationships with other sponsorship partners. (#26 [*6] ¶ 39; #66 ¶ 39). Second, by the end of 2010, a written agreement had expired (although Plaintiff does not indicate what agreement) (Defendant's Requests for Admissions, #57 exh. X ¶ 10 and Plaintiff's Response to Defendant's Request for Admission, #27 ¶ 10; but compare the inconsistency in Plaintiff's answer in #26 ¶ 41 and #66 ¶ 41). Third, that it did not have specific permission or consent from Defendant to continue using Defendant's Marks after December 31, 2010. (#26 ¶¶ 47, 51 and #66 ¶ 47, 51). Fourth, between January 2011, and late June, 2011, that Defendant's Marks appeared on Plaintiff's website in numerous places. (#26 ¶¶ 45-46 and # 47 ¶¶ 45-46). Fifth, Plaintiff alleges, but Defendant denies, that Defendant supplied to Plaintiff promotional items to give away at the 2011 races, and that Defendant approved all promotional and advertising actions taken by Plaintiff during the 2010 racing season up until November 2011. (Amended Complaint, #56 ¶ 15; Answer to Amended Complaint, #70 ¶ 15). Finally, Plaintiff admits that it received a letter from Defendants dated July 1, 2011 indicating that it was Defendant's position that there is ″no agreement currently in place″ between Plaintiff [*7] and Defendant. (#66 exh. A). That letter further demanded that Plaintiff cease and desist any and all further usage of the Marks. Around July 16, 2011, Plaintiff admits that it published the following press release on its website:

> *All Star Championship Racing, Inc. ends relationship with O'Reilly Auto Parts* Camargo, IL (7-16-11) - All Star Championship Racing, Inc. has removed O'Reilly Auto Parts as the title sponsor for the All Star Circuit of Champions, All Star Late Model Series, and the Midwest All Star Series resulting from an unpaid invoice in January 2011, we are now moving forward with collection proceedings. Please note that all O'Reilly trademarked material have been removed from all logos, printed material, and social media from this date forward. We have enjoyed several years in working with O'Reilly Auto Parts in sponsoring our company, it is regretful the relationship has ended.

(#57 exh. X ¶ 45; #27 ¶ 45). Plaintiff admits that, despite posting that release, it had continued to use Defendant's Marks on signs at races it managed, on its website, and in photographs on its website showing race winners standing next to a sign with Defendant's Marks through August 22, 2011. [*8] (#57 exh. X ¶¶ 52-57, 59-61 and #27 ¶¶ 52-57, 59-61). Plaintiff also later admitted that it

---

[1]   O'Reilly Corporate Annual Report, 2012, http://corporate.oreillyauto.com/corporate/GetUpload?id=orly_pdf_98.pdf.

Jessica Bloodgood

2013 U.S. Dist. LEXIS 55218, *8

was using the Marks on its website was September 30, 2011. (#57 exh. X, ¶ 87; #27, ¶ 87). In an Opinion issued on September 30, 2011, this court noted that:

> On July 16, 2011, All Star posted a news update on its website which stated that the relationship with O'Reilly had ended and that it had removed all Marks from its website and promotional materials. However, All Star's website continued to have O'Reilly's Marks on its website and on promotional materials at races, which were captured in pictures posted on its website.
>
> [ * * * ]
>
> Moreover, this court notes that in spite of All Star's continued statements that it has removed all references to O'Reilly, as of September 29, 2011, All Star's website, amazingly, still contains references to O'Reilly.

(#22 p.3 n.1). Plaintiff asserts that its failure to remove the Marks from its website was "simply an oversight". (#66 ¶ 46).

**Procedural posture**

On May 23, 2011, Plaintiff filed a complaint against Defendant in the Circuit Court of Douglas County in Illinois state court, alleging breach of contract. (#1 exh. A). On June 24, 2011, Defendant removed that case [*9] to this court. (#1). On July 1, 2011, Defendant filed a Motion to Dismiss (#6) and a series of counterclaims (#8). On August 24, 2011, Defendant filed a Motion for Preliminary Injunction (#12), which this court granted on September 30, 2011 (#22). On October 18, 2011, Defendant filed an Amended Counterclaim (#26). On November 1, 2011, Judge Bernthal entered his Report and Recommendations, recommending that the case be dismissed because Plaintiff alleged the breach of a contract that could not be performed within the span of one year and was not countersigned by Defendant, thereby making it unenforceable under the Illinois Statute of Frauds. (#28). The Report and Recommendation was adopted (#34), and the complaint was dismissed with prejudice (#34).

On February 1, 2012, Plaintiff filed a Motion to Amend/Correct its complaint (#35), which was granted on March 15, 2012 (#42). An appeal (#43) was filed, which was denied (#47), permitting Plaintiff to file its Amended Complaint, which alleged one claim of fraud and one claim of recovery under a theory of quasi-contract (#48). Defendant filed a Motion to Dismiss the Amended Complaint (#49), which was granted on October 4, 2012, as to the [*10] allegation of fraud, but denied as to the allegation of recovery under quasi-contract, permitting the latter claim to proceed (#58). On

January 14, **_2013_**, this court accepted the order (#69).

Earlier, on October 1, 2012, Defendant filed its Motion for Summary Judgment. (#57). On November 14, 2012, Plaintiff filed its Response (#67), and Defendant filed its Reply on November 28, 2012 (#68). That Motion (#57) is the matter currently before the court.

**Analysis**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." _Fed. R. Civ. P. 56(a)_; _see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)_. In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. _Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994)_. In making this determination, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. _See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202_ [*11] _(1986)_; _Singer v. Raemisch, 593 F.3d 529, 533 (7th Cir. 2010)_. Defendant has asserted five counterclaims: 1) trademark infringement; 2) false designation of origin; 3) violation of the Illinois Uniform Deceptive Trade Practices Act; 4) Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; and 5) defamation.

As a preliminary matter, Plaintiff's Response (#67) to Defendant's Motion for Summary Judgment is wholly inadequate. Local Rule 7.1(D)(2)(b) requires a Response to state in separate subsections the undisputed material facts, disputed material facts, disputed immaterial facts, undisputed immaterial facts, and additional material facts. Each subsection must list by number each undisputed material fact from the motion for summary judgment and whether it is considered to be material and disputed. Even read liberally, Plaintiff's Response did not comply with Local Rule 7.1(D)(2)(b). Instead, the Response has a section called "Discussion of O'Reilly's Statement of Undisputed Facts" and fails to list each of Defendant's facts by number and respond to each numbered fact. Further, the "Discussion" section appears to engage in argument when it cites to Webster's Dictionary [*12] in support of the proposition that the word "use" has a different legal meaning than what Defendant proposes it to mean. Finally, Plaintiff failed to comply with Local Rule 7.1(D)(2)(b)(5), which requires that any additional material facts must be numbered and supported by evidentiary documentation referenced by specific page. Local Rule 7.1(D)(2)(b)(6) requires that "[a] failure to respond to any numbered fact will be deemed an admission of the fact." Because Plaintiff has not complied with the local rules, this court is permitted to accept as true all of Defendant's facts for the purpose of the

2013 U.S. Dist. LEXIS 55218, *12

motion at bar. However, a party's failure to submit a proper response "does not lead directly and without more to the entry of summary judgment, but merely establishes the factual basis from which the [summary judgment] analysis will proceed." *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 392 (7th Cir. 1995). It remains "movant's burden to demonstrate that no genuine issue of material fact exists and that he is entitled to summary judgment as a matter of law." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994). Where the evidence presented clearly contradicts the facts stated by Defendant, [*13] this court has drawn any and all inferences in favor of Plaintiff.

## Count 1: Trademark Infringement

Defendant alleges that Plaintiff engaged in trademark infringement when it used Defendant's Marks without its consent, in violation of the Lanham Act, *15 U.S.C. § 1114*. That statute reads, in pertinent part, as follows:

> Any person who shall, without the consent of the registrant—
>
> > (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
> >
> > (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
>
> shall be liable in a civil action by the registrant [*14] for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

In order to prevail on a trademark infringement

claim, a plaintiff must establish that (1) its mark is protectable; (2) the defendant's use of the mark is likely to cause confusion among consumers; and (3) the defendant's use of the mark is not authorized. *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008); *see also McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998) ("[I]n order to prevail on a trademark infringement claim, a plaintiff must show that its mark was used in commerce by the defendant without the registrant's consent and that the unauthorized use was likely to deceive, cause confusion, or result in mistake.")

### Validity of the mark

Regarding the first element, Plaintiff does not contest that the Marks are valid, nor does it contest that Defendant owns the Marks. (#26 ¶¶ 7-10; #57 ¶¶ 6-9; #66 ¶¶ 7-10; #67 p.1 ("Generally speaking, [Plaintiff] has no quarrel with [Defendant's] [*15] trademarks and its right to them.")). Thus, for the purpose of this opinion only, and without making any substantive finding thereof, the Marks are both protectable and are protected.

### Likelihood of causing confusion

Regarding the second element, the likelihood of causing confusion, this Circuit normally applies a seven-factor test: "the degree of similarity between the marks in appearance and suggestion; the similarity of the products for which the name is used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of the complainant's mark; actual confusion; and an intent on the part of the alleged infringer to palm off his products as those of another." *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1167-68 (7th Cir. 1986).

In addition, a special presumption exists for licensees. "The likelihood of confusion exists as a matter of law if a licensee continues to use marks owned by the licensor after termination of the license." *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 922 (C.D. Ill. 2000). The rationale is that "a strong risk of consumer confusion arises when a terminated franchisee continues [*16] to use the former franchisor's trademarks." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983). *See also Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989) ("Once a franchise has been terminated, the franchisee cannot be allowed to keep on using the trademark."); *The Shell Co. (Puerto Rico) Ltd. v. Los Frailes Serv. Station, Inc.*, 605 F.3d 10, 22 (1st Cir. 2010) (holding that a gas station who had previously sold Shell-brand gasoline, but no longer so did was likely to confuse reasonably prudent consumers when it sold non-Shell brand fuel without completely obscuring the Shell trademarks); *Downtowner/Passport Int'l Hotel Corp. v. Norlew, Inc.*, 841 F.2d 214, 219 (8th Cir. 1988)

Jessica Bloodgood

(holding that a hotel was not permitted to use trade-marked paraphernalia, such as credit card application forms, key rings, ash trays, and shoe shine clothes after its franchise from the company that issued those items had revoked its franchise); *Sunsport Inc. v. Barclay Leisure Ltd.*, 984 F. Supp. 418, 422 (E.D. Va. 1997) ("[A] former licensee who continues to use the licensor's mark... has to overcome the presumption that it has infringed."). In fact, an ex-franchisee's **[*17]** use of a mark is likely to be even more confusing. The Second Circuit has said that

> A licensee or franchisee who once possessed authorization to use the trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder. When such party, as defendants here, loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer. Consumers have already associated some significant source identification with the licensor. In this way the use of a mark by a former licensee confuses and defrauds the public.

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986). This court agrees with the Second Circuit's reasoning.

In its Response, Plaintiff argues that it did not "use" Defendant's Marks because it was unable to make any economic profit from it. Plaintiff argues that

> *Use* is one of those all-purpose words with half a page of definitions in any serious dictionary. If "use" is intended by O'Reilly in the sense of "utilize" which implies the putting of something to a practical or profitable use (*Webster's Dictionary*, New World Edition, **[*18]** 1964), the answer is that at no time did All Star do such a thing. The only practical use that All Star could ever have made of the name O'Reilly and its various trademarks was as a method of earning advertising revenue. Once it was no longer a revenue source it was no longer utilized by All Star; it was simply a useless word in a website that All Star was dilatory in cleaning. This is a distinction with a difference, the essence of which is that All Star freely admits that the various O'Reilly trademarks appeared in a number of places and even inappropriately in the sense that those appearances were against the express request of O'Reilly. All Star was not "using" or utilizing the marks in any sense of personal gain or advancement.

(#67 p 2). In other places, Plaintiff argues that the Marks "inadvertently appeared... and to the extent that the expression 'used' implies more than that inadvertent appearance," denies that it "used" the marks. This position is unavailing. Plaintiff would like to add an additional element of economic benefit to the alleged infringer or economic damage to the trademark holder where one does not exist. The only three elements are, as discussed above, whether **[*19]** the mark is valid, whether the use of the mark is likely to cause confusion, and whether the use was authorized. No economic harm or disadvantage to the holder of the mark is required in order to sustain a trademark infringement claim. *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275-76 (7th Cir. 1976). Similarly, Plaintiff argues that its continued display of Defendant's Marks in association with its own products constituted "free advertising", when Defendant would have paid Plaintiff for that privilege. By analogy to *Burrough*, a trademark infringement claim does not require economic benefit accrue to the alleged infringer, and thus, this argument also does not succeed.

Next, Plaintiff argues that "[t]here is no allegation that anyone mistook the All Star racing circuit for O'Reilly... There is nothing in the advertising that would cause someone to go to All Star to purchase auto parts, and the inadvertent appearance of the O'Reilly name after the termination of the relationship does not add to confusion of trademarks." (#67 p.5). This argument is also spurious. In an endorsement scheme, such as the one here, the "confusion" that arises when an ex-licensee continues **[*20]** to use a licensed trademark even though the license is revoked is not that a consumer will confuse the ex-licensee for the licensor *per se*, but rather, that the consumer will think that the licensor is continuing to *endorse* the licensee's product. The continuing (yet incorrect) illusion of an extant relationship between the two entities is the source of the confusion. A more apt analogy —one avoiding the concept of "sponsorship"—is if an individual marries into a celebrity family with a famous last name, changes his or her name to the famous one for the recognition benefit, but then is subsequently divorced. To continue to use the same famous last name is likely to cause confusion (although perhaps not illegal). The divorcee is not, in and of him or herself, confused with the *person* of the famous-last-name divorcer, as Plaintiff would argue, but rather, is continuing to reap the benefits of an *affiliation* with the famous last name when no such affiliation exists.

*Consent and authorization*

The third and final element is whether Plaintiff had consent, thereby giving it authorization to use the Marks. Defendant's Motion neglects to discuss this element, apparently because it assumed that **[*21]** it had withdrawn any consent when it did not renew the All Stars Cir-

2013 U.S. Dist. LEXIS 55218, *21

cuit agreement for the 2010, 2011, and 2012 seasons. Or perhaps Defendant relied on using the Illinois Statute of Frauds offensively; by declaring the contract unenforceable through the affirmative defense, it assumed it had thereby voided the contract and the trademark license subsumed within it. [2]

However, in some circumstances, "the entire course of conduct between a patent or trademark owner and an accused infringer may create an implied license." *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995) The United States Supreme Court stated that

> Any language used by the owner of the patent or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license, and a defense to an action for a tort.

*De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241, 47 S. Ct. 366, 71 L. Ed. 625, 63 Ct. Cl. 677 (1927). [*23] *See also ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 940 (7th Cir. 2003) ("A copyright owner can grant a nonexclusive license "orally, or may even be implied from conduct.... In fact, consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing."); *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 824 (3d Cir. 2006)("Although it appears that there is no express written license agreement between the parties, a trademark license can also be implied."); *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 308 (E.D. Pa. 2000) ("It is irrelevant whether the parties thought of the arrangement at the time in terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties.")

"A trademark license is typically written and contains express terms giving the licensor power to engage in quality control to ensure that the licensee does not engage in mere 'naked' use of the mark." *Doebler*, 442 F.3d at 823. "Naked licensing is an uncontrolled licensing of a mark whereby the licensee can place [*24] the mark on any quality or type of goods or services, raising a grave danger that the public will be deceived by such a usage." *Id.* (editing marks omitted.) The 2007, 2008, and 2009 Agreement not only does not include any restrictions on Plaintiff's use of the Marks, but does not even have any terms explicitly licensing or permitting the use of trademarks. (#57 exh. E). Instead, the agreement is replete only with Plaintiff's obligations to use the Marks. Thus, because the 2007, 2008, and 2009 Agreement had no express terms limiting the use of the Marks, or retaining the power to engage in quality control, this court cannot find that Defendant granted Plaintiff an express trademark license for that time period. Rather, the only possible conclusion is that Defendant must have intended to grant Plaintiff an implied naked license. This conclusion is supported by Defendant's own attachment of an Additional Terms and Conditions rider in the 2010, 2011, and 2012 Agreement that, among other limitations, specifically revokes the license upon termination or expiration of the agreement. (#57 exh. G). That rider was not included in the 2007, 2008, and 2009 agreement. (#57 exh. E). Of course, it [*25] is Defendant who has argued that the 2010, 2011, and 2012 Agreement was not countersigned, and therefore, under the Statute of Frauds, is not binding. The self-evident severability of the licensing terms from the sponsorship agreement also suggests that the unenforceable written sponsorship contract is distinct from and independent from any implied license to use any of Defendant's Marks, and the termination of the sponsorship is neither a necessary nor sufficient condition for the termination of the implied trademark license. Further, the statute of frauds does not apply to an implied license because either party could have terminated the license within one year. *Natkin v. Winfrey*, 111 F. Supp. 2d 1003, 1012 (N.D. Ill. 2000).

Accordingly, there remains a genuine issue of material fact as to whether Defendant granted Plaintiff an im-

---

[2] Notably, and without ruling on the substance of such a position because it is *obiter dictum* vis-à-vis the present ruling, the relevant Illinois Statute of Frauds reads, in pertinent part, as follows:

> No action shall be brought, whereby to charge any executor or administrator upon any special promise to answer any debt or damages out of his own estate, or whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person, or to charge any person upon any agreement made upon consideration of marriage, or upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged [*22] therewith, or some other person thereunto by him lawfully authorized.

740 ILCS 80/1. Read closely, the statute appears to only forbid an "action" to "answer for the debt" of another person. It is not clear, and no caselaw could be found after a cursory search, regarding whether the contract is to be treated as void, or whether a plaintiff is merely barred from bringing an action. If only the latter, presumably preexisting terms of that contract could be used defensively. *See Curtis v. Hulburd*, 46 Ill. App. 419, 420 (Ill. App. Ct. 1892) ("The statute of frauds is not a sword but a shield.").

plied license to use the Marks and as to when such a license would have been terminated. Plaintiff admits that it did not have ″specific″ permission to use the Marks after December 31, 2010, but denies that it did not have consent to do so. (#26 ¶¶ 47, 51; #66 ¶¶ 47, 51). That admission, combined with the contested issue of whether Defendant supplied to Plaintiff **[*26]** promotional items to give away at the 2011 races, and whether Defendant approved all promotional and advertising actions taken by Plaintiff during the 2010 racing season up until November 2011, raises the question of whether an implied license was granted, thereby permitting Plaintiff to use the Marks for the 2010 and 2011 period.

The final question, then, is the point at which the implied license was actually terminated. While the license is valid, a licensor's use of the mark is not, without more, infringement; it is only when the licensee no longer has consent that the continued use constitutes infringement. Regarding the Midwest All Stars series, Plaintiff admits that the Title Sponsor Agreement for the Midwest All Stars series expired at the end of 2010. (#57 exh. X ¶ 10; #27 ¶ 10). Plaintiff further admits that it used the O'Reilly Mark and O'Reilly Auto Parts Mark in conjunction with Midwest All Stars racing events between January 1, 2011, and July 15, 2011. (#57 exh. X, ¶¶ 12-13; #27 ¶¶ 12-13). Regarding the All Star Late Model racing series, Plaintiff denies, strangely, that it had specific permission to use the O'Reilly Auto Parts Marks for the 2009 and 2010 racing season **[*27]** in conjunction with the All Star Late Model racing series. (#57 exh. X, ¶ 16; #27 ¶ 16). Plaintiff further admits that it used the O'Reilly Mark and the O'Reilly Auto Parts Mark in conjunction with the All Star Late Model racing series between January 1, 2011, and July 16, 2011. (#57 exh. X ¶¶ 17-18; #27 ¶¶ 17-18). Regarding the All Star Circuit of Champions events, Plaintiff admits it used the O'Reilly Mark and the O'Reilly Auto Parts Mark between January 1, 2011, and July 15, 2011. (#57 exh. X ¶¶ 21-22; #27 ¶¶ 21-22), but denies that, in a meeting on October 21, 2010, it was advised by Defendant that no agreement was in place beyond 2010 and acknowledged as much, (#57 exh. X ¶¶ 27-29; #27 ¶¶ 27-29).

However, as discussed, an implied license to use the Marks must have been granted for the 2007, 2008, and 2009 Agreement, and the ongoing validity of that agreement is disputed for 2010 and 2011. Critically, this court focuses on the disputed occurrence and characterization of whether Defendant supplied to Plaintiff promotional items to give away at the 2011 races, and whether Defendant approved all promotional and advertising actions taken by Plaintiff during the 2010 racing season up **[*28]** until November 2011. Therefore, because a genuine issue of material fact exists, summary judgment may not be granted for Defendant's counterclaim regarding trademark infringement for the contested portions of the 2010 season.

However, Plaintiff does affirmatively admit that it received a letter dated July 1, 2011 revoking authorization to use the Marks. Plaintiff also admits that on July 16, 2011, it posted a news article on its website stating that it ″removed [Defendant] as the title sponsor″ and that all of Defendant's ″trademarked material have been removed from all logos, printed material, and social media from this date forward.″ (#57 exh. X ¶ 45 and #27 ¶ 45). This appears to be an implicit admission that authorization to use the Marks had been rescinded as of this date. But not only did this court note that as of September 29, 2011, Plaintiff still contained references to Defendant, (#22 p.3), the last date that Plaintiff admits it was using the Marks on its website was September 30, 2011. (#57 exh. X, ¶ 87; #27, ¶ 87).Therefore, it is clear that Plaintiff continued to use Defendant's Marks on its website after a date it concurs it should have stopped using the Marks. There **[*29]** is no dispute, then, that Plaintiff was a holdover licensee as of the earlier date that both parties agree that permission was revoked, which was July 16, 2011.

Accordingly, because it is not disputed that Plaintiff did not have a license to use the Marks between July 16, 2011 and September 30, 2011, and that it used Defendant's Marks in a way that was likely to cause confusion by operation of law, summary judgment is GRANTED for the trademark infringement counterclaim for the period between July 16, 2011 and September 30, 2011, for all the Marks, but DENIED for all other periods.

## Count 2: False Designation of Origin (″False Endorsement″)

Defendant asserts that Plaintiff has also violated *15 U.S.C. § 1125(a)*. That statute reads, as follows:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another **[*30]** person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities,

or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

A clearer name for this claim is as the Seventh Circuit calls it—a "false endorsement". *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir. 1993). False endorsement occurs when a person's identity is connected with a product or service in such a way that consumers are likely to be misled about that person's sponsorship or approval of the product or service. *Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 880 (E.D. Wis. 2009), *aff'd*, *623 F.3d 436 (7th Cir. 2010)*, *citing* *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 925-26 (6th Cir. 2003). The elements of a false endorsement claim under *§ 1125(a)* are the same as a claim under *§ 1114*: that (1) the defendants have a protectable trademark; and (2) a "likelihood of confusion" will [*31] exist as to the origin of the plaintiff's products. *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 436 (7th Cir. 1999). *See also* *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir. 1982) ("The elements of *[§ 1114* and *§ 1125]* causes of action are essentially similar, and the same set of facts will support a suit for either."). This conclusion is supported by the fact that both Plaintiff and Defendant rely on their *§ 1114* arguments and add little more. Of course, the endorsement or designation of origin could not logically be "false" if the endorsee had consent under an implied license. Accordingly, because this court has previously found that Plaintiff has engaged in trademark infringement for the period between July 16, 2011, and September 21, 2011, and because the two causes of action have substantially similar elements, Defendant's motion for summary judgment is GRANTED for the false endorsement counterclaim for the period between July 16, 2011, and September 30, 2011, but is DENIED for all other periods.

**Use of Counterfeit Marks**

As a preliminary note, the use of a counterfeit mark in the context of the Lanham Act is not, in and of itself, a cause of [*32] action. Rather, in a civil action arising under *§ 1114*, a finding that a counterfeit mark was used permits certain additional remedies, including seizure of the goods so marked, *§ 1116(d)(1)(A)*; treble damages, *§ 1117(b)*; the awarding of statutory damages, *§ 1117(c)*; and attorney's fees, *§ 1117(a)*. It is for these special civil monetary remedies that Defendant invokes the counterfeit mark provisions.

A "counterfeit mark" is defined as

a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or

services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered;

[ * * * ]

but such term does not include any mark or designation used on or in connection with goods or services of which the manufactur[r] or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.

*15 U.S.C. § 1116(d)(1)(B)*. Thus, the elements of a counterfeit mark enhancement are: (1) a spurious [*33] mark which is identical with, or substantially indistinguishable from, a registered mark, *15 U.S.C. § 1127*; (2) that is registered with the U.S. Patent and Trademark Office's principal register for use on the same goods or services for which the defendant uses the mark; and (3) the defendant must not have been authorized to use the mark at the time the goods or services were manufactured or produced. While the first two elements are self-explanatory, the third is aided by some context. The third element's exception was intended to refer to overrun goods, which is when a licensed manufacturer makes more products than are authorized under the provision of the agreement. "If a licensee manufactures overruns during the course of a valid license, the marks on those goods will remain noncounterfeit for purposes of this act, whatever changes may later occur in the relationship between the trademark owner and the licensee. Thus, if goods are manufactured during the course of a valid license, and sold after the termination of the license, the marks of those goods remain non-counterfeit." Joint Congressional Statement on 1984 Trademark Counterfeiting Legislation, 130 Cong. Rec. H12079.

The question [*34] of whether a holdover licensee's use of a formerly-licensed mark denoting a sponsorship constitutes the use of "counterfeit mark" appears to be a matter of first impression in this Circuit, and, perhaps, the Federal judiciary. This court holds that it does if and only if the incident or product alleged to be infringing occurred or was manufactured after the alleged infringer no longer had authorization to use the mark. This reasoning is based on an analysis of the case law, a comparison of sponsorships with franchises, and the legislative history.

*Case law*

2013 U.S. Dist. LEXIS 55218, *34

There are surprisingly few cases dealing with this issue. It is usually fairly clear if a product is a counterfeit: a manufacturer indicates that the product was not made to their standards, *e.g.*, *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 589 (7th Cir. 2007), *Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1147 (7th Cir. 1992); or that the producer was not authorized to use that mark on certain products it produced, *e.g.*, *Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 698 (7th Cir. 2009); or it even appears that the counterfeit nature of the product is not contested, [*35] *e.g.*, *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 586 (7th Cir. 1989). It is less common to see cases in which the counterfeit mark provision is applied to a holdover licensee, and, as far as this court can find, none involving the endorsee of a sponsorship. Analogous cases are often about franchisees, which are fairly comparable because a franchise and a sponsorship both deal with a contractual delegation of the right to use intellectual property for a limited term, and both implicate the policy rationale of protecting the public consumer from a nonconforming product or service. Among those cases include a Sixth and Ninth Circuit decision split, and one case in our sister court at the Northern District of Indiana, relying on a Seventh Circuit case.

In *U.S. Structures, Inc. v. J.P. Structures, Inc.*, the Sixth Circuit ruled on a case involving a franchisee who had used the franchisor's trademarks in a deck construction business for a number of years without incident. *130 F.3d 1185, 1187 (6th Cir. 1997)*. When the franchisee stopped paying the required franchising fee, the franchisor terminated the agreement, but the defendant-franchisee continued to use the mark while it attempted to negotiate [*36] a settlement. *Id.* That court held that "*§ 1117(b)* does not apply where, as in this case, a holdover franchisee continues to use the franchisor's original trademark after the franchisee has been terminated. Although the use of an original trademark is without authorization, it is not the use of a counterfeit mark." *Id. at 1192*. However, the opinion did not further elaborate how it came to that conclusion.

The Ninth Circuit came to the opposite answer in *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708 (9th Cir. 2005). There, an Idaho potato distributor licensed the state agency's certification marks for its potatoes. *Id. at 711*. After years of operation, the agency-licensor filed an action, alleging that the distributor-licensee had "breached its licensing agreement and infringed [the agency's] certification marks by failing to keep adequate records and using unlicensed potato repackers." *Id. at 712*. The distributor argued that the use of the mark was not a counterfeit because it was in fact packing genuine Idaho potatoes, and thus, "the unauthorized sale of genuine goods does not constitute trademark infringement because it does not cause consumer confusion." [*37] *Id. at 721*. The Ninth Cir-

cuit disagreed and held that the use of the mark did constitute a counterfeit. The court reasoned that, among other things, it was not the nature of the product itself that was counterfeit, but rather the state agency's certification that the potatoes had been produced and distributed in accordance with its own quality control procedures that caused consumer confusion, and therefore, was counterfeit. *Id. at 722*.

The Seventh Circuit ruled on a related, but less analogous decision in *Gen. Elec. Co. v. Speicher*, 877 F.2d 531 (7th Cir. 1989). There, a subcontractor fabricated parts for a distributor, who was fulfilling a purchase order from a corporation. *Id. at 532*. The corporation required official parts from the original manufacturer, but the distributor did not acquire them from the manufacturer. Instead, the distributor passed the order through to the subcontractor, who was not authorized to fabricate those parts, and did not tell the corporation about the ultimate source. *Id. at 533*. The distributor provided boxes to the subcontractor stamped with the original manufacturer's trademark, which it was entitled to do because it was authorized to do by the manufacturer. [*38] *Id.* The Seventh Circuit held that the plaintiff was permitted to use the "counterfeit mark" enhancement because "the purpose of trademark law is not to guarantee genuine trademarks but to guarantee that every item sold under a trademark is the genuine trademarked product, and not a substitute." *Id. at 534*. "The only function of a trademark is to designate a product or service, and the misconduct at which *section 1114* is aimed consists not in making the trademark without authorization but in affixing it to the wrong product; it is a detail whether the trademark was stolen from the manufacturer or merely copied." *Id. at 535*.

Finally, and most recently, in *Century 21 Real Estate, LLC v. Destiny Real Estate Properties*, a real estate agency entered into a franchise agreement with a national real estate brokerage franchise system. *4:11-CV-38 JD, 2011 U.S. Dist. LEXIS* 147075, 2011 WL 6736060 at *1 (N.D. Ind. Dec. 19, 2011) (unpublished). When the franchisee failed to make the required payments, the brokerage terminated the franchise agreement. *Id.* After the termination, the holdover franchisee continued to use the brokerage's marks, including on signs outside its offices and various websites identifying the franchise as [*39] being part of the system. *Id.* The Northern District of Indiana found the Sixth Circuit's reasoning in *U.S. Structures* less persuasive than those in *Idaho Potato* and *General Electric*. It could find "no reason why an ex-franchisee should escape liability for counterfeiting simply because that person had access to a franchisor's original marks because of the former relationship and therefore did not need to reproduce an identical or substantially similar mark." *Century 21, 4:11-CV-38, 2011 U.S. Dist. LEXIS* 147075, 2011 WL 6736060, at *5. That court concluded that because "the purposes of avoiding public confusion and safeguarding the value of trademarks... underlie the enhanced liability for trademark

Jessica Bloodgood

counterfeiting," *Id.*

*Sponsorships vs. franchises*

Thus, if sponsorships are more like franchises, then it seems that a holdover endorsee should be treated as having used a counterfeit mark. Suppose a corporation sponsors a celebrity athlete, and that athlete competes with that corporation's logo augustly blazoned upon his person. Suppose then that the athlete engages in ethically or morally dubious (or otherwise politically incorrect) behavior. It would be certainly fair to say that when the corporation terminates the sponsorship, [*40] the athlete's *display* of the now-unlicensed mark would be advertising all the wrong qualities. His display of the mark *on his person* would be likely to confuse a consumer into thinking that the corporation endorsed those deeds, thus reducing the value of the mark, and so the display might rightfully be called a "counterfeit".

However, if a sponsorship is more like having produced a product—that is, the tangible goods subsisting of the artifacts created out of the relationship, as well as the intangible benefit created from the increased exposure by advertising the brand during the pendency of the sponsorship—then perhaps the overrun exception in *§ 1116(d)(1)(B)* could be applicable. A sponsorship is an arrangement in which "a person or an organization [] pays for or plans and carries out a project or activity; especially one that pays the cost of a radio or television program usually in return for advertising time during its course." Merriam-Webster Online, "Sponsorship: 3" http://www.merriam-webster.com/dictionary/sponsorship. A franchise is "the right or license granted to an individual or group to market a company's goods or services in a particular territory; *also*: a business granted [*41] such a right or license". Merriam-Webster Online, "Franchise: 2(c)(1)" http://www.merriam webster-.com/dictionary/franchise.

There are two fundamental differences between sponsorships and franchises. First, the franchise provides value to consumers in the present tense—that is, people buy goods or services from the franchisee, relying on the on-going use of the mark as an indicator of quality. The harm in a counterfeit mark is that consumers are confused by the holdover use of the mark when the franchisor no longer endorses the franchisee, but the franchisee continues to reap the benefits of the affiliation. But with a sponsorship, the value provided is advertising and awareness, the benefit being advertising seen by the public. At the moment the sponsorship is terminated, the value to the sponsor has already accrued. It is unlikely that an entity would continue to advertise for its sponsor when it is no longer being paid to do so. If the exposure from the advertisement occurred while the use was authorized, the effect of the sponsorship was completed at the moment of exposure. That exposure, in and of itself, cannot be made "counterfeit" by a subsequent act. Any potential harm instead [*42] would come from a negative af-

filiation with the endorsee or the erroneous belief that the sponsor is continuing to sponsor the endorsee.

The second differentiating issue between a sponsorship and a franchise is the post-termination existence of collateral artifacts created during the pendency of the relationship. A franchise is an agreement permitting the marketing of goods or services; a sponsorship is an agreement to provide an advertising service that can often create additional objects that evidence a historical affiliation. The persistence of those artifacts is like the overrun situation. Suppose the previously-discussed sponsor creates a banner with the athlete standing in front of the corporation's headquarters with the corporation's logo visible. When the relationship is terminated, is there anything at all that could be said to be "counterfeit" about the corporation's logo in that banner—or, for that matter, photographs of the banner? Perhaps the athlete posts news articles about his prior sponsorships on his personal website. Trademark infringement, possibly; a violation of his sponsorship agreement, potentially; but counterfeit? Or suppose he places his likeness and signature [*43] on the corporation's product. Upon the termination of the sponsorship, if the athlete—or even a third-party retailer—sells one of those products, how could there be liability for *counterfeiting* the corporation's mark? All of those artifacts include, as the statute reads, a "mark or designation used on or in connection with goods or services of which the manufacture[r] or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation." *15 U.S.C. § 1116(d)(1)(B).*

Certainly, this is not to say that a franchise cannot produce co-branded artifacts. However, the issue of a counterfeit representation is rarely over the retrospective existence of those items, but rather, the services or products provided on a prospective basis. Compare this with the typical franchise use prohibited in the cases discussed above. In *Idaho Potato*, the holdover distributor's ongoing use of a certification mark was considered a counterfeit because the newly-produced potatoes sold to the public were not packaged according to standards. If the potatoes [*44] had been marked while the proper procedures were being followed, it makes no sense to say that the mark or the potatoes become counterfeit if the distributor later stops following the procedures. In *General Electric*, the holdover subcontractor's use of a genuine mark was considered a counterfeit because the trademark was affixed to the wrong product being sold to a consumer. Here, at least some portion of the "sale" or representation of affiliation occurred while the use of the Marks was still authorized. And in *Century 21*, the franchisee's use of the marks was treated as counterfeit because doing so would help avoid public confusion. *Century 21, 4:11-CV-38, 2011 U.S. Dist. LEXIS* 147075, 2011 WL 6736060, at *5. It is dubious to suggest that consumers are likely to confuse an artifact created while

2013 U.S. Dist. LEXIS 55218, *44

the sponsorship existed for a current sponsorship, and besides, the policy implications of treating as counterfeit every product (or news article or photograph) cobranded by a disgraced celebrity is, to say the least, ridiculous.

*Legislative history on available remedies*

This conclusion does not leave the trademark holder with no recourse. Congress's 1984 Joint Statement specifically discussed the licensor's rights to control [*45] those items in the legislative history. The Statement noted that:

> The trademark owner has put the wheels in motion for the manufacturer to make the overruns, and has the means to protect himself or herself. For example, the trademark owner can specify in the contract that the making of overruns shall constitute a breach of contract, and that the manufacturer shall be liable for liquidated damages if overruns are made. The contract might also specify that the trademark owner has the right to inspect the manufacturer's facilities to ensure that overruns are not being made.... The contractual and other civil remedies already existing make it inappropriate to criminalize such practices.

Joint Congressional Statement on 1984 Trademark Counterfeiting Legislation, 130 Cong. Rec. H12079. Although not directly analogous to an overrun situation, the sponsor, as trademark owner, certainly has the means to protect itself. The contract may specify that the display of artifacts created or relating to events occurring before the termination of the contract must be taken down from public access, and those artifacts still in its possession destroyed. As it is now, Plaintiff would already be liable under [*46] a theory of trademark infringement and false endorsement, not to mention the state claims that have not yet been addressed (and which are coextensive to the Federal trademark claims). To add counterfeiting would be unnecessary. As Congress stated, "[t]he contractual and other civil remedies already existing make it inappropriate to criminalize such practices." 130 Cong. Rec. H12079.

Here, the 2007, 2008, and 2009 Agreement for the All Star Circuit of Champions does not have any provisions requiring Plaintiff to cease providing to the public any artifacts created during the pendency of the sponsorship. (#57 exh. E). In fact, there are no provisions regarding post-termination conduct. One would think that a corporation of Defendant's size would be able to draft an agreement that considers what happens afterward the sponsorship ends. In fact, it did—but only in the fol-

low-up (and contested) 2010, 2011, and 2012 Agreement, as provided to this court. In an Additional Terms and Conditions rider, a provision requires that "[u]pon termination or expiration of this Agreement for any reason, all parties will immediately cease all use of the NAMES of the other parties as specifically granted in [*47] this Agreement." (#57 exh. G). In its Motion for Summary Judgment, Defendant appears to confirm that these terms did not exist in the 2007, 2008, and 2009 agreement. (#57 ¶¶ 19-20). And, of course, Defendant itself is the party that wishes to render unenforceable the 2010, 2011, and 2012 Agreement.

Defendant's counterclaims list an undifferentiated amalgam of occasions and locations at which Plaintiff is alleged to have used Defendant's Marks in a counterfeit fashion. Three examples may be instructive. While Plaintiff does admit that it "[u]sed the O'Reilly Mark to promote the All Star Circuit of Champions by referring to that series as the 'O'Reilly All Star Circuit of Champions' on its website, as seen in the printout from All Star's website, printed on June 29, 2011", (#8 ¶ 46(a); #14 ¶ 46(a)), a closer examination of that document, (#57 exh. H), shows a list of news articles or press releases. Each one mentions the "O'Reilly Auto Parts All Star Circuit of Champions" along with a logo. Each of those articles dates from June 27, 2011, or earlier. As discussed earlier, this court cannot conclude from the evidence provided that the agreement was treated as terminated until July 16, [*48] 2011. Accordingly, summary judgment may not be granted on any of the trademark counterclaims from before that date.

Second, Defendant alleges, and Plaintiff does not contest, that news articles and photographs using Defendant's Marks appeared on Plaintiff's website on July 22, 2011. (#57 ¶ 62; #57 exh. Q). Here, the Marks were shown to the public after the uncontested termination date of July 16, 2011, so Defendant's motion for summary judgment on the trademark infringement claim may be granted. For example, an article on July 9, 2011 references the "O'Reilly All Star Circuit of Champions Sprint Car series event". Under today's holding, Defendant will not be permitted, as a matter of law, to apply the counterfeit mark enhancement provision to any alleged trademark infringement occurring before the date ultimately adjudged to be the termination date of the sponsorship, even if Plaintiff made them available to the public after that date. This is because Plaintiff's use of the trademark before the termination date of the sponsorship would have been "authorized to use the mark... at the time of the manufacture". Therefore, the counterfeit mark enhancement may not be applied to the events [*49] described that occurred before July 16, 2011, which is the undisputed date for the termination of the implied license.

Last, Defendant alleges, and Plaintiff does not contest, that photographs and news articles remained on Plaintiff's website until August 24, 2011. (#57 ¶ 73; #57 exh.

R). Exhibit R shows two articles with accompanying photographs using Defendant's Marks, dated July 31, 2011, and August 3, 2011. Because they occurred after July 26, 2011, summary judgment may be granted on the trademark infringement counterclaims. Furthermore, because the events themselves occurred after July 16, 2011, Plaintiff was not authorized to use the Marks for those events and for those articles, and accordingly, the counterfeit mark enhancement is applicable.

## Count 3: Illinois Uniform Deceptive Trade Practices Act

Defendant next claims that Plaintiff has violated the Illinois Deceptive Trade Practices Act. That statute states, in pertinent part, that "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person...causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods [*50] or services. *815 ILCS 510/2(a)(2)*. "Under the Illinois Deceptive Trade Practices Act a defendant is liable only if the plaintiff can establish a likelihood of confusion between the parties' products." *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1173-74 (7th Cir. 1986). Because there is only one relevant element to the cause of action, it is not surprising that "proof of a trademark infringement is sufficient to establish a violation of the Illinois Uniform Deceptive Trade Practices Act." *Pirelli Armstrong Tire Corp. v. Titan Tire Corp.*, 4 F. Supp. 2d 794, 799 (C.D. Ill. 1998); *see also Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D. Ill. 1994) ("Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act."); *compare TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 881 (7th Cir. 1997) (the Seventh Circuit stating that "federal and state laws regarding trademarks and related claims of unfair competition are substantially congruent.") *with Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill. App. 3d 99, 466 N.E.2d 1004, 1010, 81 Ill. Dec. 202 (Ill. App. Ct. 1st Dist. 1984) (an Illinois [*51] state appellate court stating that "[b]ecause the statutes themselves neither create a valid trademark or establish new rights, courts apply a single analysis to federal, state, and common law claims. We may therefore look to federal as well as to state case law in resolving the instant issues.") (citations omitted). Because this opinion has already established that a presumption of a likelihood of confusion exists, and has granted summary judgment on the trademark infringement counterclaim, summary judgment is GRANTED on this cause of action for events occurring during the period between July 16, 2011, and September 30, 2011 and DENIED as to all other periods.

## Count 4: Illinois Consumer Fraud and Deceptive Business Practices Act

Defendant additionally claims that Plaintiff has violated the Illinois Consumer Fraud and Deceptive Business Practices Act. The pertinent portion of that statute states that "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others [*52] rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful." *815 ILCS 505/2*. For the same reason that Defendant's Uniform Deceptive Trade Practices Act counterclaim is coextensive with the trademark infringement counterclaim, so is its Consumer Fraud and Deceptive Business Practices Act counterclaim. Accordingly, summary judgment is GRANTED on this cause of action on the same terms as for Count 3.

## Count V: Defamation

Under Illinois law, a defamatory statement is one "that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Green v. Rogers*, 234 Ill. 2d 478, 917 N.E.2d 450, 459, 334 Ill. Dec. 624 (Ill. 2009). "To state a defamation claim, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Id.* Statements may be considered defamatory [*53] *per se* or *per quod. Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 607 N.E.2d 201, 206, 180 Ill. Dec. 307 (Ill. 1992). "Statements are considered defamatory *per se* when the defamatory character of the statement is apparent on its face; that is, when the words used are so obviously and materially harmful to the plaintiff that injury to his reputation may be presumed." *Id.* If a statement is defamatory *per se,* the plaintiff need not plead or prove actual damages to his reputation. *Seith v. Chicago Sun-Times, Inc.*, 371 Ill. App. 3d 124, 861 N.E.2d 1117, 1126, 308 Ill. Dec. 552 (Ill. Ct. App. 1st Dist. 2007). Statements are considered defamatory *per quod* if the defamatory character of the statement is not apparent on its face, and extrinsic facts are required to explain its defamatory meaning. *Kolegas*, 607 N.E.2d at 206. "Illinois law recognizes five categories of defamatory statements which are considered actionable *per se:* (1) those imputing the commission of a criminal offense; (2) those imputing infection with a loathsome communicable disease; (3) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment; (4) those that prejudice a party, or impute a lack of ability in his or her trade, profession or business; [*54] and (5) those imputing adultery or fornication." *Van Horne v. Muller*, 185 Ill. 2d 299, 705 N.E.2d 898, 903,

2013 U.S. Dist. LEXIS 55218, *54

235 Ill. Dec. 715 (Ill. 1998).

However, one who publishes a defamatory statement of fact is not subject to liability for defamation if the statement is true. *Wynne v. Loyola Univ. of Chicago*, 318 Ill. App. 3d 443, 741 N.E.2d 669, 675, 251 Ill. Dec. 782 (Ill. App. Ct. 1st Div. 2000). Only "substantial truth" is required for the defense. *Id.* "Substantial truth refers to the fact that a defendant need prove only the 'gist' or the 'sting' of the statement." *Moore v. People for the Ethical Treatment of Animals, Inc.*, 402 Ill. App. 3d 62, 932 N.E.2d 448, 457, 342 Ill. Dec. 321 (Ill. Ct. App. 1st Dist. 2010). "While determining 'substantial truth' is normally a question for the jury, the question is one of law where no reasonable jury could find that substantial truth had not been established." *Id.*; *see also Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 793 N.E.2d 760, 767, 276 Ill. Dec. 1 (Ill. App. Ct. 1st Dist. 2003) ("The substantial truth of a statement is normally a jury question, but where no reasonable jury could find that substantial truth had not been established, the question is one of law.").

Further, this court is required to evaluate defamation actions using the innocent construction rule. "Even if a statement [*55] falls into one of the recognized categories of words that are actionable *per se*, it will not be found actionable *per se* if it is reasonably capable of an innocent construction." *Bryson v. News Am. Publications, Inc.*, 174 Ill. 2d 77, 672 N.E.2d 1207, 1215, 220 Ill. Dec. 195 (Ill. 1996). "The innocent construction rule requires courts to consider a written or oral statement in context, giving the words, and their implications, their natural and obvious meaning." *Id.* "If, so construed, a statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff, it cannot be actionable *per se.*" *Id.* (editing marks omitted). "The rigorous standard of the modified innocent construction rule favors defendants in *per se* actions in that a nondefamatory interpretation must be adopted *if it is reasonable*. The tougher standard is warranted because of the presumption of damages in *per se* actions." *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 667 N.E.2d 1296, 1302, 217 Ill. Dec. 720 (Ill. 1996). "In Illinois courts, this determination is made by the judge and it is regarded as a question of law." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003).

Here, Defendant claims there are three instances [*56] of defamatory statements in the July 16, 2011 publication that qualify as "those imputing an inability to perform or want of integrity in the discharge of duties of office or employment" or "those that prejudice a party, or impute a lack of ability in his or her trade, profession or business." Plaintiff's statement is repeated here for convenience:

*All Star Championship Racing, Inc. ends relationship with O'Reilly Auto Parts* Cama-

rgo, IL (7-16-11) - All Star Championship Racing, Inc. has removed O'Reilly Auto Parts as the title sponsor for the All Star Circuit of Champions, All Star Late Model Series, and the Midwest All Star Series resulting from an unpaid invoice in January 2011, we are now moving forward with collection proceedings. Please note that all O'Reilly trademarked material have been removed from all logos, printed material, and social media from this date forward. We have enjoyed several years in working with O'Reilly Auto Parts in sponsoring our company, it is regretful the relationship has ended.

(#57 exh. X ¶ 45; #27 ¶ 45). Defendant argues that those statements are defamatory *per se* because they incorrectly state or imply that:

> O'Reilly fails to honor its contractual obligations; [*57] O'Reilly fails to pay proper invoices, resulting in "unpaid invoices;" and O'Reilly's "unpaid invoices" result in the necessity for "collection proceedings" against O'Reilly, thereby: assailing O'Reilly's financial or business methods; accusing O'Reilly of mismanagement; imputing that O'Reilly is unable to perform its business duties; imputing that O'Reilly lacks integrity in performing its business duties; imputing that O'Reilly lacks ability in its profession; and otherwise prejudicing O'Reilly in its profession.

(#26 ¶ 84).

First, Defendant argues that the term "unpaid invoice" was a *per se* defamatory statement. Because that statement "imputes a lack of ability in his or her trade, profession or business", Plaintiff's only defense would be that there was substantial truth in the matter. Defendant asserts that Plaintiff's Amended Complaint does not even claim that there was an express agreement, and because the only recovery would be in quasi-contract, that there could not possibly have been an "invoice", much less an "unpaid" one. This court disagrees. The "gist" or "sting" of an "unpaid invoice" is merely that Defendant owes Plaintiff money. Plaintiff has claimed at least that much. [*58] In the Amended Complaint, Plaintiff claims that Defendant had given it a contract, which Plaintiff signed and returned on January 6, 2010, and that by November 2010, which is when Plaintiff asserts Defendant refused to pay for the 2011 season, it had already done much of the preparatory work for the 2011 season, and in reliance on prior dealings and on being supplied promotional items for the 2011 races and having approved all promotional and advertising actions through November 2011. (#56 ¶¶ 7-15). Defendant denies those allegations. (#70 ¶¶ 7-15). The legal procedures underlying how Plaintiff might or might not be compensated are

Jessica Bloodgood

Case: 1:14-cv-07257 Document #: 53-2 Filed: 11/05/14 Page 62 of 99 PageID #:5091

Page 14 of 14
2013 U.S. Dist. LEXIS 55218, *58

details. A reasonable jury could find that a contract had been implied, or that Plaintiff was entitled to recover in quasi-contract, and that the term "unpaid invoice" could refer to the expectation of payment for services previously rendered.

Second, Defendant argues that the phrase "moving forward with collection proceedings" was defamatory *per se* because the statement "imputes a lack of ability in his or her trade, profession or business". Defendant asserts that the statement is false because on November 1, 2011, Judge Bernthal ruled that Plaintiff's claim **[*59]** should be dismissed with prejudice, and that the only proceedings active at that point were Defendant's counterclaims. This court also disagrees. Pursuant to Local Rule 72.2, "[a]ny party may object to a magistrate judge's report and recommendation by filing an objection in accordance with *Fed. R. Civ. P. 72(b)* within 14 days after service thereof." And of course, as happened in this case, Plaintiff was given leave to file an amended complaint, which it did do. Proceedings were, and in fact, still are, continuing. Further, the gist of that phrase is that a dispute exists regarding the expectation of payment on services that have not yet been paid. A reasonable jury could find that Plaintiff merely said that "I think Defendant owes me money and I'm going to pursue it in court." If Plaintiff had instead said that "A court said Defendant owes me money", then that statement would be facially false.

Third, Defendant argues that "[it] was also clear at the time the posting was made that Plaintiff had *not* removed all O'Reilly trademarked material from its web pages." This court does not understand how this statement is defamatory. False, perhaps. Defamatory, no.

This court has reviewed the **[*60]** statements that Defendant has alleged to be defamatory and, for the reasons above, have found that they afford an innocent construction. This court concludes that Defendant failed to establish defamation *per se*. Its claim is better construed as defamation *per quod*; it is free to prove actual damage to its reputation and pecuniary loss resulting from the defamatory statement in order to recover. *See Bryson, 672 N.E.2d at 1229.* Accordingly, Defendant's Motion for Summary Judgment is DENIED as to the defamation claim.

IT IS THEREFORE ORDERED THAT:

(1) The Motion for Summary Judgment (#57) is GRANTED in part and DENIED in part, as enumerated in the opinion, as to Counts 1, 2, 3, and 4; and DENIED in whole as to Count 5.

(2) This case is REFERRED to Magistrate Judge David G. Bernthal for court-hosted mediation. Further, the parties are directed to contact Judge Bernthal's chambers to schedule a settlement conference.

ENTERED this 18th day of April, *2013*

**/s/ Michael P. McCuskey**

MICHAEL P. McCUSKEY

U. S. DISTRICT JUDGE



Positive
As of: June 26, 2013 11:35 AM EDT

# Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.

United States District Court for the Northern District of Illinois, Eastern Division
April 17, *2008*, Decided; April 17, *2008*, Filed
No. 03 C 5311 Consolidated with No. 03 C 4844

**Reporter:** 2008 U.S. Dist. LEXIS 31761

LORILLARD TOBACCO COMPANY, a Delaware Corporation, Plaintiff, v. MONTROSE WHOLESALE CANDIES AND SUNDRIES, INC., et al., Defendant.

**Subsequent History:** Motion granted by *Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc., 2008* U.S. Dist. LEXIS 40369 (N.D. Ill., Apr. 30, *2008*)

**Prior History:** *Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc., 2008* U.S. Dist. LEXIS 29229 (N.D. Ill., Apr. 8, *2008*)

### Core Terms

statutory damages, evidentiary hearing, the Lanham Act, recommendation, counterfeit, trademarks

**Counsel:** **[\*1]** For Lorillard Tobacco Company, a Delaware corporation (1:03-cv-05311), Plaintiff: John S. Pacocha, LEAD ATTORNEY, Cameron Matthew Nelson, Herbert H. Finn, Howard Kevin Jeruchimowitz, Jeffrey G. Mote, Paul A. Haskins, Greenberg Traurig, LLP., Chicago, IL.; Jason B. Elster, Greenberg Traurig, Chicago, IL.

For Kirk D Kiryakos (1:03-cv-05311), Defendant, Counter Claimant: Robert A. Egan, LEAD ATTORNEY, Robert A. Egan P.C., Chicago, IL.

For Ameen Enterprises, Inc (1:03-cv-05311), Defendant: Michael J. Boxerman, Marcus Boxerman & Chatman LLP, Chicago, IL.

For Montrose Wholesale Candies and Sundries Inc, (Defendant in 03cv4844), Ray Hazemi, (Defendant in 03cv4844) (1:03-cv-05311), Defendants: Robert A. Habib, LEAD ATTORNEY, Attorney at Law, Chicago, IL.

For Allied Tobacco Consulting and Distribution, Inc., Big Ash Fine Cigars and Tobacco Inc, Peter Karfias (1:03 -cv-05311), Respondents: David Michael Kroeger, LEAD ATTORNEY, Jenner & Block LLP, Chicago, IL.

For S&D Pantry Inc., Citation Respondent, Harwood Heights Gas Mart, Inc., Formont Corp. (1:03-cv-05311), Respondents: Robert R. Benjamin, LEAD ATTORNEY, Francisco E. Connell, Querrey & Harrow, Ltd., Chicago, IL.

For Giti Azari (1:03-cv-05311), **[\*2]** deponent: Robert R. Benjamin, LEAD ATTORNEY, Francisco E. Connell, Querrey & Harrow, Ltd., Chicago, IL.

For Lorillard Tobacco Company (1:03-cv-05311), Counter Defendant: John S. Pacocha, LEAD ATTORNEY, Cameron Matthew Nelson, Jeffrey G. Mote, Paul A. Haskins, Greenberg Traurig, LLP., Chicago, IL.

For Lorillard Tobacco Company, a Delaware corporation (1:03-cv-04844), Plaintiff: John S. Pacocha, LEAD ATTORNEY, Cameron Matthew Nelson, Herbert H. Finn, Howard Kevin Jeruchimowitz, Jeffrey G. Mote, Kevin D. Finger, Greenberg Traurig, LLP., Chicago, IL; Jason B. Elster, Greenberg Traurig, Chicago, IL.

For Allied Tobacco Consulting and Distribution Inc (1:03 -cv-04844), Plaintiff: David Michael Kroeger, LEAD ATTORNEY, Jenner & Block LLP, Chicago, IL.

For Montrose Wholesale Candies and Sundries Inc, Ray Hazemi (1:03-cv-04844), Defendants: Robert A. Habib, Attorney at Law, Chicago, IL.

Ray Hazemi, Sandra Hazemi (1:03-cv-04844), Defendants, Pro se, Lombard, IL.

For Discount Tobacco Distributors Inc, an Illinois corporation, Samina Haq, Syed Haq (1:03-cv-04844), Defendants: William H. Hrabak, LEAD ATTORNEY, Gregory Lawrence Shugar, Sara Louise Spitler, Goldstine, Skrodzki, Russian, Nemec & Hoff, Ltd., **[\*3]** Burr Ridge, IL.

For Sandra Hazemi (1:03-cv-04844), Defendant: Jeffrey H. Bunn, LEAD ATTORNEY, Horwood Marcus & Berk Chartered, Chicago, IL; Robert A. Habib, Attorney at Law, Chicago, IL.

2008 U.S. Dist. LEXIS 31761, *3

For Karfias, Big Ash Fine Cigars and Tobacco Inc (1:03-cv-04844), Respondents: David Michael Kroeger, LEAD ATTORNEY, Jenner & Block LLP, Chicago, IL.

For Formont Corp. (1:03-cv-04844), Respondent: Francisco E. Connell, Robert R. Benjamin, Querrey & Harrow, Ltd., Chicago, IL.

**Judges:** MARVIN E. ASPEN, United States District Judge.

**Opinion by:** MARVIN E. ASPEN

---

| Opinion |

---

**MEMORANDUM ORDER AND OPINION**

MARVIN E. ASPEN, District Judge:

On November 18, 2007, we issued a judgment awarding Lorillard Tobacco Company ("Plaintiff") $ 2.5 million in statutory damages under the Lanham Act. [1] Subsequently, Montrose Wholesale Candies and Sundries, Inc., Ray Hazemi, and Sandra Hazemi (collectively referred to as the "Defendants") filed a *Rule 59(e)* motion to alter or amend that judgment. We referred Defendants' motion to Magistrate Judge Cole, and he issued a Report and Recommendation on February 25, **2008** ("Report") recommending that we deny Defendants' motion. Presently before us is Defendants' [2] objections to Magistrate Judge Cole's Report. For the reasons **[*4]** set forth below, we overrule Defendants' objections and adopt the Report.

**STANDARD OF REVIEW**

*Federal Rule of Civil Procedure 72(b)* sets forth the procedure for objecting to a magistrate judge's report and recommendation on dispositive matters: "Within 10 days after being served with a copy of the recommended disposition, a party may serve and file specific, written objections to the proposed findings and **[*5]** recommendations." *Fed. R. Civ. P. 72(b)*. To comply with the rule in the Seventh Circuit, a party must "specify each issue for which review is sought[, but need] not [include] the factual or legal basis of the objection." *Johnson v. Zema Sys. Corp.,* 170 F.3d 734, 741 (7th Cir. 1999). Generally, a district court reviews a magistrate's report and rec-

ommendation for clear error. *Fed. R. Civ. P. 72(a)*; *see Hartford Accident & Indemnity v. Beede,* No. 76 C 3319, 1987 U.S. Dist. LEXIS 3216, 1987 WL 9977, at *2 (N.D. Ill. Apr. 20, 1987). However, the district court undertakes a *de novo* review of those portions of the Report to which a party specifically objected. *Johnson,* 170 F.3d at 741; *Fed. R. Civ. P. 72(b)*.

**ANALYSIS**

On February 25, **2008**, Magistrate Judge Cole issued a Report recommending that we deny Defendants' *Rule 59(e)* motion. As the Report correctly indicated, "'[a] court may grant a *Rule 59(e)* motion to alter or amend the judgment if the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact.'" *County of McHenry v. Ins. Co. of the W.,* 438 F.3d 813, 819 (7th Cir. 2006) (quoting **[*6]** *Matter of Prince,* 85 F.3d 314, 324 (7th Cir. 1996)). However, a party may not use a *Rule 59(e)* motion "to advance arguments or theories that could and should have been made before the district court rendered a judgment.'" *Id.* (quoting *LB Credit Corp. v. Resolution Trust Corp.,* 49 F.3d 1263 (7th Cir. 1995)).

Contrary to Defendants' arguments, Magistrate Judge Cole's Report found that: (1) we need not conduct an evidentiary hearing to determine statutory damages in this case; (2) the Lanham Act authorizes $ 2.5 million in statutory damages in this case; and (3) Mrs. Hazemi's arguments were insufficient to show that the court erred in holding her jointly and severally liable.

Defendants now object to the Report and argue that we should grant their *Rule 59(e)* motion because: (1) the court failed to make specific findings and conduct an evidentiary hearing regarding the amount of statutory damages; (2) the maximum statutory damages recoverable under the Lanham Act is $ 1 million based on the facts of this case; and (3) Plaintiff's Second Amended Complaint did not request statutory damages under the Lanham Act. We address each of these objections in turn below.

**A. Objections to the Statutory [*7] Damages Calculation**

Defendants argue that Magistrate Judge Cole erred in de-

---

[1] Magistrate Judge Cole provided an in-depth description of the history and background of this case in *Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.,* Nos. 03 C 5311 and 03 C 4844, 2005 U.S. Dist. LEXIS 28917, 2005 WL 311582, at *1-13 (N.D. Ill. Nov. 8, 2005), *adopted by* Docket No. 229 (N.D. Ill. Jan. 30, 2006). Therefore, we will assume familiarity with the facts and only restate them as necessary to examine the issues below.

[2] While we acknowledge that Sandra Hazemi filed a separate response on March 3, 2008 (and a virtually identical reply on March 24, 2008), for the purpose of this opinion we will assume that Mrs. Hazemi would join in Montrose's and Ray Hazemi's arguments. As relevant, we will indicate where Mrs. Hazemi has asserted objections that differ from those of the other Defendants.

2008 U.S. Dist. LEXIS 31761, *7

nying its *Rule 59(e)* motion because Plaintiff never produced evidence sufficient to justify the statutory damage award in this case. Specifically, Defendants now argue for the first time that we were required to weigh the seven factors listed in the Copyright Act in order to award statutory damages in this case. [3] (*See* Def. Objection at 2-4).

While courts have held that the seven factors under the Copyright Act offer some guidance in Lanham Act cases, *see, e.g., Gucci v. Am., Inc. v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 520 (S.D.N.Y. 2004),* [*8] courts are "not required to follow any rigid formula" when applying these factors. *See Chi-Boy Music v. Charlie Club, 930 F.2d 1224, 1229 (7th Cir. 1991).* In addition, Magistrate Judge Cole acknowledged these factors in his September 10, 2007 Report and found that they weighed against Defendants not only because they are deemed to have acted willfully by virtue of the default judgment, but also because their repeated discovery abuses prevented actual damages from being proven. *See* 9/10/07 Report at 5, 6, 9 (Case No. 03-5311, Docket No. 197)). Thus, we find that Defendants' objection lacks merit.

To the extent that Defendants repeat their request for an evidentiary hearing and/or trial in this case to determine willfulness, we again find that this argument is without merit. [4] As we have previously indicated, because we entered a default judgment in this case, all allega-

tions of the Plaintiff's complaint are taken as true. *See Cass County Music Co. v. Muedini, 55 F.3d 263, 266 (7th Cir. 1955).* [5] By virtue of this rule, Defendants are deemed to have acted willfully. (*See* Second Am. Compl. P 20 (alleging that Defendants acted "with the intent to confuse and mislead the public")). [6]

In addition to the above factors, Defendants also argue that we were required to conduct an evidentiary hearing on statutory damages. Defendants rely upon *Dundee Cement Co. v. Howard Piper Concrete Products, Inc.,* for the proposition that even after a default judgment, a hearing on damages is required unless "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." [*11] *722 F.2d 1319, 1323 (7th Cir. 1983).* [7] Magistrate Judge Cole distinguished *Dundee Cement,* however, because it did not involve statutory damages. (*See* Report at 2; *see also* 9/10/07 Report at 6 (explaining that no evidentiary hearing is necessary because "cases like this, where the information needed to prove actual damages is in the infringer's control, are the very reason for the provision allowing statutory damages awards; no prove-up is necessary")).

We agree with Magistrate Judge Cole that the statutory damage award here may be determined without an evidentiary hearing. First, requiring an evidentiary hearing for

---

3   These Copyright Act factors include:

"(1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; (7) the potential for discouraging the defendant."

*Gucci v. Am., Inc. v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 520 (S.D.N.Y. 2004)* (internal citations omitted).

4   Mrs. [*9] Hazemi's objections focus on this argument and emphasize, as she has in the past, that no evidence has been proven against her and that thus she should be afforded a trial to determine the extent of her involvement in the business.

5   Defendants also argue that *Top Brand* and *Gucci* support this argument because they require solid evidence of willfulness not present here. (Def. Objection P 6). These cases are distinguishable, however, because neither involved a default judgment. *See Nike, Inc. v. Top Brand, No. 00 Civ. 8179, 2006 U.S. Dist. LEXIS 76543, 2006 WL 2946472, at *1 (S.D.N.Y. Feb. 27, 2006)* (explaining that the decision is limited to the defendants whose liability was determined on summary judgment); *Gucci Am.,, 315 F. Supp. at 513* (noting that a two-day bench trial was conducted to determine willfulness).

6   In addition, we agree with Magistrate Judge Cole that Mrs. Hazemi has failed to provide any legal reason why our judgment should be vacated against her. In her objections, Mrs. Hazemi insinuates that Magistrate Judge Cole is somehow biased against her. Mrs. Hazemi also argues that she is being found guilty by association merely as the wife of Ray Hazemi and that she was never given the opportunity to speak [*10] at depositions. (*See* Sandra Hazemi's Objections at 1, 3). However, Plaintiff's Second Amended Complaint includes allegations regarding Mrs. Hazemi's involvement, which are taken as true upon default judgment. (*See* Second Am. Compl. P 4); *see also Cass County Music Co., 55 F.3d at 266.* In addition, while Mrs. Hazemi may not have had the opportunity to say what she wished during depositions, we find that she had ample time before we entered judgment to put forth any arguments because this case has been pending for five years and she has attended numerous court appearances. (Report at 6). Thus, we do not find that we committed "a manifest error of law or fact" by finding her jointly and severally liable in our November 18, 2007 judgment.

7   We note that Defendants only mentioned this argument in one sentence at the end of their brief. (*See* Def. Objections P 13). However, because Defendants' original Rule 59(e) motion had a more lengthy discussion of this case, we will address its arguments here. (*See* Def. Rule 59(e) Motion 4-5).

Jessica Bloodgood

statutory damages here would defeat the purpose of *15 U.S.C. § 1117(c)(2)*, which recognized that damages in trademark cases may be difficult to prove due to defendant conduct. *See* S. Rep. No. 104-177, at *10 ("The committee recognizes that under current law, a civil litigant may not [*12] be able to prove actual damages if a sophisticated, large-scale counterfeiter has hidden or destroyed information about his counterfeiting."). This purpose is particularly relevant here given Defendants' repeated discovery abuses. (*See* 11/8/05 Report (Case No. 03-4844, Docket No. 197)). In addition, other courts have awarded statutory damages after default judgment without conducting evidentiary hearings. [8]

Given these considerations and our [*13] discretion in determining statutory damages awards, we agree with Magistrate Judge Cole that our award of $ 2.5 million in statutory damages without an evidentiary hearing was not an error of law. [9]

## C. "Type of Goods" Objection

Defendants also argue that the judgment should be amended because the maximum statutory damages award recoverable in this case is $ 1 million because only one type of goods (cigarettes) are at issue. (Def. Objection at 4). The Lanham Act states that "if the court finds that the use of the counterfeit mark was willful," then the court may award [*15] "not more than 1,000,000 *per counterfeit mark per type of goods* or services sold, offered for sale, or distributed." *15 U.S.C. § 1117(c)(2)* (emphasis added).

Magistrate Judge Cole rejected this argument because not only had Defendants failed to cite any case law in sup-

port of its proffered statutory interpretation, but also because other cases indicate that a plaintiff may recover $ 1 million in statutory damages for each trademark violated even if only one product is involved. (Report at 3); *see also Top Brand Co.*, No. 00 Civ. 8179, 2006 U.S. Dist. LEXIS 76543, 2006 WL 2946472, at *3 (awarding $ 12 million in statutory damages for three counterfeit goods each bearing four trademarks and $ 5 million for one counterfeit good bearing five trademarks); *Gucci Am., Inc.*, 315 F. Supp. 2d at 521 n.8; *Variety Wholesalers, Inc.*, 274 F. Supp. 2d at 1374. Thus, because Plaintiff alleged that five of its trademarks were violated, Magistrate Judge Cole found that we have discretion to award up to $ 5 million in statutory damages. (Report at 6; *see also* Second Amended Compl. P 16).

Defendants now claim that Magistrate Judge Cole's interpretation of the statute defies commonsense and that none of the above cases are controlling [*16] in this district. Regardless, Defendants still have not cited one case that supports their interpretation, and we agree with Magistrate Judge Cole's interpretation of the statutory language.

## C. Dispute regarding Second Amended Complaint

Defendants finally argue that Plaintiff's Second Amended Complaint never requested statutory damages under the Lanham Act specifically, and thus that Magistrate Judge Cole Report incorrectly awarded them. Defendants' argument appears to be essentially that because Plaintiff's statutory damage request is at the end of its complaint, this means that Plaintiff is only claiming statutory damages under the last count of its complaint, Inducement to Commit Fraud. (Def. Objection at 5). We dis-

---

[8]   *See, e.g.*, *Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 63-64 (1st Cir. 2002) (finding that no evidentiary hearing on statutory damages was required after default judgment since was within district judge's discretion to award within an amount within the statutory range); *Microsoft Corp. v. Nop*, No. CIV S-07-1276, 549 F. Supp. 2d 1235, 2008 U.S. Dist. LEXIS 18727, 2008 WL 686584, at *4 (E.D. Cal. Mar. 11, 2008) (determining amount of statutory damages without an evidentiary hearing and noting that "statutory damages are appropriate in default judgment cases because the information needed to prove damages is within the infringers' control and is not disclosed" (internal citations omitted)); *Warner Bros. Records, Inc. v. Hentz*, No. 06-cv-686-JPG, 2007 U.S. Dist. LEXIS 63716, 2007 WL 2481289, at *4 (S.D. Ill. Aug. 29, 2007).

[9]   Defendants also attempt to distinguish the statutory damage awards in the cases cited in Magistrate Judge Cole's Report. For example, Defendants argue that: *Top Brand* is distinguishable because the defendant's infringing operations in that case led to the production of millions of infringing goods; *Gucci* is distinguishable because the defendants continued to sell counterfeit goods after the lawsuit was filed; and *Variety Wholesalers, Inc.* is distinguishable because the court awarded less than $ 2 million in damages even though defendants was a company with over 450 stores and $ 600 million in gross annual sales. (Def. Objections at 3-4).

However, we find these distinctions irrelevant because these courts also focused upon the defendants' willfulness and abusive conduct during the litigation, as has been repeatedly emphasized in this case. *See Top Brand*, No. 00 Civ. 8179, 2006 U.S. Dist. LEXIS 76543, 2006 WL 2946472, at *2 (examining the extent of the defendants' operation as only one factors in determining the statutory [*14] damage amount and also stressing that "the willfulness of their conduct, and their behavior in this litigation all weigh towards a grant of the maximum in statutory damages"); *Gucci Am., Inc.*, 315 F. Supp. 2d at 521 (determining that defendant acted willfully not only because defendant continued to sell counterfeit goods after the suit was filed, but also due to defendant's "bold contempt for the law" exhibited both during the two-year period it sold the counterfeit goods and during the course of the litigation).

In addition, Defendants' reliance upon *Nike Inc. v. Variety Wholesalers, Inc.* as evidence that the award here was excessive is misplaced because the award in that case was based upon actual damages determined after a trial, and did not involve a willful defendant. *See* 274 F. Supp. 2d 1352, 1374 (S.D. Ga. 2003).

Jessica Bloodgood

2008 U.S. Dist. LEXIS 31761, *16

agree. Reviewing Plaintiff's Second Amended Complaint, Plaintiff specifically asked for "statutory damages in lieu of actual damages, as provided in *15 U.S.C. § 1117(c)*." (Second Amended Compl. P F). While this request was at the end of the complaint and not specifically under Counts I, II, and III, this is of no consequence since Plaintiff is clearly is requesting relief for all of its counts at the end of its complaint and Plaintiff clearly cites to the Lanham Act in **[*17]** Paragraph F. Thus, we agree with Magistrate Judge Cole that this argument is without merit.

**CONCLUSION**

For the reasons set forth below, we overrule Defendants' objections and adopt Magistrate Judge Cole's Report. Accordingly, Defendant's Rule 59(e) motion is denied. It is so ordered.

/s/ Marvin E. Aspen

MARVIN E. ASPEN

United States District Judge

Date: April 17, **_2008_**


Positive
As of: June 26, 2013 1:24 PM EDT

# Lorillard Tobacco Co. v. S&M Cent. Serv. Corp.

United States District Court for the Northern District of Illinois, Eastern Division
November 5, _**2004**_, Decided ; November 8, _**2004**_, Docketed
No. 03 C 4986

**Reporter:** 2004 U.S. Dist. LEXIS 22563; 2004 WL 2534378

LORILLARD TOBACCO COMPANY, Plaintiff, v. S&M CENTRAL SERVICE CORPORATION, Defendant.

**Disposition:** Judgment entered for plaintiff. Plaintiff's request for a permanent injunction granted; Plaintiff's Motion to Amend the Pleadings to Conform to the Evidence and Motion to Strike S&M's Brief on Damages denied.

## Core Terms

infringement, counterfeit, cigarettes, statutory damages, trademark, attorney's fees, tax return, actual damage, motion to strike, award damages, packaging, brand, reproduction, imitation, dollar, deter, personal liability, likely to cause, injunction, cartons, genuine, corporate officer, consumer product, destroying, registered, deceive

## Case Summary

### Procedural Posture

Plaintiff the owner of five trademarks related to its cigarette products, brought post trial motions, seeking: an award of statutory damages of $ 500,000, pursuant to _15 U.S.C.S. § 1117(c)_; an award of its costs and reasonable attorneys' fees pursuant to _15 U.S.C.S. § 1117(b)_; a permanent injunction barring defendant infringer from selling, offering for sale or distributing counterfeit cigarettes, and, amendment of to add individual defendants.

### Overview

The complaint alleged that the infringers violated the Trademark Act of 1946, _15 U.S.C.S. § 1051 et seq._, by willfully offering for sale, selling, and distributing counterfeit versions of the owner's Newport cigarettes. A jury found that consumers would likely confuse the counterfeits with genuine Newports, and the infringing corporation had acted willfully or with willful blindness. The owner also challenged financial data in the form of tax returns submitted by the infringing corporation as improper. The tax forms were not a pleading, and actually showed real profits for the tax years, and so were

not prejudicial to the owner, so the motion to strike was denied. The court noted that the five trademarks infringed were of considerable value. Since part of the purpose of statutory damages was to deter the current violator and other potential future violators, actual damages were less relevant and statutory damages were appropriate. The court found that a $ 250,000 award was fully supported by its concurrence with the jury's determination. The owner also sought to add, after the fact, two individual officers of the infringer as defendants to conform to the evidence.

### Outcome

The court awarded statutory damages of $ 50,000 per infringed mark, reasonable costs and attorneys' fees, and a permanent injunction. The motion to amend the pleadings to conform to the evidence adding two individuals as defendants was denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview

**_HN1_** See _Fed. R. Civ. P. 12(f)_.

Civil Procedure > Pleading & Practice > General Overview
Civil Procedure > Pleading & Practice > Pleadings > Answers
Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

**_HN2_** A memorandum submitted in support of a court's determination of damages is not a pleading under _Fed. R. Civ. P. 7(a)_

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview
Civil Procedure > ... > Standards of Review > Harmless & Invited Errors > General Overview

**_HN3_** The language of _Fed. R. Civ. P. 37(c)_ allows a court to consider evidence that otherwise would be excluded, when the result of its consideration is harmless.

Tax Law > Federal Income Tax Computation > General Overview
Tax Law > Federal Income Tax Computation > Losses > General Overview
Tax Law > ... > Losses > Net Operating Losses > General Overview

2004 U.S. Dist. LEXIS 22563, *22563

Torts > Remedies > Damages > Taxation

*HN4* A net operating loss is a non cash deduction that allows a company to "carry-forward" and/or "carry-back" prior year losses and recognize them as current year tax deductions. *26 U.S.C.S. § 172*.

Copyright Law > ... > Damages > Types of Damages > Statutory Damages
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > ... > Infringement Actions > Remedies > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Damages > Types of Damages > Statutory Damages
Trademark Law > ... > Trademark Counterfeiting Act > Civil Actions > General Overview

*HN5* *15 U.S.C.S. § 1117* allows a plaintiff to elect, at any time before final judgment is rendered, one of two alternative recovery options for trademark infringement: (1) the actual damages caused by the infringement, *15 U.S.C.S. § 1117(a)*; or *(2)* statutory damages. *15 U.S.C.S. § 1117(c)*. Congress provided the statutory damages option of *15 U.S.C.S. § 1117(c)* through the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, *§ 7*, 110 Stat. 1368. That option was added due to the concern that a counterfeiter might hide, alter, or destroy records, thus making it impossible for a plaintiff to determine the scope of, or be able to prove, actual damages.

Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Trademark Counterfeiting Act > Civil Actions > General Overview
Trademark Law > ... > Civil Actions > Remedies > General Overview
Trademark Law > ... > Civil Actions > Remedies > Damages

*HN6* See *15 U.S.C.S. § 1117(c)(1)*.

Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Trademark Counterfeiting Act > Civil Actions > General Overview

*HN7* *15 U.S.C.S. § 1117(c)(2)* allows a statutory award of up to $ 1,000,000 per counterfeit mark if the court finds that the use of the counterfeit mark was willful.

Copyright Law > ... > Remedies > Damages > General Overview
Copyright Law > ... > Damages > Types of Damages > Compensatory Damages
Copyright Law > ... > Damages > Types of Damages > Statutory Damages
Trademark Law > ... > Remedies > Damages > General Overview

*HN8* A court awarding statutory damages is not required to follow any rigid formula but instead enjoys wide discretion. In computing the award amount, a court may consider factors such as the difficulty or impossibility of proving actual damages, the circumstances of the infringement, and the efficacy of the damages as a deterrent. Additionally, statutory damages are appropriate to penalize the infringer and deter future violations when the infringement was willful.

Trademark Law > Conveyances > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Counterfeiting > Trademark Counterfeiting Act > General Overview

*HN9* A counterfeiter must fear more than just having to turn over his ill gotten gains to the rightful owners. Instead, the counterfeit must understand that he risks his financial future by engaging in his illegal practice.

Trademark Law > ... > Factors for Determining Confusion > Intent of Defendant to Confuse > General Overview

*HN10* Willful infringement may be attributed to a defendant's actions where that party had knowledge that it's conduct constituted infringement or where it showed a reckless disregard for the owner's rights. Thus, knowledge need not be proved directly, but can be inferred from a defendant's conduct. Willful infringement may be shown by the fact that the defendant ignored the plaintiff's notices, did not seek advice of an attorney, and passed the matter off as a nuisance.

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards
Civil Procedure > ... > Costs & Attorney Fees > Costs > General Overview

*HN11* A prevailing party is entitled to its costs other than attorneys' fees as a matter of course pursuant to *Fed. R. Civ. P. 54(d)(1)*.

Antitrust & Trade Law > ... > Private Actions > Costs & Attorney Fees > Clayton Act
Civil Procedure > Remedies > Costs & Attorney Fees > General Overview
Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards
Trademark Law > ... > Remedies > Damages > General Overview

*HN12* A court in exceptional cases of infringement may award reasonable attorney fees to the prevailing party, pursuant to *15 U.S.C.S. § 1117(a)*. Exceptional cases allowing for an award of attorneys' fees include acts of infringement that are malicious, fraudulent, deliberate or willful.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Conforming Pleadings to Evidence
Patent Law > Remedies > Equitable Relief > Injunctions
Trademark Law > Conveyances > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Remedies > Equitable Relief > General Overview
Trademark Law > ... > Civil Actions > Remedies > General Overview
Trademark Law > ... > Civil Actions > Remedies > Injunctions

*HN13* A court has power to enter an injunction against future infringement, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office.

*15 U.S.C.S. § 1116 (a)*.

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > ... > Parties > Defendants > Personal Liability of Corporate Directors, Employees & Shareholders
Trademark Law > ... > Remedies > Damages > General Overview

**HN14** As a general rule, corporate officers cannot be held personally liable for infringing actions taken by the corporation. However, an individual may be held liable for a corporation's infringement under the theory of vicarious liability or contributory liability. Personal liability for trademark infringement is established if a corporate officer is a moving, active, conscious force behind the defendant corporation's infringement.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

**HN15** A district court has the ability, under *Fed. R. Civ. P. 15*, to add new defendants after trial and judgment has been entered. However, if the court adds a new party to the litigation, due process requires that the new party is given an opportunity to respond and contest that personal liability.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

**HN16** Although *Fed. R. Civ. P. 15* provides a liberal policy for amending pleadings, the right to amend is not absolute.

**Counsel: [*1]** For LORILLARD TOBACCO COMPANY, A DELAWARE CORPORATION, Plaintiff: John S. Pacocha, Jeffrey G. Mote, Daniel T Fahner, Cameron Matthew Nelson, Greenberg Traurig, LLP., Chicago, IL.

For S&M CENTRAL SERVICE CORPORATION, AN ILLINOIS CORPORATION, Defendant: Alexander Sotirios Michalakos, Zanayed & Michalakos, Ltd., Chicago, IL.

**Judges:** JAMES F. HOLDERMAN, District Judge.

**Opinion by:** JAMES F. HOLDERMAN

| Opinion |
| --- |

*MEMORANDUM OPINION AND ORDER*

JAMES F. HOLDERMAN, District Judge:

Plaintiff Lorillard Tobacco Co., ("Lorillard"), filed suit against defendant S&M Central Service Corporation, ("S&M"), alleging that S&M infringed of five of Lorillard's registered trademarks in violation of the Trademark Act of 1946, *15 U.S.C. § 1051 et seq.*, ("Lanham Act"), by willfully, or with willful blindness, offering for sale, selling and distributing counterfeit versions of Lorillard's Newport cigarettes. At the conclusion of a two day trial on the merits, a jury returned a verdict in favor of Lorillard and stated: (1) yes, consumers would likely confuse the cigarette packs bearing the counterfeit marks sold by S&M with genuine Newport cigarette packs; and (2) yes, S&M's actions were **[*2]** taken willfully or committed with willful blindness. (Dkt. No. 49.)

Lorillard's August 4, *2004* post-trial motions request this court to (1) award Lorillard statutory damages of five hundred thousand dollars, ($ 500,000) [1], pursuant to *15 U.S.C. § 1117(c)*; (2) award Lorillard costs and reasonable attorneys' fees pursuant to *15 U.S.C. § 1117(b)*; (3) enter a permanent injunction barring S&M from selling, offering for sale or distributing counterfeit cigarettes, and, (4) amend the pleadings to add Safwan Alkhawan ("Alkhawan") and Marwan Khawam ("Khawam") as individually liable defendants in order to conform the pleadings to the evidence presented at trial. Lorillard also submitted a motion on August 16, *2004* to Strike the Defendant's Brief on Damages pursuant to *Rules 12, 26* and *37* of the Federal Rules of Civil Procedure, ("Rules").

**[*3]** S&M, in its Brief Regarding Damages of August 6, *2004*, requests that if any damages are awarded, the court should award *15 U.S.C. § 1117(c)*'s minimum amount of $ 500 per infringed mark for a total award of $ 2,500. S&M also argues that an award of attorneys' fees and costs is not appropriate in this case.

For the reasons set forth below, this court awards to Lorillard, pursuant to *15 U.S.C. § 1117(c)*, statutory damages of Fifty Thousand Dollars ($ 50,000) per infringed mark for a total statutory damage award of Two Hundred Fifty Thousand Dollars ($ 250,000). This court also finds that Lorillard is entitled to receive reasonable costs and attorneys' fees pursuant to *15 U.S.C. § 1117(b)* but the parties must comply with the requirements of Local Rule 54.3 before this court can calculate a figure for reasonable costs and attorneys' fees. In addition, this court grants Lorillard's request for a permanent injunction, but denies Lorillard's Motion to Amend the Pleadings to Conform to the Evidence and denies Lorillard's August 16, *2004* Motion to Strike S&M's Brief on Damages.

*BACKGROUND*

---

[1]  Lorillard arrived at the $ 500,000 figure by requesting damages of one hundred thousand dollars, ($ 100,000), for each of the five infringed trademarks.

2004 U.S. Dist. LEXIS 22563, *3

*A. Lorillard Tobacco Company*

 [*4] Lorillard is the fourth largest tobacco company in the United States. (Stipulation and Statement of Uncontested Facts P 4, Ex. 1 to the Pre-Trial Order, [hereinafter Uncontested Facts].) First introduced into the market in 1956, Newport is a Lorillard cigarette brand. (*Id.* at P 6.) Newport is the leading brand of menthol cigarettes sold in the United States, and it is the second leading cigarette brand overall with an eight percent market share. (*Id.* at P 6-7.)

Lorillard has protected the value of the Newport brand by registering the five following trademarks with the United States Patent and Trademark Office: Reg. No. 1,108,876; Reg. No. 1,178,413; Reg. No. 1,191,816; Reg. No. 1,920,066; and Reg. No. 2,600,870. (*Id.* at P 10.) Four of the marks, Nos. 1,108,876; 1,178,417; 1,191,816; and 1,920,666, have attained incontestable status under *15 U.S.C. § 1115(b).* (*Id.*)

*B. S&M Central Service Corporation and its interaction with Lorillard*

S&M operates a gas station in Chicago, Illinois. (Trial Tr. pg. 59.) The station sells gasoline, operates maintenance bays, and sells consumer products including food, magazines and cigarettes. (Uncontested [*5] Facts at P 3.) Lorillard became aware of counterfeit Newport cigarettes at S&M when one of Lorillard's sales representatives made a sales call to S&M. (*Id.* at 16.) The sales representative purchased two cartons of the counterfeit cigarettes. (Trial Tr. at 42.) On July 18, 2003, Lorillard obtained an *Ex Parte* Seizure Order from this court authorizing a seizure of counterfeit cigarettes at S&M. The executed search of S&M resulted in a seizure of 83 cartons and 9 packages of counterfeit Newport cigarettes and associated business records.

*ANALYSIS*

*A. Lorillard's Motion to Strike S&M's Brief on Damages*

On August 16, *2004*, Lorillard filed a motion to strike S&M's August 6, *2004* brief on damages under *Rules 12, 26*, and *37*. Lorillard's motion asserts two separate concerns. First, Lorillard argues that S&M's brief contains misstatement of facts unsupported by citation to the record. Second, Lorillard argues that S&M improperly included its 2001, 2002, and 2003 tax returns as an exhibit to S&M's brief on damages. Lorillard argues that it had requested financial information included tax returns from S&M during discovery, that S&M had failed to disclose these items, and therefore [*6] S&M should be prohibited from using these documents under *Rule 37*. Lorillard requests the court to strike S&M's brief in whole, or in the alternative strike specific offending portions of the brief, and the impose sanctions against S&M.

S&M counters that the documents provided with its brief were specifically requested by the court at the end of the trial, that these documents were not disclosed during discovery because they were not relevant and the information contained in the brief is appropriate since S&M is making arguments to the court. S&M further argues that Lorillard should be sanctioned for bringing its motion to strike.

Lorillard is unable to bring a motion to strike under *Rule 12(f)*. *Rule 12(f)* provides that*HN1* "the court may strike from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Fed. R. Civ. P. 12(f).* The plain language of *Rule 12(f)* states that the Rule applies to "pleadings." *HN2* A memorandum submitted in support of a court's determination of damages is not a pleading under the Rules. *See Fed. R. Civ. P. 7(a)* (Defining pleadings as either a complaint, answer, reply to a counterclaim, an answer to a cross-claim, [*7] a third-party complaint, or third-party answer); *see, e.g., E.E.O.C. v. Admiral Maint. Serv., L.P.,* 174 F.R.D. 643, 645-47 (N.D. Ill. 1997). Consequently, by the plain language of Rules, *Rule 12(f)* is not applicable. The court notes, however, that any evaluation of the facts must be based on the record presented to the court and the court will provide proper citations to the record were appropriate.

Furthermore, this court concludes that it will consider the tax returns provided by S&M in its brief on damages. *HN3* The language of *Rule 37(c)* allows a court to consider evidence that otherwise would be excluded when the result is harmless. *Fed. R. Civ. P. 37(c).* In this case, the court concludes that S&M's decision to provide its 2001, 2003 and 2003 tax returns was harmless to Lorillard and actually undercuts certain of S&M's arguments due to the way that S&M uses the tax returns in its brief on damages.

S&M provides its tax returns as support for its statement that "S&M has not been a profitable enterprise. The attached tax returns of 2001, 2002, and 2003 show that there was no taxable income to the company. As a result, any award of damages would cause a hardship to the  [*8] Defendant." (Def. Br. Regarding Damages of August 6, *2004* at 3.) However, the information contained in the tax returns contradict the statement that any award of damages would be a hardship. It is true that S&M reported zero taxable income on its 2001, 2002 and 2003 federal tax returns. However, the zero taxable figure was the result of a Net Operating Loss deduction, ("NOL"), that S&M was able to take during those three years. *HN4* A NOL is a non cash deduction that allows a company to "carry-forward" and/or "carry-back" prior year losses and recognize them as current year deductions. *See 26 U.S.C. § 172.* Consequently, S&M's statement that it "has not been a profitable enterprise" may be technically correct for tax purposes since S&M reported no taxable income. However, the tax returns actually undermine S&M's statement that "any award of

damages would cause a hardship for the Defendant" because S&M recognized a profit before the NOL deduction. S&M's creditability as to its statement of financial condition is further undermined by the millions of dollars of wire transfers uncovered by Lorillard. (Pls. Brief on Damages and Att'ys Fees of August 6, **2004** at Ex. [*9] I.) Since the tax returns submitted by S&M are actually harmful to S&M and helpful to Lorillard, the court concludes there is no harm as to Lorillard and will deny Lorillard's motion to strike. In light of this decision, S&M's motion to sanction Lorillard for bringing its motion to strike is denied.

*B. Lorillard's Motion for Statutory Damages under 15 U.S.C. § 1117(c)*

**HN5** Title 15, *Section 1117* allows a plaintiff to elect, at any time before final judgment is rendered, one of two alternative recovery options for trademark infringement: (1) the actual damages caused by the infringement, *15 U.S.C. § 1117(a)*; or (2) statutory damages. *15 U.S.C. § 1117(c)*. Congress provided the statutory damages option of *15 U.S.C. § 1117(c)* through the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386. This option was added due to the concern that a counterfeiter might hide, alter or destroy records, thus making it impossible for a plaintiff to determine the scope of, or be able to prove, actual damages. *Louis Vuitton v. Veit,* 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002) [*10] (citing S. Rep. No. 177, 104 Cong. (1995)).

*Section 1117(c)(1)* allows **HN6** statutory damages of "not less than $ 500 and no more than $ 100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." *15 U.S.C. § 1117(c)(1)*. In addition, **HN7** *Section 1117(c)(2)* allows a statutory award of up to $ 1,000,000 per counterfeit mark "if the court finds that the use of the counterfeit mark was willful." *15 U.S.C. § 1117(c)(2)*.

Although *section 1117(c)* contains the dollar ranges for possible statutory damage awards, the statute does not provides guidance on how to select a damage figure within statutory dollar range. Courts interpreting *section 1117(c)* have looked by analogy to case law applying the statutory damage provision of the Copyright Act contained in *17 U.S.C. § 504(c)*, *Sara Lee v. Bags of New York, Inc.,* 36 F. Supp. 2d 161, 166 (S.D.N.Y. 1999) ("Cases decided under the Copyright Act, which deals with a similar problem and a similar legislative grant to discretion, afford guidance here."). *Accord, Tommy Hilfiger Licensing, Inc. v. Goody's* [*11] *Family Clothing, Inc.,* 2003 U.S. Dist. *LEXIS* 8788, No. 1:00-CV-1934-BBM, 2003 WL 22331254, at *28(N.D. Ga. May 9, 2003); *Louis Vuitton,* 211 F. Supp. 2d at 583; *Microsoft Corp. v. Logical Choice Computers, Inc.,* 2001 U.S. Dist. *LEXIS* 479, No. 99 C 1300, 2001 WL 58950 at * 11 (N.D. Ill. Jan. 22, 2001); , *Microsoft Corp. v. Software Wholesale Club, Inc.,* 129 F. Supp. 2d 995, 1008 (S.D.

Tex. 2000).

The Seventh Circuit's standard for awarding copyright statutory damages under *17 U.S.C § 504(c)*, and thus the standard this court will use for awarding trademark statutory damages under *15 U.S.C § 1117(c)*, is enumerated in *Chi-Boy Music v. Charlie Club,* 930 F.2d 1224, 1229 (7th Cir. 1991). Under the *Chi-Boy* standard, **HN8** a court awarding statutory damages is "not required to follow any rigid formula but instead enjoys wide discretion." *Id.* In computing the award amount, a court may consider factors such as "the difficulty or impossibility of proving actual damages, the circumstances of the infringement, and the efficacy of the damages as a deterrent." *Id.* Additionally, statutory damages are appropriate to "penalize [*12] the infringer and deter future violations" when the infringement was willful. *Id.* at 1230.

Lorillard argues for a damages award of at least $ 100,000 per each of the five infringed marks for a minimum damage award of $ 500,000. Lorillard argues that the $ 500,000 is appropriate in light of (1) S&M's annual total gross sales of approximately $ 1.35 million, (2) S&M's annual total gross sales of cigarettes of $ 300,000, (3) the "immeasurable value" of Lorillard's trademarks and the risk that customers using inferior counterfeit cigarettes will stop buying Newport products, and, (4) will serve to deter both S&M and other potential infringers. (Pls. Brief on Damages and Att'ys Fees of August 6, **2004** at pg 12-13, 18.) In addition, Lorillard argues that the court should reject any of the S&M's arguments about inability to pay a damages award. According to Lorillard, S&M's financial information should be "viewed with a healthy degree of skepticism," since they have failed to provide supporting documentation and Lorillard uncovered "millions of dollars worth of foreign wire transfers" made by S&M. (*Id.* at 13.)

Lorillard also argues for the court to find that S&M was [*13] willful in its infringement. A finding of willful infringement would allow for a damages award of up to $ 1,000,000 per counterfeit mark, *15 U.S.C. § 1117(c)(2)*, for a total potential award of $ 5,000,000. According to Lorillard, evidence of S&M's willfulness include (1) the purchase of larger than usual quantities of purported Newport cigarettes from Cam-Kat at a price well below market value and in unusual packaging that differed significantly from the genuine Newport packaging, and, (2) the jury's verdict finding willful infringement. (*Id.* at 15.) Additionally, Lorillard argues that S&M's attempts to rebut the question of willfulness merely highlight their own guilt," (*Id.*), and they have exacerbated their willful purchases of counterfeit Newports by "lying throughout this case - from the day of the *ex parte* seizure to the last day of trial." (*Id.* at 16.)

S&M argues the court should impose no damages or at the most the minimum statutory penalty of $ 500 per infringed mark for a total award of $ 2,500. S&M argues that (1) the conduct of defendants in other reported in-

fringement cases is more willful and done with more disdain than in this **[\*14]** case, and therefore warranted higher damages, (Defs. Brief Regarding Damages of August 6, *__2004__* at pg 2); (2) S&M has not been a profitable enterprise and therefore any damage award would cause a hardship, (*Id*.); (3) the actual damage to Lorillard was very small due to the small number of cartons of counterfeit product purchased, (*Id*. at 4.); (4) despite the jury's finding of willfulness, the evidence for willfulness was not overwhelming, (*Id*.); (5) Lorillard shares some level of responsibility since it possessed specialized and sophisticated knowledge about how to identify counterfeit packages and never shared this information with S&M, (*Id*. at 5); and, (6) the court should not be bound by the jury's findings. (*Id*. at 6)

This court concludes that the appropriate damage award in this case is $ 50,000 per infringed mark for a total statutory damages award of $ 250,000. This amount is appropriate due to the value of the trademarks, the conduct by S&M, and the need to deter future conduct by S&M and other potential counterfeiters. Furthermore, this court notes that an award of $ 250,000 is reasonable and fair in light of the range of awards provided by other courts **[\*15]** awarding damages under *15 U.S.C. § 1117(c)* [2], and that the total potential award could have been as high as $ 5,000,000 due to the maximum statutory award of $ 1,000,000 for each willfully infringed trademark.

 **[\*16]** The five trademarks infringed by S&M are of considerable worth and value. Lorillard has taken considerable action to cultivate, maintain and strengthen these trademarks including: (1) registering the trademarks with the United States Patent and Trademark Office, (Uncontested Facts at P 8); (2) manufacturing the Newport product through strict quality control standards, (*Id*. at P 5); (3) investing substantial time, energy and money in advertising and promoting the Newport product (*Id*. at P 6); (4) training its sales personnel to be aware of counterfeit products so, like in this case, they can identify and report suspicious items, (Trial Tr. at pg 33.); and, (5) protecting the value of its trademarks by litigating against trademark infringers.

Congress has provided the option of statutory damages under *15 U.S.C. § 1117(c)* and Lorillard has elected to pursue that remedy. Consequently, the significant value

of Lorillard's brand and the efforts taken to protect, promote and enhance that brand should be considered by the court in the determination of the appropriate dollar figure for the award. Furthermore, the actual damages incurred by Lorillard are of **[\*17]** lesser concern in determining a proper damage award because Congress' decision to allow statutory damages under *15 U.S.C. § 1117(c)* was in direct recognition of the fact that the calculation of the actual damages may be difficult, if not impossible, to determine. *Louis Vuitton v. Veit, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002)* (citing S. Rep. No. 177, 104 Cong. (1995)).

The actual damages figure is also less relevant since part of the purpose of statutory damages is to deter the current violator and other potential future violators. Thus, the court believes that a damage award limited to Lorillard's lost profits would have little to no deterrent effect on future violations. *HN9* A counterfeiter must fear more than just having to turn over his ill gotten gains to the rightful owners. Instead, the counterfeit must understand that he risks his financial future by engaging in his illegal practice. As the Seventh Circuit has held, "one who undertakes a course of infringing conduct may neither sneer in the face of the [trademark] owner nor hide its head in the sand like an ostrich." *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 514 (7th Cir. 1994) **[\*18]** (citations omitted).

Furthermore, deterring S&M along with potential future trademark infringers is an important consideration in light of the fact that counterfeiters often times produces lower quality products than the original. Lorillard properly notes that infringement deprives the rightful owner of profits and reduces the value of its brands. But an additional concern, above and beyond the financial harm, is that counterfeit consumer products can also potentially pose the risk of being more harmful or dangerous then the real product. The House of Representatives in its report on the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386, noted, "even more grievous than the enormous economic losses suffered by American companies are the serious health and safety hazards caused by criminal counterfeiting." H. Rep. No. 556, 104 Cong. (1996).

The court is not entering into a discussion of the general health effects of cigarettes or whether the counterfeit

---

2    A figure of $ 50,000 per infringed mark for a total award of $ 250,000 is within the range of statutory awards made by other courts under 15 U.S.C. § 1117(c). *See Philip Morris USA, Inc. v. Felizardo*, 2004 U.S. Dist. LEXIS 11154, No. 03 Civ. 5891, 2004 WL 1375277, at *7 n.16 (S.D.N.Y. June 18, 2004) ($ 62,500 statutory damage award for two infringed trademarks when defendant attempted to sell 7500 counterfeit cartons of cigarettes); *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 501 (C.D. Cal. 2003) ($ 2,000,000 statutory damage award for two infringed trademarks when defendant imported 8,000,000 counterfeit cigarettes); *see e.g., Silhouette Int'l Schmied v. Chakhbazian*, No. 04 Civ. 3613, at *2 (S.D.N.Y Oct. 4, 2004) ($ 250,000 statutory damage award for infringement of multiple eyewear trademarks); *Microsoft Corp v. V3 Solutions, Inc.*, 2003 U.S. Dist. LEXIS 15008, No. 01 C 4693, 2003 WL 22038593, at *16 (N.D. Ill. Aug. 28, 2003) ($ 35,000 statutory damage award for seven infringed Microsoft software trademarks); *Microsoft Corp. v. Logical Choice Computers, Inc.*, 2001 U.S. Dist. LEXIS 479, No. 99 C 1300, 2001 WL 58950, at *11 (N.D. Ill. Jan. 22, 2001) ($ 1,400,000 statutory damage for the infringement of seven Microsoft software trademarks).

Jessica Bloodgood

cigarettes sold by S&M were more harmful than the authentic Newport product. Instead, the court is noting that there was no proof presented by the parties that the counterfeit Newport products [*19] are subject to any type of safety review or quality control process when manufactured by someone other than Lorillard. Cigarettes are consumer products and the retail establishments that sell cigarettes often sell other consumer products such as food, beverages, over-the-counter medicines and cosmetics. S&M sells food and beverages as well as cigarettes. (Uncontested Facts at P 3.) When the statutory damage award will deter S&M and other retail establishments from purchasing counterfeit consumer products, and this in turn will help to reduce the probability that consumers will purchase counterfeit products that may be more dangerous than the authentic items.

The court's belief that a $ 250,000 award is fully supported by its concurrence with the jury's determination of S&M's willful infringement. A finding of willful infringement allows the court to award the maximum statutory damage amount, if appropriate under the circumstances of the case, of $ 1,000,000 per infringed mark, _15 U.S.C. § 1117(c),_ for a total potential award in this case of $ 5,000,000.

**HN10** "Willful infringement may be attributed to the defendant's actions where he had knowledge that his conduct constituted [*20] infringement or where he showed a reckless disregard for the owner's rights. Thus, knowledge need not be proved directly, but can be inferred from a defendant's conduct." _Logical Choice Computers, Inc._, 2001 U.S. Dist. **LEXIS** 479, No. 99 C 1300, 2001 WL 58950, at *11 (citing _Wildlife Express Corp._, 18 F.3d at 511). Willful infringement may be shown by the fact that the "defendant ignored the plaintiff's notices ..., did not seek advice of an attorney, and passed the matter off as a nuisance." _Wildlife Express Corp._, 18 F.3d at 511.

Several facts support the jury's determination of willfulness. S&M purchased the counterfeit cigarettes at a price below the market price. Khawam testified that S&M obtained the counterfeit cigarettes at a price of $ 34 per carton instead of the normal rate of $ 40 per carton. (Trial Tr. 155, 161.) Khawam admitted during his testimony that price was low enough to make him inspect the tax stamps and the name brands on a sample of the cartons he purchased from Cam-Kat. (Trial Tr. 160.)

Additionally evidence is that packaging for the counterfeit cigarettes, including the outer boxes, was different from the packaging used for authentic [*21] Newport cigarettes. (Trial Ex. 30 - 32c.) Alkawham, when questioned about the differences in the packaging during his testimony, responded, "it's not my business to find out if they're counterfeit or not." (Trial Tr. 91.)

In light of the reasons set forth above, this court awards to Lorillard, pursuant to _15 U.S.C. § 1117(c),_ statutory damages of Fifty Thousand Dollars ($ 50,000) per in-

fringed mark for a total statutory damage award of Two Hundred Fifty Thousand Dollars ($ 250,000). This amount is within the range authorized by Congress under the statute and is appropriate in light of the evidence presented at trial.

_C. Award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(b) and Rule 54(d)(1)_

Lorillard seeks an award of $ 140,000 for costs and reasonable attorneys' fees. **HN11** As the prevailing party, Lorillard is entitled to its costs other than attorneys' fees as a matter of course pursuant to _Rule 54(d)(1). Fed. R. Civ. P. 54(d)(1)._ **HN12** "The court in exceptional cases may award reasonable attorney fees to the prevailing party." _15 U.S.C. § 1117(a)._ Exceptional cases allowing for an award of [*22] attorneys' fees include "acts of infringement [that] are 'malicious, fraudulent, deliberate or willful.'" _BASF Corp. v. Old World Trading Co., Inc._, 41 F.3d 1081, 1099 (7th Cir. 1994) (quoting _Roulo v. Russ Berrie & Co., Inc._, 886 F.2d 931, 942 (7th Cir. 1989)).

An award of reasonable attorneys's fees under _15 U.S.C. § 1117(a)_ is appropriate in light of the jury's determination, and the court's concurrence in that determination, of willful infringement by S&M. The parties must comply with the Local Rule 54.3, before the court can determine the amount of fees and costs which reasonably should be awarded.

_D. Permanent Injunction Barring S&M from Selling, Offering for Sale or Distributing Counterfeit Cigarettes_

Lorillard seeks a permanent injunction to bar S&M from selling, offering for sale or distributing counterfeit cigarettes. **HN13** This court has power to enter such an injunction, "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." _15 U.S.C. § 1116_ [*23] _(a)._ This court grants the injunction, as detailed below, in the "Conclusion" section of this opinion.

_E. Lorillard's Motion to Amend the Pleadings to Conform to the Evidence Presented at Trial_

Lorillard moves to amend the pleadings to add Safwan Alkhawan, ("Alkhawam"), and Marwan Khawam ("Khawam") as individually liable defendants in order to conform the pleadings to the evidence presented at trial pursuant to _Rule 15(b)._ Alkhawan is the owner of S&M. (Trial at pg. 58.) Alkhawan handles S&M's financial activities including its bank accounts, the paying of bills and the writing of checks. (Trial Tr.pg 60.) Alkhawan has employed his brother Khawam to run the gas station on a daily basis for the past ten years. (_Id._)

**HN14** As a general rule, corporate officers cannot be

2004 U.S. Dist. LEXIS 22563, *23

held personally liable for infringing actions taken by the corporation. *Drink Group, Inc. v. Gulfstream Communications*, 7 F. Supp. 2d 1009, 1010 (N.D. Ill. 1998) (citing *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926)). However, this court has recognized that an individual may be held liable for a corporation's infringement under the theory of vicarious liability or **[*24]** contributory liability. *Microsoft Corp. v. V3 Solutions, Inc.*, 2003 U.S. Dist. *LEXIS* 15008, No. 01 C 4693, 2003 WL 22038593, at *13 (N.D. Ill. Aug. 28, 2003) (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt.*, 443 F.2d 1159 (2d Cir. 1971)). "Personal liability for trademark infringement … is established if a corporate officer is a moving, active, conscious force behind the defendant corporation's infringement." *Dynamic Force v. Dynamic Force, Ltd.*, 1999 U.S. Dist. *LEXIS* 7892, No. 98 C 5922, 1999 WL 342407, at *4 (N.D. Ill. May 14, 1999).

The factual situation in the present case is different from the situation in the *V3 Solutions* and *Dynamic Force* cases. In those cases, the individual corporate officer had been named as a defendant in the original complaint filed with the court. Thus, the question was whether it was appropriate to find personal liability or only limit liability to the named corporation. However, in the present case, Alkhawan and Khawam have never been named as defendants in the case. Service of process was only effectuated on S&M, not on Alkhawan or Khawam. (Dkt. No. 14.) The U.S. Marshal's served Khawam in person on July 18, 2003, however, Khawam was served **[*25]** in his role as an employee of S&M and not in his capacity as an individual. (Dkt. No. 13.)

**HN15** This court does have the ability under *Rule 15* to add new defendants after trial and judgment has been entered. However, as the Supreme Court held in *Nelson v. Adams*, that if the court adds a new party to the litigation, due process requires that the new party is given an opportunity to respond and contest his personal liability. *529 U.S. 460, 463, 146 L. Ed. 2d 530, 120 S. Ct. 1579 (2000)*. Thus, this court, although it has the power to add Alkhawan and Khawam, cannot immediately award judgment against them in favor of Lorillard. Instead, if this court decides to add Alkhawan and Khawam, it must give them the opportunity to respond.

Furthermore, **HN16** although *Rule 15* provides a liberal policy for amending pleadings, the right to amend is not absolute. *See Crestview Vill. Apartments v. United States Dep't of Hous. and Urban Dev.*, 383 F.3d 552, *2004* WL 1965663, at *5 (7th Cir. *2004*) (citing *Perkins v. Silverstein*, 939 F.2d 463, 471-72 (7th Cir. 1991)). Lorillard provides no reason for its failure to name Alkhawan and Khawam as individual defendants **[*26]** before the trial. Lorillard was aware of Alkhawan and Khawam existence and their roles in the counterfeiting before the trial. Alkhawan was present for this trial, however, his presence was in his capacity as the owner of S&M. Whether he and Khawam would have dealt with

this case in the same way as S&M, if they were facing personal liability and a possible judgment against them as individuals, is a matter of speculation. The only way to know would be to retry the case and the court is unwilling at this point to impose to undertake that burden especially when Lorillard could have named Alkhawan and Khawam as defendants much earlier in the litigation. Consequently, the court denies Lorillard's motion to amend the pleadings to conform to the evidence presented at trial.

*CONCLUSION*

For the reasons set forth above, this court order judgment to Plaintiff Lorillard Tobacco Company of statutory damages of Fifty Thousand Dollars ($ 50,000) per infringed mark for a total statutory damage award, pursuant to *15 U.S.C. § 1117(c)*, of Two Hundred and Fifty Thousand Dollars ($ 250,000) from Defendant S&M Central Service Corporation. This court also finds that Lorillard **[*27]** Tobacco Company is entitled to receive reasonable costs and attorneys' fees from S&M Central Service Corporation, pursuant to *15 U.S.C. § 1117(b)*, but the parties must comply with the requirements of Local Rule 54.3 as follows: Lorillard must provide S&M with its 54.3 material by November 12, *2004* and S&M must provide Lorillard with its 54.3 material by November 23, *2004*. The parties should then attempt to resolve any remaining disputes over attorneys' fees and costs. If an agreement cannot be reached, Lorillard's further petition for fees and costs, including the joint statement under 54.3(e), is due no later than December 6, *2004*. Response is due December 17, *2004* and the reply is December 28, *2004*.

This court denies Lorillard's Motion to Amend the Pleadings to Conform to the Evidence and denies Lorillard's August 16, *2004* Motion to Strike S&M's Brief on Damages.

The court orders the clerk of this court to release the five hundred dollar ($ 500) bond posted by Lorillard Tobacco Company at the commencement of this action on July 18, 2003, plus interest, be immediately released to Martin Kedziora or Thomas Kost in a check payable to Greenberg Traurig, LLP.

**[*28]** Furthermore, it is therefore ordered that defendant S&M Central Service Corporation, and their agents, servants, employees, attorneys, and those personal or entities in active concert or participating with them who receive actual notice of this order by personal service or otherwise, are permanently enjoined from doing, or assisting others in doing, the following acts:

(i) using any reproduction, counterfeit, copy, or colorable imitation of the Lorillard Marks in connection with the importation, sale, offering for sale, or distribution of cigarettes in the United States, which cigarettes

in fact are not connected with Lorillard or are not genuine Lorillard products, which such use is likely to cause confusion, or to cause mistake, or to deceive;

(ii) using the Lorillard Marks or any reproduction, counterfeit, copy, or colorable imitation of the same in any manner likely to cause others to believe that Defendants' products are connected with Lorillard or are genuine Lorillard products if they are not, which such use is likely to cause confusion, or to cause mistake, or to deceive;

(iii) passing off, inducing, or enabling others to sell or pass off any merchandise which is **[*29]** not genuine Lorillard merchandise as and for genuine Lorillard merchandise;

(iv) committing any other acts reasonably calculated to cause purchasers to believe that Defendant's products are Lorillard's products, when in fact such products are not Lorillard products;

(v) importing, shipping, delivering, distributing, holding for sale, returning, transferring, or otherwise moving or disposing of in any manner such cigarettes falsely bearing one or more of the Lorillard Marks or any reproduction, counterfeit, copy, or colorable imitation of the same;

(vi) discussing or communicating any aspect of the seizure of counterfeit cigarettes or the identifying markers of counterfeit cigarettes with any person or entity selling or attempting to sell cigarettes to Defendants;

(vii) assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above paragraphs (i) through (vi); and (viii) other than by an order of this Court,

(1) selling, moving, destroying, or otherwise disposing of any goods, boxes, labels, packaging or other items or documents bearing any reproduction, counterfeit, or imitation of the Lorillard **[*30]** Marks, which such use is likely to cause confusion, or to cause mistake, or to deceive;

(2) moving, destroying, or otherwise disposing of any business records or documents relating in any way to the manufacture, importation, acquisition, purchase, distribution, or sale of goods or merchandise bearing any of the Lorillard Marks or any reproduction, counterfeit, or imitation of the Lorillard Marks, which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(3) assisting any third party in identifying, moving, destroying, or otherwise disposing of any reproduction, counterfeit or imitation goods, as well as any records pertaining to reproduction, counterfeit or imitation goods, which such use is likely to cause confusion, or to cause mistake, or to deceive.

S&M Central Service Corporation and their agents, servants, employees, attorneys, and those personal or entities in active concert or participating with them who receive actual notice of this order by personal service or otherwise is warned that any act by them in violation of any of the terms of this Order may be considered and prosecuted as contempt of this Court.

ENTER:

JAMES F. HOLDERMAN

United **[*31]** States District Judge

DATE: November 5, _**2004**_

**JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came to trial before the Court. The issues have been tried and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff and against defendant in the amount of $ 250,000.00 plus costs and attorneys' fees.

Date: 11/5/_**2004**_


Caution
As of: June 26, 2013 12:26 PM EDT

# Coach, Inc. v. Ocean Point Gifts

United States District Court for the District of New Jersey
June 14, **_2010_**, Decided; June 14, **_2010_**, Filed
Civil Action No. 09-4215 (JBS)

**Reporter:** 2010 U.S. Dist. LEXIS 59003; 2010 WL 2521444

COACH, INC. and COACH SERVICES, INC., Plaintiff, v. OCEAN POINT GIFTS and DOES 1 THROUGH 10, Defendant.

## Core Terms

counterfeit, trademark, infringement, statutory damages, default, default judgment, cause of action, attorney's fees, marks, copyright infringement, permanent injunction, actual damage, trademark infringement, cigarette, likelihood of confusion, false designation, unjust enrichment, public interest, trade dress, culpability, dilution, handbags, famous

**Counsel:** **[*1]** Erica Susan Helms, Esq., STERNS & WEINROTH, PC, Trenton, NJ, for Plaintiffs.

**Judges:** HONORABLE JEROME B. SIMANDLE, United States District Judge.

**Opinion by:** JEROME B. SIMANDLE

## Opinion

**SIMANDLE,** District Judge:

This matter comes before the Court on Plaintiffs Coach, Inc. and Coach Services, Inc.'s ("Coach") motion for default judgment (Docket No. 9) as against Defendant Ocean Point Gifts ("Defendant"). For the reasons expressed below, the Court will grant Plaintiffs' motion.

## I. BACKGROUND

### A. Facts

[1]

For over sixty years Coach has been in the trade of luxury fashion accessories. Coach manufactures, markets, and sells a variety of goods including, most promi-

nently, handbags. Coach sells its goods through its own specialty retail stores, department stores, catalogs, and via the Internet at www.coach.com. Coach owns a number of trademarks, trade dresses, and design elements/copyrights that it uses on its products.

Based on information obtained from a private investigator and Coach staff, Coach alleges that **[*2]** Defendant Ocean Point Gifts has sold counterfeit Coach items at its store located at 1631 Boardwalk, Atlantic City, New Jersey. (Compl. P 28; Smith Decl. PP 3-4.) For example, Defendant sold a $ 12.99 imitation of a $ 200 Coach wallet that included a paper insert reading "The Coach Signature Collection" with contact information for Coach Consumer Service. (Smith Decl. PP 5-6.) Ocean Point Gifts has not been given permission to use the Coach trademarks. (Pyatt Decl. P 11; Compl. P 33.)

Plaintiffs served Defendant Ocean Point Gifts with a copy of the summons and complaint on August 23, 2009. (Docket No. 5.) On November 20, 2009, nearly three months after process was served, the investigator returned to the store and found that the Defendant was still selling counterfeit Coach products. (Smith Decl. P 8.) Coach alleges that Defendant Ocean Point Gifts has engaged in selling counterfeit goods knowingly and intentionally for the purpose of trading on the reputation of Coach and that Defendant will continue to do so unless otherwise restrained. (Compl. PP 34, 36.)

### B. Procedure

On August 18, 2009, the Plaintiffs filed a nine-count Complaint against Ocean Point Gifts and ten John Does presenting **[*3]** claims of trademark counterfeiting (_15 U.S.C. § 1114_), trademark infringement (_15 U.S.C. § 1114_), trade dress infringement (_15 U.S.C. § 1125(a)_), false designation of origin and false advertising (_15 U.S.C. § 1125(a)_), trademark dilution (_15 U.S.C. § 1125(c)_), copyright infringement (_17 U.S.C. §§ 501-513_), trafficking in counterfeit trademarks (_N.J. Stat. Ann. § 56:3-13.16_), unfair competition (_N.J. Stat. Ann. §§ 56:4-1_, _56:4-2_), and unjust enrichment. The Defendant was properly

---

[1] The facts recited herein are derived from the Plaintiffs' supporting declaration, including private investigator Richard H. Smith and Coach's Manager of Intellectual Property April E. Pyatt, and documents attached thereto.

served on August 23, 2009, but has failed to respond. On November 10, 2009, Coach filed a request for default, which the Clerk of the Court entered pursuant to *Rule 55(a), Fed. R. Civ. P.,* on November 12, 2009. Coach now moves the Court to enter a default judgment against Defendant and seeks a permanent injunction, statutory damages, and an award of attorney fees, investigator fees, and costs.

## II. DISCUSSION

*Fed. R. Civ. P. 55(b)(2)* authorizes the entry of a default judgment against a party that has defaulted. However, default judgment is not a right. *Franklin v. Nat'l Mar. Union of Am.,* No. 91-480, 1991 U.S. Dist. *LEXIS* 9819, 1991 WL 131182, at *1-2 (D.N.J. July 16, 1991) (quoting 10A Wright, Miller, & Kane, *Federal Practice and Procedure* § 2685 **[*4]** (3d ed. 1998)), *aff'd, 972 F.2d 1331, 1331 (3d Cir. 1992).* The decision about whether default judgment is proper is primarily within the discretion of the district court. *Hritz v. Woma Corp.,* 732 F.2d 1178, 1180 (3d Cir. 1984).

### A. Standard of Review

Once a party has defaulted, the consequence is that "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149 (3d Cir. 1990) (internal quotations omitted) (citing *Thomson v. Wooster,* 114 U.S. 104, 5 S. Ct. 788, 29 L. Ed. 105, 1885 Dec. Comm'r Pat. 279 (1885)). Entry of default judgment where damages are not a sum certain requires an application to the court to prove, *inter alia,* damages. *Fed. R. Civ. P. 55(b)(2); Comdyne,* 908 F.2d at 1149. In addition, liability is not established by default alone. *D.B. v. Bloom,* 896 F. Supp. 166, 170 n.2 (D.N.J. 1995) (citing Wright, *supra,* § 2688). The Court must determine whether a sufficient cause of action was stated, *Chanel, Inc. v. Gordashevsky,* 558 F. Supp. 2d 532, 535 (D.N.J. 2008), and whether default judgment is proper. *Chamberlain v. Giampapa,* 210 F.3d 154, 164 (3d Cir. 2000).

### B. Sufficiency of Causes of Action

In the present case, after being properly **[*5]** served on August 23, 2009 (Docket No. 5), the Defendant failed to appear or otherwise defend and the Clerk of the Court entered a default. Therefore, the first issue is whether the Plaintiffs have stated a sufficient cause of action. As will be explained below, the Court determines that Coach has established Defendant's liability for the purposes of this default judgment motion.

#### 1. *Federal Claims*

In their Complaint, Plaintiffs have asserted six federal claims against the Defendant: trademark counterfeiting (*15 U.S.C. § 1114(1)(a)*); trademark infringement (*15*

*U.S.C. § 1114(1)(a)*); trade dress infringement (*15 U.S.C. § 1125(a)*); false designation of origin and false advertising (*15 U.S.C. § 1125(a)(1)(A)*); trademark dilution (*15 U.S.C. § 1125(c)*); and copyright infringement (*17 U.S.C. §§ 501-513*). Each was stated sufficiently to establish liability based on federal law.

#### a. Trademark Infringement (*15 U.S.C. § 1114(1)(a)*) and False Designation (*15 U.S.C. § 1125(a)(1)(A)*)

Trademark infringement (Count II) and false designation (Count IV) are measured by identical standards. *A & H Swimwear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 (3d Cir. 2000). The record must show: (1) the **[*6]** plaintiff has a valid and legally protectable mark, (2) the plaintiff owns the mark, and (3) the defendant's use of the mark causes a likelihood of confusion. *Id.*

The first two elements are satisfied by registration and ownership of the relevant trademarks. (Compl. PP 14-15.) The third element is also satisfied. In the Complaint (Compl. P 49) and through exhibits, (*e.g.* Smith Decl., Ex. B) the record has uncontested assertions and evidence that are sufficient to show a likelihood of confusion between the counterfeit handbags and genuine Coach product. Further, it is reasonable to believe that some consumers would be confused by these counterfeit products. *See Coach, Inc. v. Cellular Planet,* No. 2:09-cv-00241, *2010* U.S. Dist. *LEXIS* 45087, *2010* WL 1853424, at *1, *4 (S.D. Ohio, May 7, *2010)* (holding that although the counterfeit items could be distinguished from genuine Coach items because they were being sold out of a trunk of a car, the counterfeit nature of the products meant they were inherently likely to cause confusion). Therefore, a cause of action for trade infringement and false designation has been sufficiently established.

#### b. Trademark Counterfeiting (*15 U.S.C. § 1114(1)(a)*)

To establish trademark counterfeiting **[*7]** (Count I) the record must show (1) the defendant infringed a registered trademark in violation of the Lanham Act, *15 U.S.C. § 1114(1)(a)* and *(2)* the defendant intentionally used the trademark knowing it was counterfeit or was willfully blind to such use. *Chanel v. Gordashevsky,* 558 F. Supp. 2d at 537. "The only distinction between the standard for federal trademark counterfeiting and the standard for establishing infringement is that to obtain treble or statutory damages for a counterfeiting claim, a plaintiff must show that the defendant intentionally used the plaintiff's trademark, knowing that it was a counterfeit." *Chanel v. Gordashevsky,* 558 F. Supp. 2d at 536-537. Intent can be inferred from continued use after being given notice. *Platypus Wear, Inc. v. Bad Boy Club, Inc.,* No. 08-02662, 2009 U.S. Dist. *LEXIS* 60637, 2009 WL 2147843, at *6 (D.N.J. July 15, 2009)

Here, both elements of trademark counterfeiting are met. As discussed above, a trademark was infringed. The al-

leged willfulness of the Defendant (Compl. P 41) is confirmed by evidence showing the Defendant continuing to sell the handbags nearly three months after being served with notice of the Complaint. (Smith Decl. P 8, Ex. C.) Therefore, a cause **[*8]** of action for trademark counterfeiting has been sufficiently established.

**c. Trade Dress Infringement** (*15 U.S.C. § 1125(a)*)

To establish trade dress infringement (Count III), a plaintiff must show: (1) the allegedly infringing design is non-functional, (2) the design is inherently distinctive or has acquired secondary meaning, and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product. *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,* 511 F.3d 350, 357 (3d Cir. 2007).

Each of these elements was stated in the Complaint, (Compl. PP 57-59) and was not contested. The Court is therefore satisfied that the Plaintiffs have a meritorious claim for trade dress infringement based on the non-functional nature of the infringement, the distinctiveness of the Coach elements, and the likelihood of confusion.

**d. Trademark Dilution** (*15 U.S.C. § 1125(c)*)

To establish trademark dilution under the Lanham Act a plaintiff must prove:

> (1) the plaintiff is the owner of a mark that qualifies as a 'famous' mark in light of the totality of eight factors listed in *§ 1125(c)(1)*; (2) the defendant is making commercial use in interstate commerce of a mark or **[*9]** trade name; (3) defendant's use began after the plaintiff's mark became famous; and (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.

*Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC,* 212 F.3d 157, 163 (3d Cir. 2000); *800 -JR-Cigar, Inc. v. GoTo.com, Inc.,* 437 F. Supp. 2d 273, 293 (D.N.J. 2006).

As set forth in Count V of the Complaint, the Plaintiff has shown that the relevant Coach marks are "famous" and Defendant's actions lessen the capacity of such marks to identify and distinguish Coach products. (Compl. PP 75 -76.) The interstate nature of the commerce and the timing of the Defendant's use of the mark is not perfectly clear from the record. Private investigator Erin Smith, employed by a Pennsylvania investigative firm, purchased a wallet at Defendant's store. (Smith Decl. PP 2, 5.) This is evidence that the Defendant is involved in interstate commerce. Similarly, although uncertain due to the Defendant's failure to respond, the Defendant's use almost certainly began following the time when the

Plaintiffs' marks became famous. Therefore, the Court will accept that these elements are satisfied **[*10]** and a cause of action for trademark dilution has been established.

**e. Copyright Infringement** (*17 U.S.C. §§ 501-513*)

To establish copyright infringement pursuant to *17 U.S.C. §§ 501-513*, a plaintiff must prove (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991); *Dam Things from* Denmark v. Russ Berrie & Co., Inc., 290 F.3d 548, 561 (3d Cir. 2002). The copying element can be proven by showing that the defendant had access to the work and there are substantial similarities between the two works. *Dam Things,* 290 F.3d at 561. Both elements have been sufficiently asserted to state a cause of action for copyright infringement. (Compl. PP 84-86.) Therefore, a cause of action for copyright infringement has been established.

**2.** *State Claims*

In their Complaint Plaintiffs have also asserted three state law claims: trademark counterfeiting (*N.J. Stat. Ann. § 56:3-13.16*); unfair competition (*N.J. Stat. Ann. §§ 56:4-1,* 56:4-2); and unjust enrichment. The state common law claim was sufficiently stated and because federal liability has already been established, state statutory **[*11]** liability is also met.

**a. State Statutory Claims**

*N.J. Stat. Ann. § 56:3-13.16* provides civil liability against a person who engages in trafficking of counterfeit marks and *N.J. Stat. Ann. § 56:4-2* provides civil liability against a person who appropriates trademarks. These state law claims are similar to the federal Lanham Act claims and this Court has found liability under federal law to be sufficient to establish liability under state law. *See Axelrod v. Heyburn,* No. 09-5627, ***2010*** U.S. Dist. ***LEXIS*** 43391, ***2010*** WL 1816245, at *3 (D.N.J. May 3, ***2010***); *Zinn v. Seruga,* No. 05-3572, 2009 U.S. Dist. ***LEXIS*** 89915, 2009 WL 3128353, at *27-*28 (D.N.J. Sept. 28, 2009); *N.V.E., Inc. v. Day,* No. 07-4283, 2009 U.S. Dist. ***LEXIS*** 72934, 2009 WL 2526744, at *2 (D.N.J. Aug. 18, 2009). Therefore, because Plaintiffs have established liability for their federal claims for trademark counterfeiting, the Plaintiffs have also established trademark counterfeiting under *N.J. Stat. Ann. § 56:3-13.16* and unfair competition under *N.J. Stat. Ann. §§ 56:4-1,* 56:4-2.

**b. Unjust Enrichment**

The Plaintiffs have stated a claim under New Jersey common law for unjust enrichment. (Compl. P 107.) Here the Defendant was profiting from counterfeit items based

on Coach's reputation. It would be unjust for the Defendant [*12] to enrich itself without compensating the Plaintiffs, so a cause of action for unjust enrichment has been established. *See Howard Johnson Int'l, Inc. v. Vraj Brig, LLC,* No. 08-1466, *2010* U.S. Dist. *LEXIS* 3189, *2010* WL 215381, at *9 (D.N.J. Jan. 14, *2010*) (citing *Kopin v. Orange Prods., Inc.,* 297 N.J. Super. 353, 366-68, 688 A.2d 130 (N.J. Super. Ct. App. Div. 1997)).

In sum, each count of the complaint stated a sufficient cause of action that is supported by evidence in the record. The Court now turns to whether default judgment is proper.

## C. Default Judgment

"Before imposing the extreme sanction of default [judgment], district courts must make explicit factual findings as to (1) whether the party subject to default has a meritorious defense, (2) the prejudice suffered by the party seeking default, and (3) the culpability of the party subject to default." *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds,* 250 F.R.D. 171, 177 (D.N.J. 2008) (citing *Emcasco Ins. Co. v. Sambrick,* 834 F.2d 71, 74 (3d Cir. 1987)).

The current record does not show any meritorious defenses. Because the Defendant did not respond, the Court cannot determine whether the Defendant had meritorious defenses that are not reflected in the record. The Plaintiffs [*13] have been prejudiced by the Defendant's failure to answer because they have been prevented from prosecuting their case, engaging in discovery, and seeking relief in the normal fashion. Defendant was properly served, yet failed to appear or defend itself in any fashion and has continued to sell bags. (*See* Smith Decl. P8.) It has been nearly a year and the Defendant has failed to contact the Court or the Plaintiffs. This shows the Defendant's culpability in its default. *See Platypus Wear,* 2009 U.S. Dist. *LEXIS* 60637, 2009 WL 2147843 at *5. Plaintiff is entitled to default judgment against Defendant Ocean Point Gifts.

## D. Remedies

### 1. Statutory Damages

The Lanham Act provides that a plaintiff can elect to recover either actual damages based on the defendant's profits and the plaintiff's damages (*15 U.S.C. § 1117(a)*) or statutory damages (*15 U.S.C. § 1117(c)*). The Plaintiffs have elected to recover statutory damages. (Mem. in Supp. of Mot. for Default J. and Permanent Inj., 11.) As discussed below, after considering past awards in this District, the point of sale, the extent of sales, and the lack of evidence concerning plaintiffs' losses, the Court will award $ 200,000 in statutory damages.

For statutory damages the plaintiff [*14] may recover "not less than $ 1,000 or more than $ 200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." *15 U.S.C. § 1117(c)(1)*). If the use of the counterfeit mark was willful, the maximum increases to $ 2,000,000 per mark per type of good. *15 U.S.C. § 1117(c)(2)*. For use to be willful, a defendant must show an "aura of indifference to plaintiff's rights" or a "deliberate and unnecessary duplicating of a plaintiff's mark . . . in a way that was calculated to appropriate or otherwise benefit from the good will the plaintiff had nurtured." *SecuraComm Consulting Inc. v. Securacom Inc.,* 166 F.3d 182, 187 (3d Cir. 1999) (citations and internal marks omitted), *superseded by statute on other grounds as recognized by Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 181 (3d Cir. 2005).

"In the absence of clear guidelines for setting a statutory damage award, courts have tended to use their wide discretion to compensate plaintiffs, as well as to deter and punish defendants, often borrowing from factors considered for statutory damages in copyright infringement." *Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F. Supp. 2d 567, 583-84 (E.D. Pa. 2002) [*15] (citing cases showing wide range of statutory damages awarded by district courts). Because statutory damages are meant to serve as a substitute for actual damages the Court should discern whether the requested damages "bear some relation to the actual damages suffered." *Bly v. Banbury Books, Inc.,* 638 F. Supp. 983, 987 (E.D. Pa. 1986); *see also Gucci Am. V. Duty Free Apparel, Ltd.,* 315 F. Supp. 2d 511, 520 (S.D.N.Y. 2004) ("To the extent possible, statutory damages 'should be woven out of the same bolt of cloth as actual damages.'") (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright § 14.04[E][1],* at 14-69 (2003).)

To assess whether the request is appropriate, the Court may be guided by past statutory damage awards. *See Louis Vuitton Malletier, S.A. v. Mosseri,* No. 07-2620, *2009* U.S. Dist. *LEXIS* 100851, 2009 WL 3633882, at *3 (D.N.J. Oct. 28, 2009); *N.V.E., 2009* U.S. Dist. *LEXIS* 72934, 2009 WL 2526744, at *3-*4; *Louis Vuitton & Oakley,* 211 F. Supp. 2d at 583-84. The recent Lanham Act cases in this District for counterfeit products can be generally grouped under two categories: Internet cases and cigarette cases.

The typical Internet case involves a suit against someone selling counterfeit luxury items on the Internet. These cases [*16] often have high damage awards due in part to the wide market exposure that the Internet can provide. *See Louis Vuitton v. Mosseri,* 2009 U.S. Dist. *LEXIS* 100851, 2009 WL 3633882, at *3 (awarding $ 25,141.31 per infringement for $ 4,072,892.22 total); *Chanel, Inc. v. Guetae,* 2009 U.S. Dist. *LEXIS* 49365, 2009 WL 1653137, at *5 (D.N.J. June 8, 2009) (awarding $ 490,818.45 total); *Chanel, Inc. v. Mosseri,* No. 07-2619, Order at 2, 2008 U.S. Dist. *LEXIS* 111825, *1-2 (D.N.J. May 20, 2008) (awarding $ 180,000 per infringement for $ 3,780,000 total); *Chanel v. Gordashevsky,* 558 F. Supp. 2d at 538 (awarding $ 2,238,624.50 total);

2010 U.S. Dist. LEXIS 59003, *16

*Chanel, Inc. v. Craddock,* No. 05-1593, 2006 U.S. Dist. *LEXIS* 27424, 2006 WL 1128733, at *1 (D.N.J. April 27, 2006) (awarding $ 100,000 per infringement for $ 8,100,000 total); *see also Louis Vuitton & Oakley,* 211 F. Supp. 2d 567, 584-85 (awarding $ 1,500,000 total and stating "the point of sale is very relevant to the statutory damages discussion").

The typical cigarette case involves a small retail store selling counterfeit cigarettes. These cases have dramatically lower damage awards. *See Philip Morris USA, Inc. v. Jaritza Supermarket, Inc.,* No. 09-CVS-2372, 2009 U.S. Dist. *LEXIS* 127641, 2009 WL 4496047, at *2 (D.N.J. Nov. 9, 2009) (awarding $ 4,000 total); *Philip Morris USA, Inc. v. Dorta Bars & Liquors, Inc.,* No. 07-4599, Order of June 1, 2009 at 3, 2009 U.S. Dist. *LEXIS* 127504, *5 (D.N.J. June 1, 2009) [*17] (awarding $ 1,000 each against two defendants). These awards were similar to cigarette case settlement amounts enforced by this Court. *See Lorillard Tobacco Co. v. Asian Am. Mkt.,* No. 06-cv-00948, Order at 2, 2008 U.S. Dist. *LEXIS* 116202 (D.N.J. July 7, 2008) (settlement of $ 2,000); *Lorillard Tobacco Co. v. Atlantic Produce & Supermarket,* No. 06-cv-951, Consent Judgment at 1 (D.N.J. Feb. 13, 2008) (settlement of $ 20,000).

This case falls somewhere between the Internet cases and the cigarette cases. While the counterfeit products at issue were not widely distributed via the Internet, they are counterfeit luxury items of far greater value than cigarettes. If the Internet cases represent "the new era of counterfeiting," *Louis Vuitton & Oakley,* 211 F. Supp. 2d at 584, this case reminds us that there are still hucksters on the boardwalk capitalizing on the famous marks of others. To determine damages when there is less guidance from other cases this Court has adopted factors that have been used in the Second Circuit:

(1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on others [*18] besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.

*Platypus Wear,* 2009 U.S. Dist. *LEXIS* 60637, 2009 WL 2147843, at *7; *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d 1110, 1117 (2d Cir. 1986).

As discussed earlier in the context of trademark counterfeiting, the Defendant's conduct was willful, so the maximum award of $ 2,000,000 per counterfeit mark per type of good sold is available. Four types of goods were sold by the Defendant that carried counterfeit Coach marks: handbags, wallets, scarves, and hats [2]. Five Coach trademarks were infringed: the "Signature C;" [3] "Coach Leatherware Est. 1941;" [4] "COACH;" [5] "Coach & Lozenge Design;" [6] and "Coach Op Art" [7]). Because there are four types of goods and five marks, the statutory damage amount must be not less than $ 20,000 or more than $ 40,000,000. The Plaintiffs have requested one hundred times the minimum statutory damages, $ 100,000 per mark per good for a total of $ 2,000,000. However, the Plaintiffs have provided no information about [*19] their lost revenue or the value of their trademarks, trade dresses, and copyrights. While the Court is tempted to follow the approach of *Philip Morris v. Dorta Bars* and ask for an affidavit supporting its damage request, *2009 U.S. Dist. LEXIS* 25799, 2009 WL 872026, at *3 (D.N.J. Mar. 30, 2009), the Court recognizes that the root of this deficiency is Defendant's failure to respond.

The Court chooses to follow the approach of *Platypus Wear* and award $ 10,000 per infringement for $ 200,000 total, ten times the minimum statutory damages. *2009 U.S. Dist. LEXIS* 60637, 2009 WL 2147843, at *7. This amount is within the guidelines established by Congress, takes into account the wilfulness shown by continuing to sell bags after receiving the Complaint and the culpability of failing to respond, and is significant enough to serve as compensation [*20] to the Plaintiffs and a deterrent to both the Defendant and others. This award also acknowledges that the sales took place at a small shop on the boardwalk rather than the Internet. This award is consistent with another recent case in this District which only increased the award beyond $ 10,000 per infringement due to the mass-distribution of a banned substance using the Internet. *N.V.E.,* 2009 U.S. Dist. *LEXIS* 72934, 2009 WL 2526744, at *4 (awarding $ 250,000 even though plaintiff requested $ 2,000,000). Because neither the Internet nor a banned substance is present

---

[2]   Neither scarves nor hats are explicitly listed as a class of goods that the "Signature C" mark, Registration 2,822,318, is registered for under International Class 24. But because the class is broad and scarves and hats could be considered "clothing," then this will be sufficient.

[3]   Registration No. 2,822,318

[4]   Registration No. 3,441,671

[5]   Registration No. 1,071,000

[6]   Registration No. 1,309,779

[7]   Registration No. 3,696,470

here, ten times the minimum, namely $ 10,000 per infringement, is appropriate, for each of the twenty infringements.

To check whether this amount "bears some relation," *Bly*, 638 F. Supp. at 987, the Court will approximate what the Plaintiff may have gotten based on an "actual damages" calculation under *15 U.S.C. §§ 1117(a)-(b)*. *See Malletier v. Apex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 355-356 (S.D.N.Y. *2010*).

During the November 20, 2009 visit [8] by Investigator Smith there were 25 bags priced at $ 24.99, 60 handbags priced from $ 39.00 to $ 59.00 and 5 scarf and hat matching sets with an unstated price. (Smith Decl. P 8.) If the Court assumes [*21] that the scarf and hat sets were also priced $ 39.00 to $ 59.00, then the value of the displayed inventory that day was between $ 3,159.75 and $ 4,459.75. Assuming the store sold this volume of displayed inventory each week and the store had a 300% profit margin, then the amount of trebled damages would be between $ 7,109.44 and $ 10,034.44 per week. Thus, the "actual damages" would equal the Court's determination of statutory damages at some point between 20 and 28 weeks of sales. This period of time is approximately equal to the tourist season on the Jersey Shore. The Court's determination is more reasonable than the requested award of $ 2,000,000 which would not approximate actual damages without four to six years of brisk year-round sales of counterfeit items.

Thus, considering the limited record of losses, the point of sale, and the likely extent of the Defendant's business and consistent with other awards in this District, the [*22] Court will award $ 10,000 per infringement for $ 200,000 total.

2. *Costs and Attorney Fees*

In addition to statutory damages, Coach asks for both attorney fees and costs, which their evidence shows to be $ 7,648 for attorney fees, $ 443.33 for investigative fees, and $ 434.95 for costs.

The costs of actions brought under § 43(a), § 43(d), or a willful violation under § 43(c) of the Lanham Act (codified at *15 U.S.C. § 1117(a)*, *(d)*, & *(c)*, respectively) can be recovered pursuant to § 35(a) (codified at *15 U.S.C. § 1117(a)*). In "exceptional cases" the court may award reasonable attorney fees. *15 U.S.C. § 1117(a)*. "Exceptional" has been interpreted by the Court to mean involving culpable conduct. *Securacomm*, 224 F.3d at 280. Because this case involved the culpable conduct of continuing to sell goods after the Complaint was received,

then consistent with other decisions by this Court, attorney fees and costs will be awarded to the Plaintiffs. [9] *See Louis Vuitton v. Mosseri*, 2009 U.S. Dist. *LEXIS* 100851, 2009 WL 3633882, at *4; *Chanel v. Gordashevsky*, 558 F. Supp. 2d at 539.

Attorneys fees can includes fees for investigators working under the direction of an attorney. *Chanel v. Gordashevsky*, 558 F. Supp. 2d at 539 (citing *Louis Vuitton S.A. v. Downtown Luggage Ctr.*, 706 F. Supp. 839, 842 (S.D. Fla. 1988); 130 Cong. Rec. H12076, H12083 (Oct. 10, 1984) (*J. Explanatory Statement on Trademark Counterfeiting Legis.*)). Thus, in this case the fees that the Plaintiffs have paid to the investigative firm can be included in damages.

3. *Permanent Injunction*

Coach also seeks the equitable relief of a permanent injunction to enjoin the Defendant from infringing Coach's trademarks. This request is consistent with *15 U.S.C. § 1116(a)*. The Supreme Court requires that any plaintiff seeking a permanent injunction to show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay,* Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) [*24] (citations omitted).

**a. Irreparable Injury**

The Third Circuit has explicitly stated that "once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury." *Pappan Enters., Inc. v. Hardee's Food Sys.s, Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196-97 (3d Cir. 1990). Thus, because a likelihood of confusion has been shown, the requirement of irreparable harm has been met.

**b. Inadequacy of Remedies at Law**

While a remedy at law would provide a degree of monetary relief, it will not compensate for the injury to Coach's reputation or necessarily prevent future trade-

---

[8] This visit identified the largest inventory of any of the investigator's visits. During the July 13, 2009 visit by Investigator Smith there were "at least 50 different counterfeit Coach products" but no price was entered into evidence. (Smith Decl. P 4.)

[9] In their brief, Plaintiffs request $ 8,113.25 in attorney fees. The supporting documents (Davis Decl. P 8; Confoy Decl. P 8) show attorney costs as [*23] $ 7,648. The Court will only award what the evidence shows.

mark infringement. *Louis Vuitton v. Mosseri,* 2009 U.S. Dist. **LEXIS** 100851, 2009 WL 3633882 at *5; *See also Audi AG v. D'Amato,* 469 F.3d 534, 550 (6th Cir. 2006) (stating when there is potential for future harm there is no adequate remedy at law). A remedy at law would be inadequate to compensate Coach.

### c. Balancing of Hardships

The only hardship imposed upon the Defendant is that they obey the law. On the other hand if an injunction were not issued then Coach suffers the hardships that gave rise to this suit, **[*25]** loss of reputation and sales. *Louis Vuitton v. Mosseri,* 2009 U.S. Dist. **LEXIS** 100851, 2009 WL 3633882 at *5 (citing *Microsoft Corp. v. Mc-Gee,* 490 F. Supp. 2d 874, 882-83 (S.D. Ohio 2007).

### d. Public Interest

The Third Circuit has recognized that the public has an interest in trademark and copyright protection.

> Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources that are invested in the protected work.

*Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1255 (3d Cir. 1983) (quoting *Klitzner Indus., Inc. v. H.K. James & Co.,* 535 F. Supp. 1249, 1259-60 (E.D. Pa. 1982). Issuing an injunction will serve the public interest goals of preventing consumer confusion and the trademark

holder's property interest. *Microsoft,* 490 F. Supp. 2d at 883. Here the public interest is served by issuing an injunction.

Because each of the *eBay* requirements have been met by Coach, the Court will grant Coach the relief it seeks by enjoining Defendant Ocean Point Gifts from **[*26]** infringing Coach's trademarks and copyrights. Ocean Point Gifts must also surrender the infringing products for destruction by freight prepaid to Coach.

In sum, the Court will grant $ 200,000 in statutory damages under the Lanham Act and $ 8,526.28 in attorney fees and litigation costs, bringing Plaintiffs' total recovery from Defendant Ocean Point Gifts to $ 208,526.28. In addition, the Court will permanently enjoin Ocean Point Gifts from infringing Coach's trademarks and copyrights in the future and require it to surrender all infringing products it currently possesses.

### III. CONCLUSION

For the foregoing reasons the Court will grant the Plaintiffs' motion for default judgment, award a default judgment of $ 208,526.28, and issue a permanent injunction. The accompanying order for default judgment and permanent injunction shall be entered.

*June 14, 2010*

Date

**/s/ Jerome B. Simandle**

JEROME B. SIMANDLE

United States District Judge


Caution
As of: June 26, 2013 1:28 PM EDT

# Burberry Ltd. v. Designers Imps., Inc.

United States District Court for the Southern District of New York
January 19, 2010, Decided; January 19, 2010, Filed
07 Civ. 3997 (PAC)

**Reporter:** 2010 U.S. Dist. LEXIS 3605; 2010 WL 199906

BURBERRY LIMITED AND BURBERRY USA, Plaintiffs, -against- DESIGNERS IMPORTS, INC., d/b/a DESIGNERS IMPORTS.COM USA, INC., Defendant.

**Subsequent History:** Related proceeding at *Burberry Ltd. v. RTC Fashion Inc., 2012 N.Y. Misc. LEXIS 4099 (N.Y. Sup. Ct., Aug. 17, 2012)*
*Related proceeding at Burberry Ltd. v. Horowitz, 2012 U.S. Dist. LEXIS 167630 (S.D.N.Y., Nov. 26, 2012)*

**Prior History:** *Burberry Ltd. v. Euro Moda, Inc., 2009 U.S. Dist. LEXIS 113407 (S.D.N.Y., Dec. 4, 2009)*

---
**Core Terms**
---

counterfeit, trademark, merchandise, infringement, settlement agreement, scarves, famous, trademark infringement, commerce, the Lanham Act, advertising, registered, statutory damages, court finds, dilution, handbags, unfair competition, common law, polo shirt, registrations, permanently, jacket, injunction, authentic, website, coats, marks

**Counsel:** **[\*1]** For Burberry Limited, Burberry USA, Plaintiffs: Anthony D Boccanfuso, John Maltbie, LEAD ATTORNEYS, Kimberly Isbell, Arnold & Porter, LLP, New York, NY; Hadrian Ronald Katz, LEAD ATTORNEY, PRO HAC VICE, Arnold & Porter, LLP (DC), Washington, DC; Roberta L. Horton, LEAD ATTORNEY, Arnold & Porter LLP, Washington, DC.

For Designers Imports, Inc., Defendant: Stanley Richard Goodman, LEAD ATTORNEY, Goodman & Saperstein, Garden City, NY.

**Judges:** HONORABLE PAUL A. CROTTY, United States District Judge.

**Opinion by:** PAUL A. CROTTY

---
**Opinion**
---

ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

## NATURE OF THE CASE

On May 22, 2007, Plaintiffs Burberry Limited and Burberry USA ("Burberry" or "Plaintiffs") commenced this action against defendants Designers Imports, Inc. d/b/a Designers. Com USA, Inc. ("Designers" or "Defendant"). Their Amended Complaint, filed June 5, 2007, alleges that Defendant used, sold, and advertised merchandise bearing three counterfeit Burberry registered trademarks: the Burberry name, the Burberry Check design, and the Burberry "Equestrian Knight" on horseback device.

Burberry brings claims of trademark counterfeiting and infringement pursuant to *15 U.S.C. § 1114(1)(a)*; false designation of origin **[\*2]** and trademark dilution pursuant to *15 U.S.C. § 1125(a)(1)(A)*; common law claims for breach of contract and unjust enrichment; trademark infringement and unfair competition in violation of New York common law; and trademark dilution pursuant to *15 U.S.C. § 1125(c)*; likelihood of injury to business reputation pursuant to *New York General Law Section 360-l*; and deceptive acts and practices pursuant to New York General Law *Section 349*.

Burberry seeks statutory damages and attorneys' fees and costs, and various forms of injunctive relief, including a permanent injunction barring Defendant from selling Burberry-branded merchandise.

Defendant claims half-heartedly that it did not sell counterfeit Burberry-branded merchandise, but its real argument is that it was an innocent infringer whose actions were not willful and were not the product of willful blindness. Defendant also claims that Burberry has not come to Court with clean hands and so Burberry is not entitled to damages, attorney's fees or costs.

## WAIVER OF JURY AND TRIAL

The parties waived jury trial, and the Court conducted a bench trial on September 14 and 15, 2009. The Court heard the testimony of witnesses from Burberry and Defendant **[\*3]** and considered the exhibits received in evidence, as well as designated portions of depositions. The

2010 U.S. Dist. LEXIS 3605, *3

parties stipulated to the following facts in the jointly-submitted pretrial order:

1. Plaintiff Burberry Limited is a corporation duly organized and existing under the laws of the United Kingdom with a principal place of business at Horseferry House, Horseferry Road, London SWIP 2AW, United Kingdom.

2. Plaintiff Burberry USA, a sister company of Plaintiff Burberry Limited, is located at 444 Madison Avenue, New York, NY 10022. Burberry USA enforces in North America the trademarks owned by Burberry Limited. Burberry Limited, Burberry USA, and their predecessor are herein referred to collectively as "Burberry."

3. Burberry has continuously used the BURBERRY (R) word mark in commerce since 1856.

4. Burberry introduced the BURBERRY CHECK trademark in its original distinctive red, camel, black and white check design in the 1920's. Burberry has continuously used the BURBERRY CHECK in both the original colors and other distinctive color combinations for over three-quarters of a century.

5. Burberry has continuously used the Burberry equestrian knight on horseback (the "EQUESTRIAN KNIGHT DESIGN") [*4] on numerous products since 1901.

6. Burberry USA is the exclusive importer and distributor in the United States of BURBERRY (R) merchandise that bears the BURBERRY (R) mark, the BURBERRY CHECK, and/or the EQUESTRIAN KNIGHT DESIGN (collectively, the "Burberry Trademarks"). Burberry has used the Burberry Trademarks on, and in connection with, the advertising and sale of Burberry's products, including, but not limited to, scarves, swimwear, coats, jackets, polo shirts, handbags, and t-shirts in interstate and intrastate commerce, including commerce in the State of New York and in this judicial district.

7. Burberry Limited owns the following valid and enforceable U.S. trademark registrations for the BURBERRY (R) word mark, among others: U.S. Reg. No. 260,843; U.S. Reg. No. 510,077; U.S. Reg. No. 1,133,122; and U.S. Reg. No. 3,202,484. These registrations are incontestable pursuant to 15 U.S.C. § 1065.

8. The BURBERRY word mark is famous within the meaning of 15 U.S.C. § 1125(c).

9. The BURBERRY word mark was famous within the meaning of 15 U.S.C. § 1125(c) prior to Defendant's use and/or sale of the items in dispute in this litigation.

10. Burberry Limited owns the following valid and enforceable [*5] U.S. trademark registrations for the BURBERRY CHECK trademark, among others: U.S. Reg. No. 1,241,222; U.S. Reg. No. 2,732,617; and U.S. Reg. No. 2,022,789. These restrictions are incontestable pursu-

ant to 15 U.S.C. § 1065.

11. The BURBERRY CHECK trademark is famous within the meaning of 15 U.S.C. § 1125(c).

12. The BURBERRY CHECK trademark was famous within the meaning of 15 U.S.C. § 1125(c) prior to Defendant's use and/or sale of the items in dispute in this litigation.

13. Burberry Limited owns the following valid and enforceable U.S. trademark registrations for the EQUESTRIAN KNIGHT DESIGN trademark, among others: U.S. Reg. No. 863,179; and U.S. Reg. No. 2,512,119. These registrations are incontestable pursuant to 15 U.S.C. § 1065.

14. The EQUESTRIAN KNIGHT DESIGN trademark is famous within the meaning of 15 U.S.C. § 1125(c).

15. The EQUESTRIAN KNIGHT DESIGN trademark was famous within the meaning of 15 U.S.C. § 1125 (c) prior to Defendant's use and/or sale of the items in dispute in this litigation.

16. Defendant Designers Imports, Inc. d/b/a Designers Imports.com USA, Inc. is a New York corporation located at 11 Lake Street, No. 201, Monroe, New York 10950 and/or 1117 Route 17M, Suite [*6] 2, Monroe, New York 10950.

17. Since at least as early as 2003, Designers has continuously sold apparel and accessories online, including at its website located at www.designersimports.com.

18. Asher Horowitz is the owner and Chief Operating Officer of Designers.

19. Mr. Horowitz is the only officer of Designers, its only Director, and its sole shareholder.

20. Mr. Horowitz sets the price for the goods that his business sells. He also decides what will be displayed on www.designersimports.com.

21. Mr. Horowitz sets his own salary and makes sure that bills at the company are paid.

22. Designers cannot allocate a portion of its expenses to its sale of Burberry-branded items.

23. Mr. Horowitz was aware of BURBERRY products before he founded Designers.

24. Since at least as early as 2003, Designers has sold or offered for sale products that display one or more of the Burberry Trademarks that were not purchased directly from Burberry or one of its authorized retailers.

25. Designers has purchased keywords containing the BURBERRY trademark from Google's Pay Per Click pro-

gram such as "Burberry," "Burberry scarf or scarves, "Burberry jacket," and "Burberry handbag." Designers purchased similar advertising [*7] from Yahoo, including the keyword "Burberry scarf." When potential customers shop online for Burberry products, they are automatically referred to the Designers website.

26. Mr. Horowitz is the only person who decides what Burberry-branded goods Designers will sell on its website.

27. Designers' suppliers include "Moda Oggi." Moda Oggi has since been sued as a third party by Burberry for selling counterfeit Burberry-branded products, and Burberry prevailed on summary judgment against Moda Oggi on this and related claims on June 10, 2009. See *Burberry Limited, et al. v. Euro Moda, Inc., et al*., Civil Docket for Case No. 1:08-cv-05781-CM, 2009 U.S. Dist. LEXIS 53250, 2009 WL 1675080 (S.D.N.Y. June 10, 2009);

28. On April 12, 2005, Burberry and Designers entered into a settlement agreement ("Settlement Agreement") regarding Designers' sales of items that Burberry contented were counterfeit. The agreement was amended on May 4, 2005. The agreement was received in evidence (Ex. 185).

29. After the agreement was signed, Burberry bought products from Defendant to determine whether it was complying with the agreement.

30. On February 23, 2006, Burberry's attorney sent a letter to Defendant's attorney contending that Designers [*8] sold two counterfeit scarves that infringed the Burberry Trademarks. Designers' lawyer responded that the goods were purchased from a Burberry store and that the goods were not counterfeit.

31. On March 8, 2006, Burberry's lawyer sent another letter to Defendant's counsel contending that Designers sold a counterfeit bikini and three counterfeit polo shirts that infringed the Burberry Trademarks. Designers' counsel responded (Ex. 177).32.

32. On May 9, 2007, Burberry's attorney sent a letter to Defendant's counsel contending that Designers sold two counterfeit quilted coats and two counterfeit white shirts with check trim that infringed the Burberry Trademarks. Designers' counsel responded (Ex. 178).33.

33. On July 9, 2007, Burberry's attorney sent a letter to Defendant's counsel contending that Designers sold two counterfeit scarves that infringed the Burberry Trademarks. Defendant's counsel received this letter (Ex. 179).34.

34. Investigators acting on behalf of Burberry purchased the following Burberry-branded articles of clothing from Designers' website, www.designersimports.com (the "Purchased Goods"):

. One bikini with check trim purchased on March 1, 2006;

. Three polo shirts, one [*9] each in white, black, and gray purchased on March 1, 2006;

. One "Constance" padded jacket purchased on February 7, 2007;

. A second padded jacket, in the longer "Langford" style, purchased on April 7, 2007;

. One cashmere "Baby Blue Happy Scarf" and one cashmere "Classic Plaid Scarf," purchased on June 9, 2007;

. One "Nova Check Cashmere Scarf" purchased on October 11, 2007;

. One cashmere Cream-White Check "Plaid Mini Scarf" purchased on April 7, 2008; and

. Two white t-shirts with checked trim purchased on February 7, 2007 and April 7, 2007.

35. Designers shipped the Purchased Goods to Burberry's investigators.

36. Burberry's investigators shipped the Purchased Goods to Burberry at its New York offices.

37. An employee in Burberry's New York office received the Purchased Goods.

38. On June 28, 2005, Kate McKinnon, an Investigator for Abacus Security, sent three (3) Burberry-branded handbags that had been purchased from Designers to Burberry's New York Office. Burberry determined that these three (3) handbags were not counterfeit, but rather genuine.

39. On December 15, 2005, Ayodele Akingbade, an Investigator for Abacus Security, sent three (3) Burberry-branded handbags that had been purchased [*10] from Designers to Burberry's New York Office. Burberry determined that these three (3) handbags were not counterfeit, but rather genuine.

## ISSUES AT TRIAL AND FINDINGS OF FACT

Defendant stipulated to the counterfeit nature of substantially all of the products that Burberry found to be counterfeit, except for two scarves, purchased in December, 2005. Accordingly, Burberry had two goals at trial: (a) to establish that Defendants were the source of the counterfeit products; and (b) to establish that Defendant's violations were willful or the result of willful blindness. Defendant's goal was to minimize its damages to the extent possible.

### a. Proof Regarding the Source of Products

Burberry engaged a series of investigators to buy certain products from Defendant and submit these products,

along with the packing slips, invoices, and shipping information, to Burberry (Trial Tr. 95-100). Burberry would then attach a security tag bearing a unique number to these products, photograph the products, and prepare a chain of custody form (Trial Tr. 95-96). The chain of custody form listed the source of the product, the date of receipt, and the date the recipient sent the product to another party (Trial **[*11]** Tr. 96). For everything but the most obvious counterfeits, Burberry would ship the suspect products to its London office, where Burberry's expert would examine them and determine whether a product was genuine or counterfeit (Trial Tr. 98).

Burberry submitted twenty products for their expert to review (Trial Tr. 41, 46). Burberry's expert found that six products (all handbags) were genuine but that the balance of fourteen were counterfeit (Trial Tr. 36, 42, 44). As previously indicated, Defendant does not contest the counterfeit nature of twelve of the fourteen products.

Defendant does contend, however, that two of the Burberry expert's counterfeit determinations were erroneous: the determinations relating to a blue "happy" scarf and a check cashmere scarf, both purchased in December, 2005 (Trial Tr. 248-52). Mr. Horowitz testified that he suspected that J. Burke was a possible investigator for Burberry when he saw Burke's name on an order for two scarves and a coat (Trial Tr. 248, 271-72). While Defendant had Burberry scarves in stock at the time, Designers was aware that Burberry was monitoring its compliance with the Settlement Agreement, so Mr.

Horowitz enlisted his wife to buy two **[*12]** Burberry scarves from a Burberry store in Boca Raton, Florida (Trial Tr. 249). Mr. Horowitz filled Mr. Burke's order with the two scarves his wife had purchased (Trial Tr. 249-51). Burberry tested these scarves and found them to be counterfeit (Trial Tr. 251-52). Mr. Horowitz challenges Burberry's determinations (Trial Tr. 251-52).

Since Burberry's findings on the two scarves were erroneous, Defendant argues that Burberry's twelve other determinations of counterfeit must be wrong as well. Defendant's argument is *falsus in uno; falsus in omnibus*; but that is inconsistent with Defendant's stipulation that it had no factual basis for challenging Burberry's other determinations. Even if Burberry's determinations regarding the two scarves were incorrect, moreover, this would not impair the validity of Burberry's separate determinations made at different times, on twelve different products, that the Defendant's goods were in fact counterfeit. Finally, Defendant did not establish that the determinations were wrong: Defendant cannot prove that it sent Mr. Burke the two authentic Burberry scarves that Mrs. Horowitz purchased in the Boca Raton Burberry store.

Based on the routine procedures Burberry **[*13]** took to protect its trademarks, and its carefully devised and methodically applied procedures to test the authenticity of Burberry-branded merchandise, the Court finds that Designers sold the following twelve items of counterfeit merchandise to Burberry:

| Date of Purchase | Goods Sold |
|---|---|
| March 1, 2006 | 1. Bikini |
| | 2. White Polo Shirt |
| | 3. Black Polo Shirt |
| | 4. Gray Polo Shirt |
| | |
| February 7, 2007 | 5. "Constance" Jacket |
| | 6. White Shirt -- Checked Trim |
| | |
| April 7, 2007 | 7. Quilted Langford Coat |
| | 8. White Shirt -- Checked Trim |
| | 9. Cashmere Cream-White Check Mini Scarf |
| | |
| June 9, 2007 | 10. Cashmere Baby Blue Happy Scarf |
| | 11. Cashmere Classic Plaid Scarf |
| | |
| October 11, 2007 | 12. Nova Check Cashmere Scarf |

**b. Proof of Defendant's Willfulness or Willful Blindness**

Burberry has demonstrated Defendant's willfulness based on its conduct spanning several years during which Defendant repeatedly sold a variety of counterfeit Burberry merchandise. In addition to the April 2005 Settlement Agreement (Ex. 185), Burberry submitted a series of letters and emails proving that it repeatedly placed De-

fendant on notice that Defendant was violating the trademark law by selling counterfeit Burberry merchandise (Ex. 177-79). Additionally, Mr. Horowitz testified that, **[*14]** even after the Settlement Agreement, he occasionally purchased Burberry items from anonymous internet vendors and from vendors whose last names he did not know (Trial Tr. 282-84). Mr. Horowitz also testified that he did not always question his vendors about the

source of their Burberry merchandise (Trial Tr. 284-85); that he used suppliers whose goods had been seized by the Customs Department (Trial Tr. 286-87; 289-90; 292 -93); and that he purchased a substantial amount of Burberry goods from Moda Oggi, a known seller of counterfeit merchandise (Trial Tr. 295). In fact, the United States Customs Service repeatedly notified Defendant that it was seizing Burberry-branded goods addressed to Designers because the goods were counterfeit (Exs. 223-25; 302-05).

Defendant introduced testimony, however, that mitigates the willfulness of his trademark violations. Mr. Horowitz testified, for example, that he often traveled overseas to purchase branded merchandise (Trial Tr. 242); that he visited the offices of his suppliers (Trial Tr. 242); that, following the Settlement Agreement, he ceased selling items that Burberry claimed were counterfeit (Trial Tr. 248); that he generally complied with his **[*15]** obligations under the Settlement Agreement (Trial Tr. 247-48; 300-01); that all the Burberry items he currently sells originated in Burberry outlet centers (Trial Tr. 254); that all the non-Burberry branded produces he recently added to his website originated with authorized distributors or manufacturers (Trial Tr. 257); that he made numerous, sincere efforts to authenticate his merchandise before offering them for sale (Trial Tr. 277-82; 288-89; 292); and that he was unaware that Moda Oggi a seller of counterfeit items (Trial Tr. 295). Defendant also introduced a supplier's deposition testimony, stating that Mr. Horowitz insisted on buying only authentic goods (Trial Tr. 304-06).

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction under *15 U.S.C. § 1121*, *28 U.S.C. §§ 1331* and *1338*, and has supplemental jurisdiction under *28 U.S.C. § 1367(a)*.

### Trademark Counterfeiting and Infringement under the Lanham Act (Counts I and II)

Burberry alleges that Defendant committed trademark counterfeiting and infringement under section 32(1)(a) of the Lanham Act through its unauthorized use of the Burberry trademarks. Section 32(1)(a) of the Lanham Act provides that a person shall be civilly **[*16]** liable if, without the registrant's consent, such person:

> use[s] in commerce any reproduction, counterfeit, or copy or colorable limitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

*15 U.S.C. § 1114(1)(a)*.

Section 45 of the Lanham Act, *15 U.S.C. § 1125*, defines a "counterfeit" mark as "a spurious mark which is

identical with, or substantially indistinguishable from, a registered mark."

Defendant is liable for trademark counterfeiting and infringement if Burberry establishes that: (1) Burberry had valid registered marks entitled to protection under the Lanham Act; and (2) Defendant used a similar mark in commerce in a way that would likely cause confusion among the relevant consuming public. *Cartier Int'l B.V. v. Ben-Menachem*, 2007 U.S. Dist. LEXIS 95366, 2008 WL 64005, at *10 (S.D.N.Y. Jan. 3, 2008).

Burberry has met its burden. The parties stipulated that Burberry had valid registered marks entitled to protection under the Lanham Act. These marks include the BURBERRY(R) word mark; the BURBERRY CHECK mark; and the EQUESTRIAN KNIGHT **[*17]** DESIGN. Defendant has offered for sale and has sold merchandise displaying spurious designations that are identical to, or substantially indistinguishable from, Burberry's famous, registered trademarks on goods for which Burberry trademarks are registered, including: a bikini; a jacket; a coat; five shirts; and four scarves. Defendant intentionally used these spurious designations without authorization and in connection with the advertising, sale, offering for sale and distribution of goods for its own financial gain.

Defendant's use of the Burberry trademarks is likely to cause confusion among the relevant consuming public. To determine whether confusion is likely to arise, a court need only determine that the items at issue are counterfeit and that Defendant distributed, offered for sale, and sold the items. *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F.Supp.2d 284, 287 (S.D.N.Y. 2003).

The Court finds that Defendant is liable for trademark counterfeiting and infringement.

### False Designation of Origin, Trade Name, Infringement, and False Description and Representation under the Lanham Act (Count III)

The Court also finds Defendant liable under *Section 43(a)* of the Lanham Act, *15 U.S.C. § 1125(a)(1)(A)*:

> Any **[*18]** person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, terms, name, symbol, or device, or any combination thereof, or any false designation or origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to "deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by

2010 U.S. Dist. LEXIS 3605, *20

another person….

Having established its claim for federal trademark infringement under *Section 32*, it is unnecessary for the plaintiff to make any additional showing to satisfy *Section 43(a)*. *Russian Kurier, Inc. v. Russian Am. Kurier, Inc.*, 899 F.Supp. 1204, 1208 (S.D.N.Y. 1995).

### Trademark Dilution under the Lanham Act and Dilution and Likelihood of Injury under Section 360-l of N.Y. Gen. Bus. Law (Counts IV and VI) [1]

A trademark holder claiming dilution under *15 U.S.C. § 1125(c)* must show that: (1) the senior mark is famous; (2) the defendants are making commercial use of the junior mark in commerce (under the Federal Trademark Dilution Act, the "FTDA") or use of the junior mark in commerce (under the Trademark Dilution Revision Act of 2006, the "TDRA"); (3) defendant's use of the junior mark began after the senior mark became famous; and (4) actual dilution (under the FTDA) or a likelihood of dilution (under the TDRA). See **[*20]** e.g., *Malletier v. Dooney & Bourke, Inc.*, 561 F.Supp.2d 368, 380-81 (S.D.N.Y. 2008).

Plaintiffs have met their burden on their trademark dilution claim, based on the parties' stipulations: the fame of Burberry's mark; Defendant's commercial use of Burberry's mark in commerce; and Defendant's use of Burberry's mark subsequent to Burberry's mark becoming famous. Further, Burberry has established a presumption of actual and likely dilution by showing that Defendant's used counterfeit marks that were identical to the Burberry trademarks. See *Savin Corp. v. Savin Corp.*, 391 F.3d 439, 452-53 (2d Cir. 2005).

Dilution by tarnishment reflects an "association arising from the similarity between a mark or a trade name and a famous mark that harms the reputation of the famous mark." *15 U.S.C. § 1125(c)*. Defendant tarnished Burberry's marks by using them on inferior products (Tr. 18:23-22:19; 36:17-37:4). See e.g., *Hormel Foods v. Jim Henson Products, Inc.* 73 F.3d 497, 507 (2d Cir. 1996) (a trademark may be tarnished when linked to products of shoddy quality). Accordingly, the Court finds Defendant liable for trademark dilution by tarnishment under both the FTDA and the TDRA.

Since Burberry has established **[*21]** that (1) the Burberry trademarks are famous, and (2) there is a likelihood of dilution, Defendants are also liable under New York State Business Law *§ 360-l* for dilution and likelihood of injury to business reputation. See *Malletier*, 561 F.Supp.2d at 381.

### Deceptive Acts and Practices under New York Law (Count V)

*New York General Business Law § 349* forbids "[d]eceptive acts and practices." Burberry has satisfied the three-factor test for establishing a *§ 349* violation: (1) that Defendant engaged in a consumer-oriented act (sale of Burberry-branded merchandise); (2) that was misleading in a material way (the products were counterfeit); and (3) Burberry suffered injury. See *Vitabiotics, Ltd. V. Krupka*, 606 F.Supp. 779, 785 (E.D.N.Y. 1984) (sale of infringing products creates presumption of injury under *Section 349*). Accordingly, the Court finds Defendant liable under *Section 349 of the New York General Business Law*.

### Trademark Infringement and Unfair Competition under New York Common Law (Counts VII and VIII)

The New York common law on trademark infringement and unfair competition claims mirrors the Lanham Act. To prevail on its common law claim of trademark infringement, Burberry need only **[*22]** present evidence sufficient to establish a violation of *section 32(1)* of the Lanham Act. *Standard & Poor's Corp., Inc. v. Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982). Since Burberry has established liability under the Lanham Act, it has also established liability under New York's common law of trademark infringement.

The same principle is applicable to the New York State unfair competition claim. A claim under the Lanham Act, coupled with a showing of bad faith or intent, establishes a claim for unfair competition. *Girl Scouts of U.S.A. v. Bantam Doubleday Dell Publ'g Group, Inc., 808 F.Supp.* 1112, 1131 (S.D.N.Y. 1992). Use of a counterfeit mark creates a presumption of bad faith under New York law. *Philip Morris U.S.A., Inc. v. Felizardo*, 2004 U.S. Dist. LEXIS 11154, 2004 WL 1375277 (S.D.N.Y. June 18, 2004), at *6. Accordingly, Burberry's evidence of Defendant's sale of counterfeit Burberry-branded merchandise creates a presumption of bad faith, satisfying the elements of Burberry's common law unfair competition claim.

---

[1]   The Court will analyze Burberry's federal and state law dilution claims together. The New York State anti-dilution statute, N.Y. Gen. Bus. L. § 360-l, and the Federal Trademark Dilution Act, the federal anti-dilution **[*19]** statute in effect prior to October 6, 2006, are alike. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 119 (2d Cir. 2006). This analysis is essentially unchanged under the Trademark Dilution Revision Act of 2006, effective October 6. 2006. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 523 (S.D.N.Y. 2008). Some courts have held that the New York State statute provides greater protection against dilution than the TDRA. See *GMA Accessories*, 2008 U.S. Dist. LEXIS 16052, 2008 WL 591803, at *11. But the Court need not engage in a separate analysis for Burberry's New York State claims because the Court concludes that Burberry's dilution claim succeeds under the more exacting FDTA standard.

2010 U.S. Dist. LEXIS 3605, *22

## Common Law Breach of Contract (Count IX)

The April 12, 2005 Settlement Agreement is governed by New York law (Ex. 185 P11). The parties do not dispute the existence or validity of the [*23] April 12, 2005 Settlement Agreement, nor does Defendant argue that Burberry failed to perform under the Settlement Agreement.

Burberry has also established Defendant's non-performance. Paragraph 2.6 of the Settlement Agreement provides that Defendant will not "knowingly infringe or dilute Burberry's trademarks." The same paragraph defines "knowingly" as occurring when Defendant "knows or should have known that their actions violate Burberry's trademark rights."

The Court has already found that Defendant committed trademark infringement. It now finds that the same infringing conduct constituted a breach of contract. See e.g., *Heisman Trophy Trust v. Smack Apparel Co.*, 595 F.Supp.2d 320, 329 (S.D.N.Y. 2009) (evidence of trademark infringement shows the likelihood of success on breach of settlement agreement claim).

Regarding damages, Section 12 of the Settlement Agreement contains a liquidated damages clause providing that Defendant is obligated to pay "$ 1,500.00 per day for each day a breach occurs."

Defendant's breach of contract liability, however, is limited to violations that occurred prior to Burberry's commencement of the lawsuit. Under New York's doctrine of the election of remedies, [*24] when a party breaches a contract, the adverse party has to make an election: to either treat the entire contract as breached and pursue damages for the breach or, alternatively, to reject the proposed breach, demand performance, and continue to treat the contract as valid. See e.g., *Inter-Power of New York Inc. v. Niagara Mohawk Power Corp.*, 259 A.D.2d 932, 934, 686 N.Y.S.2d 911 (3d Dept. 1999).

Accordingly, Defendant is liable only for trademark violations occurring prior to May 22, 2007, the date Burberry commenced this lawsuit. These pre-commencement violations include nine of the twelve items: the four items Defendant sold on March 1, 2006 (Bikini; White Polo Shirt; Black Polo Shirt; and Gray Polo Shirt); the two items Defendant sold on February 7, 2007 (the "Constance" Jacket and the White Shirt - Checked Trim); and the three items Defendant sold on April 7, 2007 (the Quilted Langford Coat; the White Shirt-Checked Trim; and the Cashmere Cream-White Check Mini Scarf).

## Common Law Unjust Enrichment (Count X)

The Court dismisses Burberry's unjust enrichment claim because a party cannot prevail on remedies under both contract and quasi-contract theories. See e.g., *Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987) [*25] ("quasi contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment).

## Defendant 's Willfulness or Willful Blindess

The Court finds that Defendant acted willfully in selling twelve counterfeit Burberry-branded items of merchandise. Actual knowledge is not necessary for willful trademark infringement liability; rather, "[i]nfringement is willful when the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility." *Hermes Int'l v. Kiernan*, 2008 U.S. Dist. LEXIS 70506, 2008 WL 4163208, at *3 (E.D.N.Y. Aug. 28, 2008).

Here, Burberry established Defendant's willfulness by demonstrating a course of conduct spanning several years during which Defendant repeatedly sold a variety of counterfeit Burberry merchandise. Defendant repeatedly and knowingly violated its obligations under the Settlement Agreement. Defendant willfully failed to investigate the bona fides of Burberry-branded goods it purchased for sale and by failing to implement procedural safeguards against the sale of counterfeit goods. When Defendant became aware that Burberry, through [*26] its agent J. Burke, placed a test order for Burberry items, Defendant did not fill the order from its own inventory, but rather sent Mrs. Horowitz to an authorized Burberry store to purchase items to fill the order. This is further evidence that Defendant was not confident in the authenticity of its own Burberry-branded inventory. Accordingly, the Court finds that Defendant's trademark violations were willful.

Defendant, however, has introduced some evidence of compliance with the terms of the Settlement Agreement and of some level of diligence. These factors mitigate the degree of Defendant's willfulness.

## DAMAGES

The Court asked the parties to provide summations of their damages. Burberry claimed statutory damages under *15 U.S.C. § 1117(c)* in the amount of $ 6.5 million (Dkt. # 30, at 2, 10). Defendants argued that its maximum exposure is $ 18,000 (Dkt. # 32 at 13).

Section *15 U.S.C. § 1117(c)* provides:

> In a case involving the use of a counterfeit mark (as defined in *section 1116(d)* of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead [*27] of actual damages and profits under subsection (a) of this sec-

2010 U.S. Dist. LEXIS 3605, *27

tion, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--

(1) not less than $ 1,000 or more than $ 200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $ 2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

*15 U.S.C. § 1117(c) (2004)* (amended 2008). [2]

In determining the amount of statutory damages, courts consider several factors, including:

(1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the [trademark]; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.

*Kenneth Jay Lane, Inc. v. Heavenly Apparel, Inc.*, 2005 U.S. Dist. LEXIS 28815,, 2006 WL 728407, at *6 (S.D.N.Y. November 17, 2005).

Several of these factors support a substantial award. Defendant has acted willfully in selling twelve counterfeit Burberry-branded items of merchandise. Burberry's trademarks are highly valuable and of worldwide renown. The goal of deterring others from similar conduct requires a significant award. *Louis Vuitton Malletier, S.A. v. LY USA*, 2008 U.S. Dist. LEXIS 107592, 2008 WL 5637161, at *2 (S.D.N.Y. Oct. 3, 2008). A large award

is also necessary because the Settlement Agreement failed to deter Defendant and because of Defendant's ability to reach a vast customer base through internet [*29] advertising. See e.g., *Rolex Watch U.S.A., Inc. v. Jones*, 2002 U.S. Dist. LEXIS 6657, 2002 WL 596354, at *5 (S.D.N.Y. Apr. 17, 2002). [3]

There are other factors which mitigate the degree of Defendant's willfulness. Defendant cooperated in providing financial records. These records indicate that Defendant reported sales of $ 4,276,581 for Burberry-branded merchandise sold between March 29, 2005 and June 26, 2008 (Ex. 308). Defendant also reported net income of $ 1,158,295 for scarves, shorts, jackets, and coats sold between March 29, 2005 and May 13, 2008 (Ex. 220). [4] Burberry-branded merchandise, however, represented only a percentage of Defendant's entire business, and not all Burberry-branded items were counterfeit. [5] Finally, few courts have awarded maximum statutory damages on the basis of a per mark, per type of good calculation. See e.g., *Gucci Am., Inc. v. MyReplicaHandbag.com*, 2008 U.S. Dist. LEXIS 14047, 2008 WL 512789, at *5 (S.D.N.Y. Feb. 26, 2008) (collecting cases to note that "[M]ost judges have [*30] issued awards well below the maximum available on the basis of per-mark-per -type-of-goods").

Having considered all relevant factors, the Court awards Burberry statutory damages in the amount of $ 1,500,000. This amount represents $ 100,000 per mark per types of goods sold. Specifically, Defendant infringed three of Burberry's registered trademarks (the Burberry name, the Burberry Check design, and the Burberry "Equestrian Knight" on horseback device) and sold five types of counterfeit Burberry-branded merchandise (Bikini; Shirts; Jacket; Coat; and Scarves). An award of $ 100,000 per mark per type of good sold totals $ 1,500,000.

Since there was willful infringement and [*31] no "extenuating circumstances," the Court allows Burberry attorneys' fees and costs, as required by *15 U.S.C. § 1117(b)*. *Sara Lee Corp. v. Bags of New York, Inc.*, 36 F.Supp.2d 161, 170 (S.D.N.Y. 1999). Burberry's counsel

---

[2] Prior to October 13, 2008, the minimum for § 1117(c)(1) was $ 500 and the maximum was $ 1,00,000; and the maximum for § 1117(c)(2) was $ 1,000,000. See Prioritizing Resources and Organization for Intellectual Property Act of 2008, Title I, sec. 104, § 1117, 122 Stat 4256, 4259 (Oct. 13, 2008). Defendant's sales of counterfeit Burberry items occurred prior to October 13, 2008. Accordingly, the Court applies the pre-amendment statutory amounts. See e.g., *Century 21 Real Estate LLC v. Bercosa Corp.*, __ F.Supp.2d __, 666 F. Supp. 2d 274, 2009 U.S. Dist. LEXIS 94094, 2009 WL 3111759, at *12 n.9 (E.D.N.Y. Sept. 18, 2009). [*28]

[3] Plaintiffs' Ex. 300 indicates that between September 13, 2003 and June 11, 2008, Designer's Burberry advertising in Google had been clicked 1,021,744 times.

[4] Plaintiffs' Ex. 220 was not introduced at trial. After the trial, however, on September 25, 2009, the Court reopened the trial record to admit this exhibit into evidence (Dkt. # 28).

[5] Plaintiffs' Ex. 308 indicates that Burberry-branded merchandise represents the following percentages of Designer's overall sales: 65.13% between March 29, 2005 and December 31, 2005; 34.44% between January 1, 2006 and December 31, 2006; 21.35% between January 1, 2007 and December 31, 2007; and 6.97% between January 1, 2008 and June 26, 2008.

Jessica Bloodgood

should submit an itemized fee application, supported by time-sheets, along with a statement of the nature of the work performed, as well as explanations of each attorney's expertise and any other relevant factors. See e.g., *Pressman v. Estate of Steinvorth*, 886 F. Supp. 365, 367 (S.D.N.Y. 1999).

### INJUNCTIVE RELIEF

Section 34(a) of the Lanham Act provides for injunctive relief to prevent trademark violations "according to the principles of equity and upon such terms as the court may deem reasonable." *15 U.S.C. § 1116(a)*. Courts may grant permanent injunctions where a plaintiff demonstrates actual success on the merits and irreparable harm. *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F.Supp.2d at 290. As indicated, Burberry has established success on the merits. Burberry has also established irreparable harm by establishing a likelihood of confusion. See *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997). Accordingly, the Court permanently **[*32]** enjoins Defendant from infringing on any Burberry trademarks.

The Court denies Burberry's request to completely bar Defendant from selling Burberry goods. Defendant may continue to participate in the secondary market provided Defendant sells only legitimate products. In light of Defendant's continuing pattern of trademark infringement, however, any further violation of the injunction will result in Defendant's being permanently enjoined from selling, offering for sale, advertising, or distributing any Burberry-branded merchandise.

### CONCLUSION

The foregoing constitutes the Court's findings of fact and conclusions of law. Defendant is liable to Burberry for a total of $ 1,500,000 in statutory damages. Defendant is further liable for Burberry's reasonable attorneys' fees and costs, in an amount to be determined by the Court, after Burberry's counsel submits contemporaneous time records, reflecting the work done in this litigation. Finally, Defendant is hereby permanently enjoined from infringing on any Burberry trademarks. If Defendant violates Burberry's trademarks in the future, then Defendant will automatically be permanently enjoined from selling, offering for sale, advertising, or distributing **[*33]** any Burberry-branded merchandise.

Plaintiff is directed to submit a proposed order of judgment on 10 days notice.

Dated: New York, New York

January 19, 2010

SO ORDERED

/s/ Paul A. Crotty

PAUL A. CROTTY

United States District Judge


Caution
As of: June 26, 2013 12:41 PM EDT

# Phillip Morris USA Inc. v. Marlboro Express

United States District Court for the Eastern District of New York
August 26, 2005, Decided
CV-03-1161 (CPS)

**Reporter:** 2005 U.S. Dist. LEXIS 40359; 2005 WL 2076921

PHILLIP MORRIS USA INC., Plaintiff, - against - MARLBORO EXPRESS, TOBACCO TRADERS AND TRUST, TIMOTHY FARNHAM, individually and doing business as Tobacco Traders and Trust and Marlboroexpress.com, MARY KIM JAMIESON, individually and doing business as Tobacco Traders and Trust and Marlboroexpress.com, NATIVE EXPRESS, DON DOCTOR, individually and doing business as Marlboroexpress.com and Nativeexpress.com, DENNIS KENNEDY, individually and doing business and Double D Smoke Shop, SOVEREIGNTY VENTURES, INC., DON DELAND, individually and doing business as Sovereignty Ventures, Inc., IROQOUIS TOBACCO COMPANY, SCOTT SNYDER, individually and doing business as Iroquois Tobacco Company, SIMON MOSHEL, an individual; MICHAEL MOSHEL, an individual, ROBERT BERARDELLI, an individual, and Does One Through Ten Inclusive, Defendants.

**Subsequent History:** Related proceeding at *Philip Morris USA Inc. v. A & V Minimarket, Inc., 2008 U.S. Dist. LEXIS 120183 (S.D.N.Y., Dec. 15, 2008)*

### Core Terms

counterfeit, trademark, cigarette, infringement, register, statutory damages, summary judgment, default, brand, label, default judgment, district court, maximum, violation of section, injunctive relief, statutory award, registrant, permanent, carton, roof, entry of default, do business, plea guilty, indictment, injunction, pentagonal, traffic

**Counsel:** [*1] For Philip Morris USA Inc., Plaintiff: Samuel L. Barkin, Heller Ehrman LLP, New York, NY.

For Michael Moshel, as individual, Defendant: Saul E. Feder, Regosin, Edwards, Stone & Feder, New York, NY.

**Judges:** Charles P. Sifton, United States District Judge.

**Opinion by:** Charles P. Sifton

### Opinion

MEMORANDUM OPINION AND ORDER

SIFTON, Senior Judge.

Plaintiff Phillip Morris USA, Inc. ("Philip Morris") brings this trademark action seeking damages and injunctive relief against defendants Marboro Express, Tobacco Traders and Trust, Timothy Farnham, individually and doing business as "Tobacco Traders and Trust" and "Marlboroexpress.com," Don Doctor, individually and doing business as "Marlboroexpress.com" and "Nativeexpress.com," Dennis Kennedy, individually and doing business as "Double D Smoke Shop," Don Deland, individually and doing business as "Sovereignty Ventures, Inc.," Iroqis Tobacco Company, Scott Snyder, individually and doing business as "Iroqois Tobacco Company," and Robert Berardelli. [1] Plaintiff's claims arise out of defendants' sale of counterfeit Marlboro[R] brand cigarettes. Specifically, plaintiff alleges the following claims against the defendants: (1) infringement of plaintiff's [*2] registered trademarks in violation of Section 32 of the Lanham Act, *15 U.S.C. § 1114* (Claims 1-4); (2) importation of counterfeit goods bearing an infringing trademark in violation of Section 42 of the Lanham Act, *15 U.S.C. § 1124* (Claims 5-6); (3) false designation of origin in violation of Section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)* (Claims 7-8); (4) trademark dilution in violation of the Federal Trademark Di-

---

[1] Plaintiff's complaint also named as defendants Simon Moshel, Michael Moshel and Mary Kim Jamieson. Plaintiff has entered a Consent Judgment with defendants Simon and Michael Moshel, which was "so ordered" by this Court on February 2, 2005. Pursuant to the Consent Judgment, defendants Simon and Michael Moshel agreed to pay plaintiff $ 150,000 and were permanently enjoined from selling counterfeit or illegally imported Marlboro cigarettes. (*See* Consent Judgment at 2). Plaintiff also filed a notice of voluntary dismissal of the claims asserted against defendant Mary Kim Jamieson without prejudice, pursuant to *Rule 41(a) of the Federal Rules of Civil Procedure* on July 22, 2005.

lution Act, *15 U.S.C. §§ 1125(c)* and *1127* (Claims 9-10); (5) "cybersquatting" in violation of the Anti-Cybersquatting Consumer Protection Act, *15 U.S.C. § 1125(d)* (Claim 11); (6) unfair competition in violation of the common law of New York (Claim 12); (7) trademark infringement in violation of the common law of New York (Claim 13); and (8) trademark dilution in violation of *New York General Business Law § 360-l et seq.* (Claim 14).

[*3] Presently before the court are the following motions: (1) plaintiff's motion for partial summary judgment against defendant Snyder on Claims 1, 2, 5, and 7 alleged in the complaint, pursuant to *Rule 56 of the Federal Rules of Civil Procedure* ("Fed. R. Civ. P."); and (2) plaintiff's motion for entry of default judgment and order granting damages and injunctive relief against defendants Berardelli, Deland, Farnham, Kennedy, and Doctor (collectively "Default Defendants"), pursuant to *Fed. R. Civ. P. 55(b)*. The defendants have not responded to plaintiff's motions. [2] For the reasons set forth below, the motions are granted.

## BACKGROUND

The following facts are drawn from the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits in connection with this motion. The facts are undisputed unless [*4] otherwise noted.

Plaintiff Phillip Morris is a corporation organized under the laws of Virginia with its principal place of business in New York. For several decades, Phillip Morris has manufactured and sold tobacco products under the Marlboro[R] brand (Pl. 56.1 Statement P1). Among the distinctive features of the Marlboro[R] brand is its pack design, which features the Marlboro Roof Design Label[R] Mark (a pentagonal figure with a horizontal top and two vertical sides with two upwardly and inwardly sloping diagonals). Phillip Morris is the registered owner of the "Marlboro Marks" on the Principal Register of the United States Patent and Trademark Office ("USPTO").

The "Marlboro Marks" include the Roof Design Label[R] Mark, Marlboro[R], Marlboro Lights[R], Marlboro Menthol[R], Marlboro Lights Menthol[R], Marlboro Ultra Lights[R]. (*See* Registration Certificates, Johnson Decl. Ex. A). Phillip Morris has invested substantial time, effort, and money to advertise and promote the Marlboro Marks, and as a result, they are widely recognized trademarks for which significant "good will" has developed.

Between August 2000 and February 2003, defendants Snyder, Deland, Farnham, [*5] and Berardelli, in conjunction with others, imported approximately 200,000 cartons of counterfeit Marlboro[R] and Marlboro Lights[R] cigarettes from China. (Pl. 56.1 P3; Johnson Dec. Ex. B). These cartons were imported in at least five separate shipments, and were monitored by the United States Customs Service after arrival in the United States from China. (Pl. 56.1 PP3-4; Johnson Dec. Ex. B). Defendants sold counterfeit Marlboro brand cigarettes at retail stores, including the "Double D Smoke Shop," located on the Seneca Indian Cattaraugus reservation and the "Iroqious Tobacco Company," located in Irving, New York, and through various Internet websites, including "Marlboroexpress.com" and "Smokeheap.com." (Pl. 56.1 P5; Johnson Dec. Ex. C). Defendants purchased counterfeit cigarettes at prices between $ 2.00 and $ 2.20 per carton and sold them at retail prices between $ 19.00 and $ 29.99 per carton. (Pl. 56.1 P6; Johnson Dec. Ex. H).

On February 14, 2003, the United States Customs Service filed a criminal complaint in the United States District Court for the Eastern District of New York against defendants Snyder, Deland, Farnham, Berardelli and others [3] for conspiracy to smuggle [*6] and traffic in counterfeit goods, in violation of *18 U.S.C. §§ 545* and *2320*. [4] (*See* Criminal Complaint, *United States v. Moshel, et. al.,* 1:03-m-276 (E.D.N.Y.), Johnson Decl. Ex. B). On March 20, 2003, defendants Snyder, Deland, Farnham, Berardelli were indicted in the United States District Court for the Eastern District of New York on three counts of trafficking and conspiring to traffic counter-

---

[2] The defendants against whom these motions are brought appear to be proceeding *pro se*.

[3] The criminal complaint also named Simon and Michael Moshel as defendants. (Johnson Dec. Ex. B at 1).

[4] *18 U.S.C. § 545* provides in relevant part that:

Whoever knowingly and wilfully . . . smuggles or clandestinely introduces . . . into the United States any merchandise which should have been invoiced . . . . or fraudulently or knowingly imports or brings into the United States any merchandise contrary to law. . . shall be fined under this title or imprisoned. . .

*18 U.S.C § 2320* provides in relevant part that:

Whoever intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such good or services shall be fined. . . or imprisoned. . . .

feit goods in violation of *18 U.S.C. §§ 545* and *2320*. (*See* Indictment, Johnson Decl. Ex. C). On September 30, 2003, defendant Farnham pled guilty before Magistrate Judge Cheryl Pollack to Count One of the indictment which accused them of knowingly and intentionally conspiring to traffic in counterfeit cigarettes. On October 1, 2003, defendants Snyder and Deland also pled guilty before Judge Raymond Dearie to Count One of the indictment. (*See* Johnson Decl. Ex. D; Barkin Decl. Ex. 7-8; Pl. 56.1 Statement P29). [5] Defendant Berardelli pled guilty to Count Two of the Indictment which accused him of knowingly and intentionally trafficking in counterfeit goods in violation of *18 U.S.C. § 2320*.

[*8] Plaintiff commenced this action by filing a complaint and summons against the defendants on March 10, 2003 (the "Complaint"). Between March 2003 and June 2003, plaintiff served process upon each of the defendants. To date, defendants Berardelli, Deland, Farnham, Kennedy, and Doctor [6] have not filed an answer or otherwise responded to the Complaint. On May 11, 2005, the Clerk of this Court issued a Notation of Default pursuant to *Fed. R. Civ. P. 55(a)* against defendants Farnham, Doctor, Kennedy and Deland. [7]

[*9] **DISCUSSION**

**Jurisdiction**

The Court has jurisdiction over this action pursuant to *15 U.S.C. § 1121* and *28 U.S.C. § 1338*, which confers jurisdiction over actions involving violations of patents and trademarks, *28 U.S.C. § 1331*, which authorizes jurisdiction over civil actions arising under federal law, and principles of pendent jurisdiction over the state law claims.

**Motion for Partial Summary Judgment**

Summary Judgment Standard

A motion for summary judgment may be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Celotex Corp v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A motion for summary judgment may be defeated by the non-moving party if that party produces sufficient specific facts to establish that there is a material issue of fact for trial. *Montana v. First Federal Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 103 (2d Cir. 1989).* [*10] The role of the court on such a motion is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Knight v. United States Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986)*. The "court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

Defendant Snyder's Failure to Respond

*Local Rule 56.1* of the Eastern and Southern Districts of New York requires that all summary judgment motions be accompanied by a "short or concise statement of material facts as to which the moving party contends there is no genuine issue to be tried." *Local Rule 56.1(a)*. The rule also requires that the party opposing summary judgment file a response setting forth the material facts about which it contends there exists a triable issue. Because defendant Snyder has failed to file any response, all facts contained in plaintiff's *Rule 56.1* statement are deemed admitted. [8] *See Local* [*11] *Rule 56.1(b)* and *(d)*. However, defendant Snyder's failure to respond to plaintiff's motion does not mean that plaintiff automatically prevails. *See e.g. Adickes v. S.H. Kress & Co., 398 U.S. 144, 160, 90 S. Ct. 1598, 26 L. Ed. 2d 142*

---

[5] Defendants Snyder, Deland and Farnham were also charged in the United States District Court for the Western District of Texas with smuggling and trafficking counterfeit cigarettes in violation of *18 U.S.C §§ 371*, *2342(a)* and *2320(a)*. Defendant Snyder pled guilty and was sentenced to 27 months imprisonment in December 2003. He was also ordered to pay $ 861,260 in restitution for unpaid cigarette taxes. Phillip Morris is not entitled to any part of that restitution award. (*See* Johnson Decl. Ex. G.). Defendants Deland and Farnham also pled guilty, and were sentenced to 24 and 18 months imprisonment, respectively. (*See* Barkin Decl. Ex. 11-12).

[6] Although defendants Kennedy and Doctor were not named in the related criminal action, they are alleged in plaintiff's complaint to be co-owners or operators of some of the outlets through which the counterfeit cigarettes were sold, including "Double D Smoke Shop," "Marlboroexpress.com" and "Nativeexpress.com."

[7] Defendant Berardelli is not listed on the Clerk's Notation of Default. However, this appears to be an oversight, as plaintiff provided the Clerk of Court with a copy of the summons and complaint served by personal service on defendant Berardelli on March 25, 2003. (*See* Barkin Decl., Ex. 14 PP7-8; Ex. 15). The default is hereby noted.

[8] Plaintiff filed a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" on May 23, 2005, informing defendant Snyder of the consequences of failing to respond to a summary judgment motion. *See Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996)* (an "easily comprehensible notice" from the party moving for summary judgment provides sufficient notice to a *pro se* litigant).

(1970). The moving party must "nevertheless offer facts supporting its *Rule 56.1* Statement, and must satisfy the movant's *Rule 56* burden." *Smith v. Principi, 2004 U.S. Dist. LEXIS 16418, 2004 WL 1857582, at *1, n.1 (S.D.N.Y. 2004); see also Vermont Teddy Bear Co., Inc. v. 1-800 BEARGRAM Co.,* 373 F.3d 241, 242 (2d Cir. 2004) ("Even when a motion for summary judgment is un-opposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.").

**[*12]** Lanham Act

Plaintiff seeks summary judgment against defendant Snyder on its First, Second, Fifth and Seventh Claims for relief, which allege (1) trademark infringement in violation of Section 32 of the Lanham Act, (2) importation of goods bearing an infringing trademark in violation of Section 42 of the Lanham Act, and (3) false designation of origin and trademark and dress infringement in violation of Section 43(a) of the Lanham Act. [9] *See 15 U.S.C. §§ 1114(1), 1124, 1125(a).*

*Sections 32 and 43(a)*

Section 32 of the Act prohibits the use in commerce, without consent, of any "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, **[*13]** distribution, or advertising of any goods," in a way that is likely to cause confusion with plaintiff's registered trademarks. *15 U.S.C. § 1114 (1)(a).* Section 43(a) prohibits similar conduct, though it is not limited to registered trademarks, and deems liable for false designation of origin "any person who. . .uses in commerce any container for goods. . . name, symbol, device. . .or any false designation of origin . .which is likely to cause confusion." *15 U.S.C. § 1125(a); see also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 155 (2d Cir.2002). Liability is established under both *Sections 32* and *43(a)* of the Lanham Act if a plaintiff can demonstrate (1) that it has a valid trademark entitled to protection under the Act, and (2) defendant's actions are "likely to cause confusion." *Arrow Fastener v. Stanley Works,* 59 F.3d 384, 390 (2d Cir.1995).

In this case, plaintiff's certificates of registration with the USPTO for the Marlboro Marks are "prima facie evidence that the mark[s] [are] registered and valid (i.e. protectible), that the registrant owns the mark[s], and that the registrant has the **[*14]** exclusive right to use the mark[s] in commerce." *Lane Capital Management, Inc. v. Lane Capital Management, Inc.,* 192 F.3d 337, 345 (2d Cir. 1999); *15 U.S.C. § 1067(b)*("A certificate of registration of a mark...shall be prima facie evidence of the validity of the registered mark"). Thus, the plaintiff has es-

tablished that its Marlboro Marks are valid and entitled to protection under the Act.

In considering the likelihood of confusion, district courts generally apply eight nonexclusive factors, known as the *Polaroid* factors:

> (1) the strength of the plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the competitive proximity of their products; (4) the likelihood that plaintiff will "bridge the gap" and offer a product like defendant's; (5) actual confusion between products; (6) defendant's good faith; (7) the quality of defendant's product as compared to plaintiff's; and (8) the sophistication of the purchasers.

*Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 742-43 (2d Cir.1998) (citing *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961). **[*15]** However, in cases involving counterfeit marks, "the Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion." *Gucci America, Inc. v. Duty Free Apparel, Ltd.,* 286 F.Supp.2d 284, 287 (S.D.N.Y. 2003); *Phillip Morris USA Inc. v. Felizardo,* 2004 U.S. Dist. LEXIS 11154, 2004 WL 1375277, at *5 (S.D.N.Y. 2004). Thus, the Court "need only determine the more fundamental question of whether there are items to be confused in the first place--that is, whether the items at issue here are, in fact, counterfeit, and whether defendant [Snyder] sold those items." *Gucci America, Inc.,* 286 F.Supp.2d at 287. In this case, it has not been disputed that the items at issue are counterfeit Marlboro brand cigarettes, and that defendant Snyder sold and distributed these items. *See* Pl. 56.1 Statement at P29. Accordingly, defendant Snyder's actions caused a likelihood of consumer confusion, and plaintiff has established liability under *Sections 32* and *43(a)* of the Lanham Act. *See Phillip Morris Inc. v. Felizardo,* 2004 U.S. Dist. LEXIS 11154, 2004 WL at *5.*

*Section 42*

*Section 42* of the Lanham Act, *15 U.S.C. § 1124,* **[*16]** provides in relevant part that "no article of imported merchandise...which shall copy or simulate a trademark registered in accordance with the provisions of this chapter...shall be admitted entry at any customhouse of the United States." The Second Circuit has explained that

---

[9]  During oral argument before this Court on July 21, 2005, plaintiff's counsel stated that plaintiff intends to dismiss the remaining claims against defendant Snyder if plaintiff's motion for partial summary judgment on the claims which are the subject of this motion is granted.

*15 U.S.C. § 1124* "applies only to merchandise bearing counterfeit or spurious trademarks that copy or simulate genuine trademarks." *Olympus Corp. v. U.S.,* 792 F.2d 315, 322 (2d.Cir. 1986), *cert. denied, 486 U.S. 1042, 108 S. Ct. 2033, 100 L. Ed. 2d 618 (1988); Disenos Articos E Industriales, S.A. v. Work,* 676 F.Supp. 1254, 1271 (E.D.N.Y. 1987). In this case, it has not been disputed that defendant Snyder, together with others, imported at least five separate shipments of cigarettes from China bearing counterfeit Marlboro marks. [10] Accordingly, plaintiff has established defendant Snyder's liability under *Section 42* of the Lanham Act. [11]

Injunctive Relief

Plaintiff seeks to permanently enjoin defendant Snyder from future trademark infringement. [12] Section 34(a) of the Lanham Act provides courts with the "power to grant injunctions according to the principles of equity and upon such terms as the Court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." *15 U.S.C. § 1116(a).* To obtain a permanent injunction, plaintiff must demonstrate (1) actual success on the merits and (2) irreparable harm. *See e.g., Gucci America, Inc.,* 286 F.Supp.2d at 290; *Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 148, n.13 (S.D.N.Y. 1990). [*18] As previously discussed, plaintiff has established success on the merits on its Lanham Act claims. Moreover, in this Circuit, "proof of a likelihood of confusion establishes both likelihood of success on the merits and irreparable harm." *Brennan's Inc. v. Brennan's Rest.,* 360 F.3d 125, 129 (2d Cir.2004); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997). Accordingly, plaintiff is entitled to a permanent injunction enjoining defendant Snyder from further infringement of plaintiff's trademarks. *See e.g., Phillip Morris v. Felizardo,* 2004 U.S. Dist. LEXIS 11154, 2004 WL at *7; *Gucci America, Inc.,* 286 F.Supp.2d at 290.

[*19] Damages

Plaintiff seeks statutory damages rather than actual damages for defendant Snyder's infringement. Plaintiff argues that it is entitled to recover $ 4 million in statutory damages based on defendant Snyder's willful use of

counterfeit versions of four registered Marlboro Marks. Section 35(c) of the Lanham Act provides that:

> in a case involving the use of a counterfeit mark. . .in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits. . ., an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services. . .

*15 U.S.C. § 1117(c).* Congress added the statutory damages provision of the Lanham Act in 1995 because "counterfeiters' records are frequently nonexistent. . .making proving actual damages in these cases extremely difficult, if not impossible." *See Gucci America, Inc.,* 315 F. Supp. 2d 511, at 520. A plaintiff may recover "not less than $ 500 or more than $ 100,000 per counterfeit mark [*20] per type of goods or services sold. . ." *15 U.S.C. § 1117 (c)(1).* If the Court finds that "the use of the counterfeit mark was willful," then the plaintiff may recover "not more than $ 1,000,000 per counterfeit mark. . ." *Id.* at 1117(c)(2). "The standard for willfulness is whether the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility." *Kepner-Tregoe, Inc. v. Vroom,* 186 F.3d 283, 289 (2d Cir. 1999).

District courts have wide discretion in awarding statutory damages. *See Cable/Home Communication Corp. v. Network Prod., Inc.,* 902 F.2d 829, 852 (11th Cir.1990). Although *Section 1117(c)* "does not provide guidelines for courts to use" in determining an appropriate statutory damage award, "many courts have found guidance in the caselaw of an analogous provision of the Copyright Act, *17 U.S.C. § 504(c),* which also provides for statutory damages for willful infringement." *Gucci America,* 315 F.Supp.2d at 520; *Sara Lee Corp. v. Bags of New York, Inc.,* 36 F.Supp.2d 161, 165-67 (S.D.N.Y. 1999); *Rodgers v. Anderson,* 2005 U.S. Dist. LEXIS 7054, 2005 WL 950021, [*21] at *2 (S.D.N.Y. 2005). Using Copy-

---

[10] I should note that in this case, defendant Snyder has not argued nor do plaintiff's submissions indicate that the cigarettes imported by defendant Snyder and his co-conspirators were genuine Marlboro cigarettes bearing a genuine trademark. The importation of genuine goods, unlike counterfeit goods, is not actionable under the Lanham Act. *Olympus Corp.,* 792 F.2d at 321-22.

[11] While plaintiff moves for summary judgment on this claim, plaintiff does not brief this issue in its supporting memorandum, apart from stating that "the same facts that support Phillip Morris USA's First and Second Claims also establish Plaintiff's Fifth claim for violation of *Section 42* of the Lanham Act, *15 U.S.C. § 1124.*" (Pl. Summary Judgment Memo at 1).

[12] Specifically, plaintiff seeks to permanently enjoin defendant Snyder from the following: (1) importing, distributing, purchasing, selling, offering for sale, or otherwise using in commerce any counterfeit Philip Morris USA branded cigarettes; (2) aiding or abetting others in the importation, distribution, purchase, sale, or offering for sale or other use in commerce of any Philip Morris USA branded cigarettes; and (3) engaging in any other activity constituting infringement of Phillip Morris USA's rights in any Phillip Morris USA trademarks, including without limitation the Marlboro Marks. (*See* Pl. Summary Judgment Memo at 12).

right Act caselaw as a guide, courts have considered the following factors in setting statutory damage awards under the Lanham Act: defendant's profits from infringement, the defendant's wilfulness, the size of defendant's counterfeiting operation, defendant's efforts to mislead and conceal, "the deterrent effect on others besides the defendant. . . and the potential for discouraging the defendant." *Sara Lee Corp., 36 F.Supp.2d at 166.*

In this case, I find that defendant Snyder's conduct was willful. Defendant Snyder recently pled guilty to knowingly and intentionally conspiring to traffic counterfeit cigarettes. (Johnson Decl. Ex. D). Moreover, defendant's counterfeiting operating was large, involving at least 200,000 cartons and millions of cigarettes. (Johnson Decl. Ex. B, Criminal Compl. at 3). The government, using a conservative retail price of $ 23.50 per carton, estimated the total value of the five infringing shipments to be $ 4,773,790. (Johnson Decl. Ex. I at 7). Given the evidence of willfulness, demonstrated by defendant Snyder's own admissions, the size of the potential profit, the large quantities of cigarettes involved, **[*22]** and the need for a substantial deterrent to future misconduct by Snyder and other similarly situated counterfeit cigarette traffickers, I find that the maximum statutory award is warranted. *See e.g. Philip Morris USA, Inc. v. Castworld Products, Inc., 219 F.R.D. 494, 501-02 (C.D.Cal. 2003)* (awarding maximum statutory award of $ 2 million for the infringement of two trademarks where the defendant "imported 8,000,000 counterfeit cigarettes, having a street value of millions of dollars."); *Phillip Morris USA, Inc. v. David Banh, et.al., 2005 U.S. Dist. LEXIS 43113, CV-03-4043 (GAF) (C.D.Cal. 2005)* (awarding maximum statutory award); *Philip Morris United States v. Sheng Chen Lin & Does One ex rel. Ten, 2004 U.S. Dist. LEXIS 29904, CV-03-08923 (CAS) (C.D.Cal. 2004)* (same); *Gucci America, Inc., 315 F.Supp.2d at 520-21* (awarding $ 2 million in statutory damages for use of two counterfeit marks). The counterfeit cigarettes imported and sold by defendant Snyder and his co-conspirators infringed upon four of plaintiff's

registered and valid trademarks: the Marlboro(R) brand trademark (i.e. the word "Marlboro"), the Marlboro Roof Design Label(R) mark (i.e. the red and gold pentagonal label), the Marlboro Lights(R) brand trademark (i. **[*23]** e. the phrase "Marlboro Lights"), and the Marlboro Lights Roof Design Label(R) mark (i.e. the gold pentagonal label). (*See* Supplemental Decl. of Samuel Barkin PP3-4; Newman Aff. Ex. 1). [13] Accordingly, plaintiff is entitled to a maximum statutory award of $ 4,000,000.

## **[*24] Motion for Default Judgment, Damages and Injunctive Relief**

### Default Judgment

Plaintiff also moves for an entry of default judgment against defendants Berardelli, Deland, Farnham, Kennedy, and Doctor pursuant to *Fed. R. Civ. P. 55(b)*. Pursuant to *Fed. R. Civ. P. 55(b)*, a Court may enter a default judgment against a party who "has failed to plead or otherwise defend" an action, and this constitutes a final judgment in the action. [14] *Id. at 325.* The Second Circuit has noted that default judgments are "left to the sound discretion of the district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties." *Enron Oil, 10 F.3d at 95.* An entry of default judgment should be made only where there was willful default, involving more than a failure to answer as a result of negligence or carelessness. *See SEC v. McNulty, 137 F.3d 732, 738 (2d Cir.1998).*

**[*25]** In this case, defendants Berardelli, Deland, Farnham, Kennedy, and Doctor have failed to file an answer or otherwise respond to the complaint, which was filed by plaintiff in March 2003, or to respond to plaintiff's application for default judgment. [15] Having failed to provide any explanation for their failure to defend, I find that these defendants have defaulted willfully. *See Cablevision Sys. N.Y. City Corp. v. Leath, 2002 U.S. Dist. LEXIS 13768, 2002 WL 1751343, at *2 (S.D.N.Y. 2002)* (default willful where defendant never responded

---

[13] Plaintiff's original submissions did not provide sufficient evidence of the number of counterfeit marks used by defendant Snyder and his co-conspirators. During oral argument held on July 21, 2005, the Court advised plaintiff to provide additional evidence on the issue. Plaintiff subsequently provided an affidavit from Assistant United States Attorney Debra D. Newman, the attorney assigned to the criminal proceedings against defendant Snyder and his co-conspirators, dated August 2, 2005 ("Newman Aff."), accompanied by two sample counterfeit cigarette packs that were seized by customs officials. The sample packs were packaged to look like genuine Marlboro and Marlboro Lights cigarette packs, and contain counterfeit versions of the four trademarks discussed above. (Newman Aff. Ex. 1).

[14] *Fed. R. Civ. P. 55(a)* provides that a "clerk may enter a default upon being advised by affidavit or otherwise that a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." *Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993).* Unlike a court's entry of default judgment pursuant to *Fed. R. Civ. P. 55(b)*, a clerk's "default notation is an interlocutory action; it is not itself a [final] judgment." *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 335 (2d Cir. 1986).*

[15] In a letter to the Court, plaintiff's attorney Samuel Barkin stated that he had "received a request from defaulting defendant Timothy Farnham for a 3 week extension of time to respond to Phillip Morris's default judgment against him." As a result of that letter, oral argument on this motion was continued from June 6 to July 21, 2005. However, since that last communication, Farham has not filed any response to the default judgment motion.

to the complaint, appeared, or explained default). Plaintiff has documented service of its complaint and of its motion papers. There is no indication that requiring plaintiff to take further steps prior to a determination on the merits would be effective in eliciting a response. *See id.* Accordingly, an entry of default judgment is appropriate.

**[*26]** Damages and Injunctive Relief

"While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *See Greyhound Exhibitgroup v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir.1992), cert. denied, 113 S.Ct. 1049, 506 U.S. 1080, 122 L. Ed. 2d 357 (1993). A plaintiff must substantiate a claim with evidence to prove the extent of damages. Although an evidentiary hearing may be held, "it is not necessary for the district court to hold a hearing, as long as …there was a basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir. 1997); *Tamarin v. Adam Caterers, Inc.,* 13 F.3d 51, 54 (2d Cir.1993) (district judges are given much discretion to determine whether an inquest need be held).

In this case, plaintiff seeks a permanent injunction against all defaulting defendants enjoining them from future distribution and sale of counterfeit Marlboro brand cigarettes. As previously discussed, Section 34(a) of the Lanham Act gives courts the "power to grant injunctions…to prevent **[*27]** the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." *15 U.S.C. § 1116(a).* Given the risk of irreparable harm caused by default defendants' continued sale of counterfeit Marlboro brand cigarettes, I find that permanent injunctive relief is warranted. *See Philip Morris, USA v. Castworld Products, Inc.,* 219 F.R.D. 494, 502 (C.D.Cal.2003) ("failure to grant injunction would needlessly expose Plaintiff to the risk of continuing irreparable harm").

Plaintiff also seeks statutory damages against three of the defaulting defendants, Berardelli, Deland and Farnham, [16] jointly and severally, in the amount of $ 4 million, based on their willful use of counterfeit versions of four Marlboro Marks. (*See* Pl. Default Judgment Memo at 2, 9). Plaintiff submits evidence that these defendants, along with defendant Snyder and others, imported counterfeit cigarettes that infringed upon four registered Marlboro Marks: the Marlboro(R) brand trademark (i.e. the word "Marlboro"), the Marlboro Roof Design Label(R) mark (i.e. the red and gold pentagonal label), the Marlboro Lights(R) brand trademark (i.e. the phrase **[*28]** "Marlboro Lights"), and the Marlboro Lights Roof Design Label(R) mark (i.e. the gold pentagonal la-

bel). (*See* Supplemental Decl. of Samuel Barkin PP3-4; Newman Aff. Ex. 1). As previously discussed, under *15 U.S.C. § 1117(c)* a plaintiff may elect to pursue statutory rather than actual damages. "Several courts have found statutory damages especially appropriate in default judgment cases due to infringer nondisclosure." *PetMed Express, Inc. V. MedPets.Com, Inc.,* 336 F.Supp.2d 1213, 1219 (S.D.Fla. 2004) (citing *Sara Lee Corp.,* 36 F.Supp.2d at 165). Here, given the willfulness of Berardelli, Deland and Farnham who each pled guilty to knowingly trafficking counterfeit cigarettes, the size of the potential profit given the large quantities of cigarettes involved, and the need for a substantial deterrent to future misconduct by defendants and other counterfeit cigarette traffickers, I find that plaintiff is entitled to the maximum statutory award under *15 U.S.C. § 1117(c)(2)*--$ 4,000,000 or $ 1,000,000 per counterfeit mark. *See e.g. Philip Morris USA, Inc. v. Castworld Products, Inc.,* 219 F.R.D. at 501-02 (C.D.Cal. 2003) **[*29]** (awarding maximum statutory award of $ 2 million for the infringement of two trademarks where the defendant "imported 8,000,000 counterfeit cigarettes, having a street value of millions of dollars"); *Phillip Morris USA, Inc. v. Glenda Patton,* CV-03-2569 (GAF) (C.D.Cal.2003) (granting default judgment and awarding plaintiff maximum statutory damages in the amount of $ 4 million).

**CONCLUSION**

For the reasons set forth above, (1) plaintiff's motion for partial summary judgment against defendant Snyder on Claims 1, 2, 5, and 7 alleged in the complaint is granted; (2) plaintiff's motion for an entry of default judgment against defendants Berardelli, Deland, Farnham, Kennedy, and Doctor pursuant to *Fed. R. Civ. P. 55(b)* is granted; (3) defendants Snyder, Berardelli, Deland, Farnham, Kennedy, **[*30]** and Doctor are permanently enjoined from future infringement of plaintiff's trademarks; and (4) plaintiff is awarded $ 4 million in statutory damages, for which defendants Snyder, Berardelli, Deland, and Farnham are liable, jointly and severally.

Plaintiff is directed to settle a final judgment on notice in accordance with this opinion and its undertaking to discontinue claims not made the subject of the motion. The Clerk is directed to furnish a filed copy of the within to all parties and to the Magistrate.

SO ORDERED.

Dated: Brooklyn, New York

August 26, 2005

By: /s/ Charles P. Sifton (electronically signed)

United States District Judge

---

[16]   Plaintiff does not seek any damages against defendants Doctor and Kennedy, the two defendants who were not criminally prosecuted. (*See* Pl. Default Judgment Memo at 10, n.8).